United States District Court
District of Connecticut
FILED AT      NEW HAVEN

March 23,      20 04
Kevin F. Rowe, Clerk

By P. A. Villano
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA, ex rel        :        Civil Action
and ROBERT C. SMITH, M.D.               :        No. 3:00CV01359 (PCD)
                    PLAINTIFFS          :        False Claims Act
                                        :        Action Pursuant to
                                        :        31 U.S.C. § 3730
                                        :
        V.                              :
                                        :
                                        :
YALE UNIVERSITY and                     :
    YALE-NEW HAVEN HOSPITAL, INC.       :
                    DEFENDANTS          :        January 23, 2004

## SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

1.    This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements and claims made by the Defendants, in violation of the federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended ("FCA"). As alleged herein, Defendants violated the FCA, *inter alia,* by billing and retaining payments from the Medicare and Medicaid Programs for Radiological Services which were (1) worthless and not used for patient diagnosis or treatment, (2) not medically indicated and medically unnecessary, (3) substandard, and/or (4) never actually provided.

2.    In pursuit of billing for these Radiological Services, Defendants falsified and altered patient records, submitted bills which they knew were in violation of Medicare and Medicaid billing requirements and falsely certified conformity with regulations and applicable

minimum standards of patient care. Defendants' use of these schemes to bill Medicare and Medicaid unallowable fees for Radiological Services violates applicable Medicare and Medicaid Program requirements and subjects them to liability for penalties and damages under the FCA.

3.    Based on these provisions, the Qui Tam Plaintiff-Relator, Robert C. Smith, M.D., is seeking, through this action, to recover damages and civil penalties arising from claims for payment submitted to the United States Government and the State of Connecticut through the Medicare and Medicaid Programs. Relator Smith estimates that the amount of such damages and civil penalties that may be assessed against the Defendants, under the facts as alleged in this Complaint, exceeds tens of Millions of dollars.

4.    Relator Smith also alleges herein that he was harassed and discriminated against by Defendants Yale University and Yale-New Haven Hospital after he began investigating and reporting the policies and procedures implemented by the Defendants which were resulting in the following: Medicare and Medicaid Program violations; improper, substandard and/or inadequate patient care; improper diversion of hospital patients to a private entity ("Temple Radiology") separate from Yale-New Haven Hospital and Yale University but owned and operated by the parent corporation of Yale-New Haven Hospital; improper kickback payments by Yale-New Haven Hospital and Yale University to the Department of Radiology; medical errors; violations of Yale University's Faculty Practice Standards; and the impairment of the Graduate Medical Education ("GME") Residency Program at Defendant Yale-New Haven Hospital. In addition to pursuing this suit, Relator Smith has reported the frauds alleged herein to the (then) Chairman of Yale University's Department of Radiology and (then) Chairman of the Yale-New Haven

2

Hospital's Diagnostic Imaging Department, Bruce McClennan, M.D.; Dr. McClennan's superior,

David Kessler, M.D., (former) Dean of Yale University's School of Medicine; Yale University's

President, Richard Levin, Ph.D.; Yale University's Associate Dean of Clinical Affairs, David

Leffell; Yale University's Deputy Provost, Stephanie Spangler; Yale University's

Ombudsperson, Merle Waxman, M.D.; Yale University's School of Medicine's Chief Operating

Officer, Irwin Birnbaum; Yale University's Vice President and General Counsel Dorothy

Robinson, Esq.; the Special Advisor to the Dean, Larry Cohen; three Vice Chairs of Yale

University's Radiology Department: Howard Forman, M.D., Vice Chair of Finance and

Administration; James Brink, M.D., Vice Chair of Clinical Affairs (now Chairman); and Shirley

McCarthy, M.D., (then) Vice Chair of Academic Affairs; Yale University's Department of

Diagnostic Radiology's Associate Business Manager, Felicia Tencza; Yale University's

Department of Diagnostic Radiology's Business Manager, Alan Scheps; Yale University's

additional counsel, David King, Esq. of Hogan and Harstson; Associate DeanCarolyn Slayman,

M.D. and (then) Associate Dean Morton Glickman, M.D.; the Manager for the Yale-New Haven

Hospital Department of Diagnostic Imaging, Steven Bencivengo; Assistant Manager for the

Yale-New Haven Hospital Department of Diagnostic Imaging, James Amato; Assistant Manager

for the Yale-New Haven Hospital Department of Diagnostic Imaging and the Radiology Film

Library, transcription and other radiology support services, Sally Howell; Nursing Manager for

Yale-New Haven Hospital's Department of Diagnostic Imaging, Francine LoRusso; Assistant

Manager, Yale-New Haven Hospital's Department of Diagnostic Imaging, Bill Brown; Yale's

Consultants, Nicholas Bryan, M.D. and Lawrence Staab, M.D., and the Director of Legal Affairs

and Risk Management at Yale-New Haven Hospital, Sara Cohn, Esq. These individuals have all

failed to take action to remedy the violations. Rather, Relator Smith asserts, the Defendants have

3

taken adverse employment action against him in reprisal for investigating and reporting the

violations of the False Claims Act. Relator Smith further asserts that the Defendants have taken

adverse employment action against Drs. Morton Burrell and Arthur Rosenfield in reprisal for

their actions in furtherance of these claims.

## II.    JURISDICTION AND VENUE

5.    This is a civil action arising under the laws of the United States to redress

violations of the federal False Claims Act. This Court has jurisdiction pursuant to 28 U.S.C. § §

1331, 1345 and 31 U.S.C. § 3732.

6.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because the

Defendants transact or have transacted business in this judicial district in New Haven,

Connecticut and the acts and violations herein complained of took place in this District.

## III.    PARTIES TO THE ACTION

7.    Relator Robert C. Smith, M.D., is a citizen of the United States, a medical doctor

licensed to practice medicine in the States of Connecticut and New York and a resident of the

State of New York.  Relator Smith brings this action for violations of the federal False Claims

Act on behalf of himself and the United States Government pursuant to 31 U.S.C. § 3730(b)(1).

Relator Smith was until recently a physician practicing in New York State and a Professor and

Associate Chair of Information Technology and Systems Administration, Department of

Radiology, Cornell University Medical College, New York Presbyterian Hospital.  Relator Smith

was formerly employed by Yale University commencing on July 1, 1990, for nine years until he

was forced out on June 30, 1999, for his actions in investigating and reporting the frauds alleged herein.  He was appointed as an Instructor in 1990; Assistant Professor in July 1991; and Associate Professor in July 1996.  Since 1992, Smith held a variety of administrative positions at Yale University's School of Medicine including:  Director of the Abdominal Imaging Fellowship Program (7/92-9/97); Acting Chief of Magnetic Resonance Imaging (5/94-9/94); Acting Chief of Computerized Tomography (4/96-8/96); and Chief of Magnetic Resonance Imaging (9/96-9/97).  Most recently, Relator Smith held the positions of Associate Professor, Department of Diagnostic Imaging and Chief, Section of MRI, Department of Diagnostic Imaging at Yale University's School of Medicine; and Director, Magnetic Resonance Imaging Center and attending staff physician at Yale-New Haven Hospital.  Relator Smith's duties at Yale University required him to provide Radiology Services to patients of Yale-New Haven Hospital, including but not limited to Medicare and Medicaid beneficiaries, and to teach, train and supervise Radiology Residents and Fellows who were participants in the Hospital's GME Residency Program as well as technical staff employed by Yale-New Haven Hospital.  Relator Smith has direct and independent knowledge of the allegations in the Complaint and has provided this information to the United States government before bringing this suit.


8.      Defendant Yale University ("Yale") is a corporation organized and existing under the laws of the State of Connecticut, authorized to do business, and so doing business, with its principal place of business in New Haven, Connecticut.  Yale operates a medical school, the School of Medicine.  Yale's faculty members at the School of Medicine are responsible for providing both professional services to patients of Yale-New Haven hospital as well as administration, supervision and teaching services to Residents and Fellows, technical support

5

staff and the clinical service departments at Yale-New Haven Hospital. Yale's School of Medicine's faculty members are "providers of services" participating in the Medicare and Medicaid Programs within the meaning of 42 U.S.C. § 1395x(u). Yale is remunerated for professional services to Medicare and Medicaid patients by Medicare's intermediaries and by Connecticut Department of Social Services, respectively. Yale is remunerated for administrative, supervision and teaching services, at least in part, by Yale-New Haven Hospital through the monies the Hospital receives from the Medicare Program as a Teaching Hospital operating a Graduate Medical Education ("GME") Residency Program. Yale also receives monies from the Hospital which supplement the Medicare Program payments for administration, supervision and teaching services. Yale also receives money from the Yale-New Haven Hospital to support salaries of Yale Radiology Department Faculty who provide Radiology Services in the YNHH Emergency Department, as well as money to compensate Yale for revenues it may have lost by virtue of radiology patient volume being shifted to Temple Radiology, an outpatient radiology clinic owned and operated by the Hospital's for-profit affiliate, Yale-New Haven Health Ambulatory Services Corporation ("YNHHASC"). YNHHACS is a subsidiary of Yale-New Haven Health Services Corporation. The Yale Faculty Practice represents the clinical activity of the Faculty at the Yale School of Medicine. The Faculty Group is affiliated with Yale-New Haven Hospital.

9. Defendant Yale-New Haven Hospital, Inc. ("YNHH") is a not-for-profit, tax exempt, non-stock corporation that is a licensed general hospital. It is a corporation organized and existing under the laws of the State of Connecticut, authorized to do business, and so doing business, with its principal place of business in New Haven, Connecticut. At all times pertaining

hereto, YNHH was, and is now, a "provider of services" participating in the Medicare and

Medicaid Programs within the meaning of 42 U.S.C. § 1395x(u). YNHH operates a GME

Residency Program, which is paid for, at least in part, by the Medicare Program. Residents and

Fellows who participate in the YNHH GME Residency Program are trained by faculty members

of Yale's School of Medicine ("Teaching Physicians") and attending physicians at the Hospital.

YNHH is affiliated with Defendant Yale pursuant to the terms of an affiliation agreement which

became effective in 1965, as subsequently amended (the "Affiliation Agreement"). YNHH is a

wholly owned subsidiary of Yale-New Haven Health Services Corporation ("YNHHSC").

YNHH is the sole member of YNHHSC. The Board of Trustees of YNHH, appointed by

YNHHSC, controls the operations of YNHH. The President and CEO of YNHH is also the

President and CEO of YNHHSC. The President and CEO of YNHH is a member of the Board

of Trustees of YNHH.

IV.    **DEFINITIONS**

10.    <u>Radiological or Radiology Services</u>. The terms "Radiological Services" or

"Radiology Services" mean services in which X-rays or other forms of radiant energy (e.g.,

magnetic resonance imaging and ultrasound or rays from radioactive substances) are utilized for

diagnostic or therapeutic purposes, whether furnished on an inpatient or outpatient basis and

which otherwise comply with the definition of "Radiological Services" contained in the

Medicare Carriers Manual § 256. Radiological Services are comprised of a "Technical

Component," involving the taking of a Radiological Study (or test), and a "Professional

Component," involving the interpretation (or reading) of the study by a Qualified Physician.

Without the Professional Component, the Technical Component alone provides neither

diagnostic information nor therapeutic benefit. Radiology Studies taken without diagnostic or

therapeutic purpose could be considered harmful because the patient receives potentially

dangerous ionizing radiation without a corresponding benefit.


      11.    <u>Radiological or Radiology Studies</u>. The term "Radiological Studies" or

"Radiology Studies" means the actual radiology test or procedure for an individual patient

performed at YNHH.


      12.    <u>Technical Component</u>. The "Technical Component" of Radiological Services is

the actual taking of the Radiology Studies or performance of the tests and the reduction of the

hard data results onto a film or other storage media.  It represents the facility portion of the

service, e.g., the portion of the service performed by the owner of the equipment.  This includes

the technologist, specific radiology equipment, film and film processing, and any facility

overhead in providing the service.  The Technical Component is covered under Medicare Part A

for inpatient services and hospital-based services, under Medicare Part B for outpatient services

and under the Medicaid Program.


      13.    <u>Professional Component</u>.  This designation identifies the part of the total

Radiological Services provided by a Qualified Radiologist.  The "Professional Component" is

made up of the interpretive skills a Qualified Radiologist uses in interpreting a Radiology Study

or test. The "Professional (diagnostic or therapeutic) Component" of the Radiological Services,

are services which go hand-in-hand with the Technical Component requested by the patient's

physician in order to obtain "Radiological Services." The Professional Component is usually

covered under Medicare Part B and under the Medicaid Program.

14.     <u>Qualified Radiologist</u>.  The term "Qualified Radiologist" means a radiologist who

possesses the requisite professional training and skills to furnish the Professional Component,

who is duly approved and credentialed by Yale and YNHH to interpret Radiological Studies and

to finalize dictated reports of those Studies and who is authorized, according to Medicare and

Medicaid billing requirements, to execute Radiological Studies so that the Professional

Component may be billed.  In the event that a Radiology Study is interpreted and/or dictated by a

Resident, Fellow or anyone other than a Qualified Radiologist, a Qualified Radiologist must

review and sign the Study in accordance with the applicable rules and regulations governing

physicians at Teaching Hospitals.  Otherwise that study may not be billed.

15.     <u>Responsible Radiologist</u>.  The term "Responsible Radiologist" means the

Teaching Physician or Qualified Radiologist of record noted on each patient's radiological report

as having reviewed and interpreted the patient's Radiological Study and edited, reviewed and

approved the final report of the Study.

16.     <u>Teaching Physician</u>.  The term "Teaching Physician" means a physician (other

than another Resident or Fellow) who involves Residents and Fellows in the care of patients at

YNHH and its affiliates.  *See* Medicare Part B Answer Book, <u>Definitions</u>, § 15016, p. 22107.

Teaching Physicians in the YNHH GME Residency Program include the faculty members of

Yale's Radiology Department.  These Teaching Physicians are paid by the Medicare Program

through YNHH for administrative, supervision and teaching services provided to the YNHH Residents and Fellows.

17.    <u>Full-time Yale Radiology Faculty</u>.  The term "Full-time Yale Radiology Faculty" means those faculty members that hold non-clinical appointments at Yale's School of Medicine (e.g., Assistant Professor, Associate Professor and Professor) and their salaries are paid by Yale. The Medicare provider number of Full-time Radiology Faculty is assigned exclusively to Yale for billing purposes.

18.    <u>Clinical Yale Radiology Faculty</u>.  The term "Clinical Yale Radiology Faculty" means those faculty members that hold clinical appointments at Yale's School of Medicine (e.g., Clinical Assistant Professor, Clinical Associate Professor and Clinical Professor) and who receive no salary from Yale.  The Clinical Faculty are typically physicians who maintain a private practice in the community, as well as former Residents and Fellows, who wish to maintain an academic affiliation.  Pursuant to regulations effective January, 1998, Clinical Faculty Members were no longer allowed to reassign their Medicare provider numbers to Yale, thus making it improper for Yale to bill for studies read only by Clinical Faculty.

19.    <u>DecRad System</u>.  The "DecRad System" (produced by IDX Corporation), also known as the "IDXRad System," is the Radiology information application for the Computerized Information ("CI") System which supports Yale's and YNHH's Radiology departmental functions.  It provides the vehicle to register and order Radiology Studies via direct entry, track patient status and history, and control film management.  This system initiates results and it

archives radiology reporting dating back to 1985. It also provides the appropriate tool for bar code processing, document writing sign-off monitoring, and user defined report writing. This application is linked directly between the YNHH and Yale's School of Medicine's Radiology Department to permit a seamless patient record documentation, reporting and billing system. The DecRad System is utilized by YNHH, Yale and YNHHASC. It receives automated data transfer ("ADT") information and patient orders from the YNHH CI System and returns results of those orders back for presentation to clinicians.

     a.      When a patient is scheduled for a Radiology Study, the study is listed in the DecRad System as "S" (Scheduled) status.

     b.      Once the Study is completed by a radiology technologist, the exam status is changed to "C" (Completed) status. Until the Study is read by a Resident, Fellow or Qualified Radiologist and a report is dictated and entered into the DecRad system, the examination will remain in "C" status. Any Radiology Study in "C" status will have no report associated with it.

     c.      When a report is dictated and placed into the DecRad system, the exam status is changed to "P" (Preliminary Report).

     d.      Reports of Studies interpreted and dictated by a Qualified Radiologist become final after the radiologist has reviewed, edited and approved the transcribed report and certified it with his or her electronic signature. Reports of Studies dictated by a Resident or Fellow must be reviewed, edited and/or approved by the Teaching Physician. 42 C.F.R. § 482.26; 42 C.F.R. § 415.55; 42 C.F.R. § 415.180. Adherence to these requirements was a condition of employment at the Yale School of Medicine. After review, the Teaching Physician finalizes the report using his or her electronic signature to sign its certification. Upon finalization the indicated report status is changed to "F" (Finalized). Whether the study is interpreted initially by a Qualified

Radiologist, Resident, Fellow or Clinical Physician, proper finalization and certification of the report is required for the Professional Component of Radiology Services to be billed to the Medicare and Medicaid Programs under applicable billing regulations.

20.    <u>Autosign</u>.  "Autosign" is the generic name created by Yale and YNHH to reflect a fictitious qualified "Responsible Radiologist" of record for purposes of finalizing radiology reports which were dictated by YNHH's radiology Residents and Fellows but never reviewed, approved or edited, and certified by the Residents' or Fellows' Teaching Physician as required pursuant to the laws governing billing for services provided by physicians at Teaching Hospitals. 42 C.F.R. 415.172; 60 Fed. Reg. 63124 (December 8, 1995).  "Autosign" was also created to finalize preliminary reports which were dictated by Qualified Radiologists but never reviewed, edited or approved, and certified by them prior to finalization.  In addition to these two uses, upon information and belief, Autosign has also been used to move Radiology Studies from "C" status, which have never been interpreted, to "F" status, indicating that the Studies have been interpreted and certified

## V.    <u>MEDICARE AND MEDICAID RULES GOVERNING THE REIMBURSEMENT OF HOSPITAL-BASED RADIOLOGY SERVICES</u>

21.    The Secretary of the United States Department of Health and Human Services ("Secretary" and "HHS") is responsible for, *inter alia*, implementing the provisions of Title XVIII of the Social Security Act (the "Medicare Program"), as amended, 42 U.S.C. § 1395 *et seq.* (the "Medicare Act").  The Secretary administers the Medicare Program through the Center for Medicare and Medicaid Services ("CMS"), a component Administration of HHS.  In turn, the

Secretary and CMS contract with private organizations (intermediaries and carriers) to determine

the amounts payable to providers for covered services furnished to Medicare and Medicaid

beneficiaries and to make payment. The intermediaries and carriers are required by their

contract to give effect to law, regulations and rulings, as well as general instructions issued by

CMS and found in Manuals and intermediary letters, when determining whether and how much

payment is to be made to providers for services furnished to Medicare and Medicaid

beneficiaries.

22.    Congress enacted the Medicaid Program in 1965 to provide a comprehensive

range of medical services to both the disabled and the poor. Medicaid is financed by federal and

state funds. In Connecticut, the State Department of Social Services ("DSS") administers the

Medicaid Program.

### A.    Framework for Payments by Medicare and Medicaid

23.    Part A of the Medicare Program provides generally for the payment of hospital

services furnished to inpatients and outpatients. Part B of the Medicare Program pays for various

health services not covered by Part A including physician, as well as other professional and

hospital outpatient services.

24.    To participate in the Medicare Program, hospitals enter into "provider

agreements" with the HHS Secretary. *See* 42 U.S.C. § 1395cc. The Medicare Program pays the

hospital directly for covered inpatient and outpatient services provided to Medicare beneficiaries

except for any deductible or coinsurance, which are collected from the beneficiaries. *Id*.

25.    In their capacity as Medicare providers, hospitals are paid for all inpatient and outpatient hospital services they provide to Medicare beneficiaries unless such services are specifically excluded from coverage under Section 1862 of the Social Security Act (42 U.S.C. § 1395y). Inpatient hospital services are defined in the Act as including: "(1) bed and board; (2) such nursing services and other related services, such use of hospital facilities, and such medical social services as are ordinarily furnished by the hospital for the care and treatment of inpatients, and such drugs, biologicals, supplies, appliances, and equipment, for use in the hospital, as are ordinarily furnished by such hospital for the care and treatment of inpatients; and (3) such other diagnostic or therapeutic items or services, furnished by the hospital or by others under arrangements with them made by the hospital, as are ordinarily furnished to inpatients either by such hospital or by others under such arrangements. . . ." 42 U.S.C. § 1395x(b). One of the exclusions from coverage is for items and services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. §1395i(a)(1)(A); 42 U.S.C. § 1395y(a)(1).

26.    Section 1871(a)(1) of the Medicare Act (42 U.S.C. § 1395hh) requires the HHS Secretary to prescribe such regulations as may be necessary to administer the Medicare Program. 42 C.F.R. 415.102 and 415.120 set forth the regulations applicable to the payment of Radiological Services by the Medicare Program. 42 C.F. R. 415.172, 60 Fed. Reg. 63124 (December 8, 1995) sets forth the rules governing Teaching Physicians services. 42 C.F.R. 405.350 *et seq.* sets forth the rules governing the liability for payments to providers or suppliers and handling of incorrect payments, including overpayments.

27.    The Medicare and Medicaid Programs pay for the performance of Radiology Studies furnished in hospitals only if the test is medically necessary and utilized for diagnostic or therapeutic purposes in connection with health care services provided to Medicare and Medicaid beneficiaries. The Medicare and Medicaid Programs only pay for expenses incurred for items and services which are reasonable and necessary for the diagnosis and treatment of illness or injury. *See* 42 U.S.C. § 1395y(a)(1); 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 485550 (October 1, 1981); Regulations of Connecticut State Agencies ("R.C.S.A.") § 17b-102-01 to 17b-102-04. Connecticut General Statutes ("Gen. Stat.") §53a-290. Participating providers are required to ensure that any services rendered to Medicare recipients are supported by sufficient evidence of medical necessity. 42 U.S.C. §1320c-5(a)(1). Standing orders or panels of Radiology Studies or tests are usually not acceptable documentation that tests are reasonable and necessary. *See* OIG's Compliance Program Guidance for Clinical Laboratories, August, 1998.

28.    At all times relevant hereto, the Secretary's regulations provided: "The following services are excluded from coverage. . . (k) Any services that are not reasonable and necessary for one of the following purposes: (1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 48550 (October 1, 1981); R.C.S.A. §17b-262-441; *see also* Gen. Stat. §53a-290, also applicable to services provided to Medicaid Program beneficiaries in Connecticut.

29.    When submitting claims for reimbursement to the Medicare or Medicaid Programs the provider is required to furnish a Certificate of Medical Necessity and Program Compliance which certifies: (1) that the services and procedures claimed were medically necessary; (2) that the services claimed were actually provided by the provider making the claim; and (3) that the services and procedures claimed were adequately documented in the patient's medical treatment records.

30.    CMS (formerly HCFA) policy expressly limits payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. *See* Medicare Carriers Manual, Part 3, CMS (formerly HCFA) Pub. 14-3, § 15016C.1; 42 C.F.R. 415.172 *et seq.;* 60 Fed. Reg. 63124 (December 8, 1995); *see also* R.C.S.A. § 17b-262-443; Practice Standards for Yale Faculty Practice 1998, p. 15.

31.    Through the Medicare and Medicaid Programs, the federal and state governments pay for the performance of Radiology Studies furnished by hospitals only if the test is reasonable and medically necessary and utilized for diagnostic or therapeutic purposes in connection with health care services provided to Medicare and Medicaid beneficiaries. 42 U.S.C. § 1395y(a)(1). For Radiological Services, which consist of a Technical Component (the production of the images) and a professional component (the interpretation of the images by a radiologist) provided at Yale New Haven Hospital ("YNHH") emergency room, YNHH is paid a fee for the technical component, *see* 42 C.F.R. 413.122, and the Yale University School of Medicine is paid a fee for the Professional Component, *see* 42 C.F.R. 415.102(a)(2). In the case of a teaching hospital, Medicare will pay for the interpretation of diagnostic Radiology Services only if the

16

interpretation is performed or reviewed by a Qualified Radiologist, e.g., (a) a diagnostic film read and interpreted by a Teaching Physician other than a Resident Physician or a fellow, or (b) a diagnostic film read and interpreted by a Resident or Fellow under the supervision of the a Teaching Physician. If the Resident or Fellow prepares and signs the interpretation, the Teaching Physician must indicate that he or she has personally reviewed the image and the interpretation and either agrees with it or edits the findings. Medicare does not pay for interpretation if the documentation shows simply a countersignature of the Resident's interpretation by the Teaching Physician. See 42 C.F.R. 415-172; 60 Fed. Reg. 63124 (December 8, 1995). Teaching physicians at Yale University School of Medicine are mandated to know and abide by these rules as set forth in Yale's Medical Billing Compliance Manual and Yale's Faculty Practice Standards. To that end, the form submitted for Medicare and Medicaid reimbursement provides the following certification: "*Signature of Physician or Supplier: I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision.*" See CMS (formerly HCFA) Form 1500. The Medicare Carriers Manual provisions and Connecticut Department of Social Services regulations expressly limit payment to services for which there is documentation demonstrating the appropriate level of services required by the patient. See 42 U.S.C. § 1320c-5(a)(1); Medicare Carriers Manual, Part 3; CMS (formerly HCFA) Pub. 14-3, § 15016C.1. Medicare and Medicaid providers are required to make restitution when overpayments are identified. See 42 U.S.C. §1320a-7b(a)(3); Connecticut General Statutes § 53a-290 *et seq.*

17

32.      Medicare and Medicaid providers are required to make restitution to the Medicare and Medicaid Programs when overpayments are identified unless the provider is without fault. *See* 42 U.S.C. § 1320a-7b(a)(3); Medicare Hospital Manual § 485; *see also* 42 C.F.R. 405.350 *et seq.;* 42 C.F.R. § 489.20(b); Medicare Carriers Manual § 7120.2; OIG Compliance Guidelines for Hospitals, 63 Fed. Reg. 8987, 8998 (February 23, 1998); Gen. Stat. § 53a-290 *et seq.*

### B.      Payments for the Technical Component of Radiological Services

33.      For Radiological Services provided at YNHH (whether inpatient or outpatient), YNHH gets paid the Technical Component and Yale is paid only for the Professional Component.   The Medicare Program, through the Medicare Part A fiscal intermediary, reimburses YNHH for the Technical Component of Radiological Services provided for inpatients according to the appropriate diagnosis-related group (DRG).  A blended payment method is used to reimburse YNHH for the Technical Component of outpatient Radiological Services, including those provided to patients evaluated in the YNHH Emergency Department and served through YNHHASC.  *See* 42 C.F.R. 413.122; Medicare Carriers Manual § 255 *et seq.*

34.      If the Technical Component is completed but the Radiology Study is not medically indicated or is not utilized for diagnostic or therapeutic purposes, Medicare and Medicaid will not pay for the performance of the Study.  *See* 42 C.F.R. 411.15(k); 42 C.F.R. Parts 405 and 441; 46 Fed. Reg. 48550 (October 1, 1981); R.C.S.A. §§ 17b-102-01 to 17b-102-04.

**C.    Payment for the Professional Component of Radiological Services**

35.    Under CMS (formerly HCFA) policy, the Medicare carrier will pay a Qualified Radiologist who interprets the Radiology Study if it is interpreted in time to be used in the diagnosis and treatment of the patient. *See* 42 C.F.R. 415.102(a)(2). Payment is made under the physician fee schedule Professional Component, *see* 42 U.S.C. § 1395m(b) and 42 C.F.R. 415.120; interpretations of Radiology Studies not made in time to be used in the diagnosis and treatment of the patient are not reimbursable by Medicare. *See* 42 C.F.R. 415.102(a)(2).

36.    Under the Medicaid Program, the DSS pays the Qualified Radiologist who performs the Radiology Study interpretation (Professional Component) in time to be used in the diagnosis and treatment of the patient. Payment is made under the physician fee schedule Professional Component. 42 C.F.R. Parts 405 and 441, 46 Fed. Reg. 48550 (October 1, 1981).

37.    Payment for Teaching Physician's services are governed by 42 C.F.R. 415.172, 60 Fed. Reg. 63124 (December 8, 1995) and the Medicare Carriers Manual provisions implementing the regulations. *See* Medicare Carriers Manual Part 3, CMS (formerly HCFA) Pub. 14-3, § 15016.

38.    The CMS (formerly HCFA) standards reflect CMS's Teaching Physician Guidelines which establish conditions under which a Teaching Physician may bill for services rendered by a Resident or Fellow. Those conditions relate to the presence of the Teaching Physician when the service is rendered, and the appropriate documentation of the service

provided. *See* 42 C.F.R. 415.150 to 415.190. Teaching Physicians at Yale and YNHH are expected to know and abide by these Guidelines. *See* Yale School of Medicine's Medical Billing Compliance Manual, p.1; Practice Standards Yale Faculty Practice dated January 1998, pp. 14-15.

39.    Medicare pays for the interpretation of diagnostic radiology and other diagnostic tests furnished in hospitals only if the interpretation is performed or reviewed by a Qualified Radiologist: e.g., (a) a physician other than a Resident or Fellow reads and interprets the Radiology Study; or (b) the Radiology Study is read and interpreted by a Resident or Fellow under the supervision of a Teaching Physician. If the Teaching Physician's signature is the only signature on the interpretation, it is assumed that he or she is indicating that he or she personally performed the interpretation. If a Resident prepares and signs the interpretation, the Teaching Physician must sign indicating that he or she has personally reviewed the image and the Resident's or Fellow's interpretation and either agrees with it or edits the findings. *See* 42 C.F.R. 415.172, 60 Fed. Reg. 63124 (December 8, 1995).

**D.    Payment for Teaching Services at Teaching Hospitals**

40.    Pursuant to the YNHH GME Residency Program, Yale's School of Medicine's Radiology Department is paid money by the Medicare Program through YNHH for administration, supervision and teaching services provided to the YNHH Department of Diagnostic Imaging and the radiology Residents and Fellows in the YNHH GME Residency Program. The Medicare Program funding for these payments to Yale is derived, in part, from

information presented on the YNHH Medicare cost reports and time allocation forms completed by Yale's Radiology Department faculty members.

## V.  DEFENDANTS' VIOLATIONS OF THE  FALSE CLAIMS ACT, 31 U.S.C. § 3729 AND 31 U.S.C. § 3730(h)

### A.  Background

41.    At all times relevant hereto, the Defendants YNHH and Yale were providers of Medicare and Medicaid services.  From time to time, Defendants billed Medicare through Cigna, Travelers, MetraHealth, United HealthCare and Empire Medicare Services; at all times they billed Medicaid through the State of Connecticut Department of Social Services.

42.    Yale's Radiology Department was, until recently, under exclusive contract with YNHH to provide Radiology Services to patients at YNHH in accordance with the YNHH Bylaws and the Affiliation Agreement.  Yale Radiology faculty are responsible for supervision and oversight of Residents, Fellows and the YNHH Department of Diagnostic Imaging technical staff (which includes hospital radiology managers, technologists, nurses, schedulers, Film Library personnel, patient transport services, and others).  Yale is reimbursed by YNHH for this supervision and oversight through funds which originate from the federal hospital reimbursement system (Medicare Part A).  Yale is responsible for providing billing services, including the preparation and issuance of bills to the Medicare and Medicaid Programs on behalf of physicians employed by Yale's School of Medicine on a full/part-time basis (whether clinical, teaching, community based or other physicians) who furnish Radiology Services to patients at YNHH.

Yale provides these services to the members of its Radiology Department when they furnish the Professional Component of Radiology Services.

43.     At all times relevant hereto, YNHH contracted with Yale's Department of Radiology for the purpose of providing high quality Radiology Services to patients at YNHH. Access to YNHH's diagnostic imaging and therapeutic radiology resources is restricted to physicians who are members of Yale's Department of Radiology or who are designated by the Department Chief as adjunct members of Yale's Department of Radiology so as to enable the service to fulfill its obligations for patient care education and research.  *See* Yale University and Yale-New Haven Hospital Affiliation Agreement.

44.     In exchange for providing Radiology Services to patients at YNHH pursuant to the Yale/YNHH Affiliation Agreement, Yale is paid large sums of money by YNHH, including compensation for the loss of patient volume due to the redirection of patients from the YNHH Diagnostic Imaging Department to Temple Radiology at the YNHHASC.

45.     Under the terms of the Affiliation Agreement between YNHH and Yale's Department of Radiology, Yale contracted to fulfill a number of duties owed by YNHH to Medicare, Medicaid and its patients.  Yale agreed to provide Radiology Services consistent with the prevailing standard of care and in accordance with the applicable federal, state and local rules and regulations, and in compliance with patient care standards required for participation in the Medicare and Medicaid Programs.  As members of the YNHH Medical Staff, the members of Yale's Department of Radiology pledged, *inter alia,* to refrain from delegating the responsibility

22

for the diagnosis or care of hospitalized patients to a physician who is not qualified to undertake this responsibility or who is not adequately supervised. *See* YNHH Bylaws, § H., p. 27.

46.    At all times pertinent hereto, Bruce McClennan, M.D., was Chairman of Yale's Department of Radiology and Chairman of Yale-New Haven Hospital's Department of Diagnostic Imaging.  His duties and responsibilities included, *inter alia*, implementation of Yale's Medical Billing Compliance Plan; Yale's Radiology Department's and YNHH's Radiology Studies record retention system; and YNHH's Diagnostic Imaging Quality Improvement Plan, each of which he implements with the assistance of his Vice Chairs, Howard Forman, M.D., James Brink, M.D., and Shirley McCarthy, M.D.  Dr. McClennan, with the assistance of his Vice Chairs, was also responsible for providing administration, supervision and teaching services to the YNHH's GME Residency Program and the oversight of all Hospital support services for the Yale Radiology Department, including, but not limited to, the maintenance of the Film Library and the computerized patient record-keeping system known as the DecRad System.

47.    David Kessler, M.D., former Dean of the Yale School of Medicine, was responsible, *inter alia*, for ensuring the integrity of the Medical School education program at Yale; and compliance with all federal and state laws governing medical education, Physicians at Teaching Hospitals ("PATH"), physician billing, and federal and state medical education program funding requirements.

48.    Richard Levin, Ph.D., the President of Yale, is a member of the YNHHSC's

Board of Directors and a member of YNHH's Board of Trustees. *See* Amended and Restated

Bylaws of Yale-New Haven Ambulatory Services Corporation. He participated in the acts of

which the Relator complains. As a member of each Board, Dr. Levin is charged with ensuring

that, *inter alia*, Yale and the YNNH institute effective medical billing compliance programs.


49.    At all times relevant hereto, the Faculty members at Yale's Radiology Department

were required to abide by the terms of the Yale School of Medicine's Medical Billing

Compliance Program and the rules applicable to participating providers in the Medicare and

Medicaid Programs.


50.    At all times relevant hereto, the Defendants represented to the Medicare and

Medicaid Programs and to beneficiaries that: (1) they were committed to providing high quality

patient care; (2) they had policies and procedures in place to ensure patient safety and that the

quality of care provided to such beneficiaries was consistent with the prevailing standard of care

and federal and state laws; and (3) they were committed to ethical business practices.


51.    At all times relevant hereto, Defendant YNHH, through the YNHH Quality

Improvement Committee and the YNHH Quality Assurance Committee, was responsible for

implementing the policies and procedures of the YNHH Department of Diagnostic Imaging's

Quality Improvement Plan and the YNHH Quality Assurance Plan.

24

52.     The Dean of the Yale School of Medicine and the Chairman of the Yale Radiology Department, are responsible for implementing and enforcing the Yale School of Medicine's Medical Billing Compliance Program.

53.     Starting, on or before July 1996, the YNHH Department of Diagnostic Imaging has maintained a Quality Improvement Program. The ostensible purpose of the program is to ensure that improvements in care and performance are sustained and integrated with other departments and services through continuous monitoring and evaluation activities, including but not limited to data collection and monthly analysis and reporting of whether all Diagnostic Imaging reports are being completed within 48 hours as required by departmental policy. The YNHH Diagnostic Imaging Department is responsible for monitoring and evaluating activities connected with the furnishing of Radiological Services by YNHH and Yale, including the ordering of Radiological Studies and completion of reports to ensure the quality and appropriateness of the care and services provided. *See* YNHH Department of Diagnostic Imaging's Quality Improvement Plan.

54.     The Chairman of the YNHH Diagnostic Imaging Department and Yale's Radiology Department is responsible for ensuring that the YNHH Quality Improvement Plan within the Department of Diagnostic Imaging at YNHH was implemented effectively and that the members of the YNHH Department of Diagnostic Imaging as well as the members of Yale's Radiology Department participated in and complied with the applicable policies and procedures and that corrective measures were taken in a timely fashion to resolve or prevent any deficiencies in compliance.