**B.**    **Billings for the Professional Component of "Old" Radiology Studies and for Interpretations by Residents, Fellows and other Non-qualified persons**

**1.**    **Billing for Interpretations of "Old" Studies**

55.    Since on or about 1995, YNHH has employed a full-time staff person to find lost Radiology Studies, many of which were located months and years after they had been Completed but for which no report had been dictated or which had not been finalized. Said employee regularly presents Radiology Studies to Yale's Radiology Department faculty for purposes of obtaining their interpretations and final reports of the old Studies. Reads of old studies are performed long after the point in time when they can be considered medically necessary.

56.    Since on or about 1995, Dr. McClennan, and his Vice Chairs, Howard Forman, M.D., James Brink, M.D. and Shirley McCarthy, M.D., with the knowledge and assistance of the Manager of the YNHH Department of Diagnostic Imaging, Steven Bencivengo and his Assistant Manager, Sally Howell, have directed and made numerous attempts to intimidate Yale's Radiology Department faculty members to review and interpret these old Radiology Studies and furnish finalized reports for which Yale could and would bill the Professional Component, even though the delayed interpretations had no therapeutic or diagnostic value and they did not constitute "physician services" which could be billed and paid for by the Medicare and Medicaid Programs.

**2.**    **Billing for Interpretations by Non-qualified Persons and Falsification and Alterations of Records**

57.    YNHH's Diagnostic Imaging Department and Yale's Radiology Department have a continuous practice of issuing reports of Radiology Studies which were based solely upon

26

interpretations made by Residents and Fellows who had not been properly supervised by a Qualified Radiologist or Teaching Physician or which constituted interpretations made by attending physicians who lacked the specialized training to render an adequate interpretation of the Study.

58.    On April 27, 1998, Relator Smith, along with the Chairman of Yale's Radiology Department and all of the other Radiology Department faculty members; Alan Scheps, Yale's Business Manager for the Radiology Department; Sally Howell, Assistant Manager for the YNHH Department of Diagnostic Imaging and responsible for the Radiology Film Library, transcription and other radiology support services; and Pradeep Mutalik, YNHH's Director of Computer Systems, were advised by Felicia Tencza, Yale's Associate Business Manager for the Radiology Department, that Yale and YNHH were implementing a procedure to finalize those reports of Radiology Studies which had been dictated by Residents and Fellows and were pending as preliminary reports in the computerized electronic signing queues of several attending physicians.  According to Ms. Tencza, these pending reports involved films which had been lost so that the attending physicians could not view the images prior to moving the report to a "Final" status.  Ms. Tencza further advised that a "generic" position called "Autosign" had been created which would be put in the position of "Responsible Radiologist," in addition to the attending's name on the finalized radiological reports.  Howard Forman, M.D., Yale's Vice Chair of Finance and Administration, was authorized to finalize reports under the "Autosign" name.  Ms. Tencza advised that the "Autosign" process would be "rarely used and then only in the most extenuating circumstances."

59.    On April 30, 1998, Relator Smith responded to Ms. Tencza's directive and made certain inquiries about the process as he was concerned that the "Autosign" process was unethical and illegal.

60.    On April 30, 1998, Ms. Tencza responded to Relator Smith's inquiries and concerns and she informed him that the "Autosign" process had been reviewed with and approved by YNHH's Chief Counsel for Legal Affairs and Risk Management, Sarah Cohn, Esq., and Yale's administration.  She also reported that the procedure would be implemented as a "little used" procedure.

61.    On May 4, 1998, Relator Smith reported his concerns about the "Autosign" process to Dr. McClennan.  He also reported his concerns about other instances of possible Medicare fraud involving the practice of requiring faculty members to finalize pending reports for outside clinical attendings for Radiology Studies that the faculty members had never seen and were never involved with.   In addition, Relator Smith advised Dr. McClennan that he had discussed these issues with his colleagues, Morton Burrell, M.D. and Dr. Curtis, and they concurred with Relator Smith's feelings and opinions.

62.    On April 28, 1998, Relator's colleague, Dr. Burrell, reported to Howard Forman, M.D., Vice Chair of Finance and Administration for Yale's Radiology Department, that there were a number of cases pending in his DecRad queue awaiting finalization by him involving patients Radiology Studies with which he had never been involved.  Dr. Burrell complained about the fact that he had requested that they be removed from his signing queue but despite his

efforts, they were still nesting there.  Dr. Burrell also took issue with the April 27, 1998 E-mail

memorandum he had received from Ms. Tencza and voiced his suspicions that most people

would not want their name associated with cases they had not seen and that may have involved

diagnoses which literally affect life and death.  Dr. Burrell advised Dr. McClennan that he might

raise the issue at an upcoming departmental meeting.

63.     In addition, Dr. Burrell informed Dr. McClennan that he had found approximately

20 cases in his queue from 1996, which had been read in the YNHH Emergency Department by a

Resident and a member of the Clinical Radiology Faculty, and with which Dr. Burrell had no

association at the time they were performed.  Dr. Burrell noted that the Resident involved had

not spent any time on the GI, GU or abdomen service although the studies involved these areas.

Dr. Burrell further advised that on the date for which he was being requested to finalize the

reports prepared by the Resident, he had been on jury duty.  Dr. Burrell cited the fraudulent and

illegal nature attendant to his finalizing those reports and refused to do so.  Dr. Burrell

highlighted the serious nature of the circumstances, noting that there were "patients at the other

end of these reports and scary diagnosis hanging out in the air with no confirmation" and he

recommended that this problem and the billing problem be fixed.  A copy of the communication

was sent to Dr. McClennan.

64.     On April 28, 1998, Dr. Forman responded to Dr. Burrell's communication and

advised Dr. Burrell that the issue was "mainly an issue of compliance for [Dr. Burrell] and not

the department" and that "you [Dr. Burrell] should understand that so there is no mistake."  Dr.

Forman advised that there was no problem with Dr. Burrell finalizing the reports at issue and

29

having his name on the reports as the "Responsible Physician" even though he did not supervise the examination of the Radiology Study. Dr. McClennan and James Brink, M.D., Vice Chair of Clinical Affairs, of the Radiology Department at Yale were copied on the communication.

65.    On May 1, 1998, Dr. Burrell responded to Dr. Forman's April 28, 1998 communication and reiterated his concerns about "the patients who may have wrong diagnoses on their reports" and several misstatements in Dr. Forman's memo. Dr. Burrell also reiterated his unwillingness to sign off on or finalize reports of Radiology Studies that were "a couple of years old" and that he had never been involved with in any way. Dr. Burrell directed Dr. Forman that his name was not to be placed on a report that he had never seen and that his name be removed from reports upon which he had not signed off. Dr. Burrell forwarded copies of the communications on these issues to Dr. McClennan.

66.    On May 21, 1998, the "Autosign" process was discussed at the Abdomen Section Meeting. Radiology Department members Dr. Burrell; Shirley McCarthy, M.D.; Arthur Rosenfield, M.D.; Lynwood Hammers, M.D.; James Brink, M.D.; Robert Troiano, M.D. and Relator Smith were present for the discussion and, with the exception of Drs. McCarthy and Brink, they were united in their adamant opposition to the "Autosign" policy as set forth in the April 28, 1998 memorandum from Ms. Tencza.

67.    Relator Smith reported and complained about the deficiencies in patient care, improper billing, falsification of records and deficiencies in the GME Residency Program to Defendants' representatives, Dean Kessler, President Levin and Yale's Counsel, Dorothy

30

Robinson, Esq. and David King, Esq., along with numerous other representatives of Yale and

YNHH, including but not limited to Sara Cohn, YNHH's Director of Legal Affairs and Risk

Management, and the Defendants failed to take any corrective action in response to those reports

and complaints.

68.    Concerned about what he perceived to be substandard care which was harming

patients and putting patients at risk, the illegal alteration of patient records, misrepresentation of

information on patient reports, and fraudulent billing practices, Relator Smith reviewed a series

of radiology reports in the DecRad System.  The review encompassed those reports which Dr.

Burrell had complained about to Dr. Forman and Dr. McClennan, those reports finalized by

"Autosign" for the period from January 1, 1998 to May 2000, and other reports  finalized "after-

the-fact" which had never been interpreted or finalized for use in connection with the patient's

diagnosis and treatment.

69.    Based upon a comprehensive review of radiology records dating back to 1998,

Relator Smith discovered that thousands of reports of Radiology Studies reflecting the initial

interpretations of Residents and Fellows had been finalized by "Autosign" or physicians who had

never reviewed the films and had not supervised the Resident or Fellow when the Studies were

interpreted.  Also upon information and belief, the films and/or images associated with all

autosign studies were lost and never repeated, retrieved or found.

70.    "Autosign" was also used to finalize preliminary reports dictated by Qualified

Radiologists who were no longer at Yale.

31

71.    Since January 1, 1998, at least 1,594 reports of Radiological Studies have been finalized using the "Autosign" process, despite the email from Ms. Tencza that this would be a "little used" process.

72.    Upon information and belief, the "Autosign" process for finalizing radiological reports of Radiology Studies has continued in effect, and several hundred more reports have been altered through the "Autosign" process up to and including the present.

73.    Relator Smith's investigation has revealed that at least 81 patient radiological reports initially interpreted by Residents and Fellows have been altered to reflect the names of Qualified Radiologists as the Responsible Radiologists even though those so named never supervised the Residents and Fellows when the preliminary interpretations were performed and they never reviewed or interpreted the Radiology Studies prior to finalizing the reports.  *See e.g.,* Radiology Study Reports finalized by Dr. Morton Glickman.

74.    Since July 17, 1998, at least 67 preliminary patient radiological reports reflecting the initial interpretation by Clinical Faculty members have been finalized by other Yale Radiologists and/or nonprofessional personnel who have never even reviewed the Radiology Studies associated with the preliminary reports.

75.    Since, at least July 22, 1998, reports by Residents and Fellows were finalized by the following outside clinical attending physicians who were not authorized to bill Medicare as Teaching Physicians.  Examples of these include the following:

      a.    Bruce Simmonds, M.D.        34 Reports

      b.    Andy Haims, M.D.          1,024 Reports

76.    Since April 17, 1998, at least 84 patient radiological reports were finalized to reflect that certain Qualified Radiologists approved the interpretations *even though* the Responsible Radiologists of record on the reports were on vacation at the time.

77.    On information and belief, Defendants Yale and YNHH billed Medicare and Medicaid for the Professional Component of these Radiological Studies never reviewed by a Qualified Radiologist, in violation of 31 U.S.C. § 3729(a)(1-2).

78.    Upon information and belief, Defendants utilized the "Autosign" process and the other afore-described non-Qualified Radiologist Radiology Study report finalization methods to avoid and conceal the obligations of said Defendants to repay the United States monies paid to Yale and YNHH for both the Professional and Technical Components of these Radiological Services, in violation of 31 U.S.C. § 3729(a)(7) and 18 U.S.C. § 1001.

79.    On July 15, 1999, Dr. Rosenfield met with President Levin, to discuss in detail the Medicare frauds committed by Dr. McClennan and colleagues. (e.g., the signing of reports by

attendings who did not see films in emergency room, and the issues regarding outside attendings.)

80.     On July 15, 1999, Dr. Burrell met with President Levin on the issues raised in Dr. Burrell's letter dated July 3, 1999 (as referenced above) e.g.:

a.     Issues of patient safety as they related to non-specialists doing examinations in which they were not proficient, which was occurring in many areas of the department including MR, CT, and Ultrasound, and Emergency Room;

b.     The intense pressure to read cases rapidly while clinical input and accuracy suffered greatly;

c.     The mental anguish of seeing patients harmed and dying as a result of inadequate and inappropriate staffing; and

d.     Extensive issues related to fraud:

(1)  President Levin was made aware that Dr. Burrell was coerced to sign off on patients' radiographic studies that he had not seen. These were on patients seen two years prior, on another service, with whom Dr. Burrell had no contact or knowledge. These cases appeared on Dr. Burrell's sign out queue, with Dr. Burrell's name as the attending of record. Dr. Burrell refused to sign off on these reports despite  coercion by Dr. Forman, Dr. Brink, and Dr. McClennan that he do so.  President Levin was shown examples of these reports with Dr. Burrell's name on them;

(2).     President Levin was also shown a Radiology Study audit trail done on or about early Summer of 1999, which demonstrated that Dr. Burrell's name, after having previously appeared on these reports, two years after the fact, had indeed been subsequently removed from the reports and

34

substituted with Dr. Glickman's name. Dr. Glickman promptly signed off
on these reports;

(3).    Additionally, President Levin was shown the computerized
tracking form of these radiographic studies which showed that they had
never been signed out or moved from storage, in the past two years, nor
had they been edited in any fashion indicative of the fact that Dr.
Glickman did not see or interpret these radiographs, since movement of
films in the department as well as editing of reports is tracked by
computer;

(4).    President Levin was given a complete record of all correspondence
between Drs. Burrell and McClennan, as well as the correspondence
relating to the allegations of fraud. The latter included the e-mail among
Drs. McClennan, Forman, Brink and Burrell, as well as a list of patients x-
ray reports on which Dr. Burrell's name was placed, despite Dr. Burrell
having no knowledge or involvement with these cases. Additionally,
President Levin was given the computerized audit trail of the signing of
the reports and the lack of movement of the films;

(5).    President Levin expressed shock at the above allegations stating,
"How can anybody do such things," and questioned whether or not the
computers should be impounded immediately. Dr. Burrell responded that
it would be an excellent idea; and

(6).    President Levin assured Dr. Burrell that such serious allegations by
two of Yale's most respected senior Professors would get serious and
prompt attention.

81.     On July 21, 1999, Drs. Burrell, Rosenfield, and Smith met with Yale's General

Counsel, Dorothy Robinson, Esq. in her office, at which time she had David King, Esq. and/or

(?? Steven Immelt) , Esq. on a conference call line:

     a.     The issues previously discussed with President Levin were reiterated;

     b.     General Counsel Robinson said she had all of the pertinent

correspondence that was given to President Levin by Drs. Burrell, Rosenfield, and

Smith;

     c.     Upon discussion of the issues relating to signing unreviewed reports,

Attorney King and/or (?? Immelt) repeatedly commented via phone, "everybody

does it";

     d.     Drs. Burrell, Rosenfield, and Smith corrected him promptly and responded

that this had never been done in the history of Yale University, prior to Dr.

McClennan, and that if doctors do this elsewhere, that they are committing fraud

according to Medicare regulations;

     e.     Dr. Burrell informed General Counsel Robinson of at least five serious

improprieties regarding inappropriate signing of reports. They are as follows:

          (1).     Reports of patients that were two years old not on Dr. Burrell's

          service and to which Dr. Burrell had no knowledge appeared on Dr.

          Burrell's queue, with Dr. Burrell's name as the attending;

          (2).     In essence, Dr. Burrell was told that this was a matter of Dr.

          Burrell complying if he knew what was good for him;

36

(3).    Dr. Burrell was told that these reports were douriered to the proper outside attending, in this case, Dr. Belleza.  Dr. Burrell subsequently called multiple attendings including Dr. Belleza and this, in fact, had not been done;

(4).    After Dr. Burrell's vigorous protestations, his name was removed from these reports and replaced with Dr. Glickman's name.  Dr. Glickman promptly signed off on these reports; and

(5).    Computerized sign out trails of the films show that these films have never in fact been moved from long term storage, nor have they been edited.  This indicated that these films were never read.

82.     Despite protestations by Drs. Smith, Burrell and Rosenfield, President Levin and General Counsel Robinson permitted Dean Kessler to investigate all of the fraud allegations including the allegations of fraudulent report signing against Dr. Morton Glickman who was Associate Dean under Dr. Kessler.  Upon information and belief, Dr. Kessler conspired with Attorney David King  to cover up Dr. Glickman's fraud as evidenced by, among other things, Dr. Kessler issuing a "secret" reprimand to Dr. Glickman, said reprimand concluding that Dr. Glickman had in fact engaged in the fraudulent activities alleged by Drs. Smith, Burrell and Rosenfield.  At the same time, Dr. Kessler publicly announced to the entire Yale Radiology Department faculty, among others, that none of the fraud allegations made by Drs. Smith, Burrell and Rosenfield were true and that there was "no evidence" to support such allegations.

37

C.    **Residents and Neuroradiology Fellows used to facilitate fraudulent billing practices.**

83.    Upon information and belief, over a one-year period, from on or about July 1997 to July 1998, several thousands of Radiology Reports read by Residents and first year Neuroradiology Fellows were fraudulently finalized by Yale Faculty who never reviewed the images. These faculty include, but are not limited to, Morton Glickman, M.D., Howard Forman, M.D., and Gordon Sze, M.D.

84.    In the case of the Neuroradiology Fellow and Resident fraud, the essence of the claim, first raised by Resident Physicians, is that one or more Teaching Physicians finalized the Radiology Report for billing purposes without having ever reviewed the Radiology Study and without having dictacted, edited or reviewed the final Report. Not only does this practice violate the certification set forth above, it is evident that the Teaching Physicians who finalized the Report had contributed nothing to the diagnosis and/or care of the patient and that both the Technical Component and the Professional Component were improperly billed to the United States government.

85.    A review of the Defendants' records provided thus far has revealed evidence of the alleged Neuroradiology Fellow and Resident billing fraud: (a) comparison of dictation and transcription times contradicts the method of case review and Report signing described in Yale's version of the facts as contained in a Hogan & Hartson investigative Report which was prepared to cover up the fraud; (b) comparison of the signing times of sequential reports reveals an

38

unavoidable inference that the preliminary Reports were never read and were never reviewed in conjunction with the associated images; (c) virtually none of the Reports reviewed thus far show text edits of the original text, providing indisputable evidence that the preliminary Reports and associated images were never reviewed; (d) virtually none of the films were signed out of the library by the Teaching Physician who signed the Reports or by any other person at the time the Report was finalized, confirming these Radiology Studies were never reviewed. For example, one of the physicians, Dr. Gordon Sze, finalized 88 Reports in four minutes between 10:14 A.M. and 10:18 A.M. on March 9, 1998. At the time Dr. Sze signed off on the preliminary Report, the x-ray film in each case was filed in the Yale-New Haven Hospital library. Dr. Sze never reviewed the Radiology Studies or preliminary Reports in connection with his finalization of the Reports nor was he present when the films were first reviewed and the preliminary Report was created.

86.    The Neuroradiology Fellow billing fraud issue, which is reflected in the handwritten notes taken by President Levin, and other documents, make it clear that the Neuroradiology Fellow billing fraud issue was brought to the attention of Dean Kessler and General Counsel Robinson. In the handwritten notes of President Levin from July 1999, the following appears, *Rosenfield. Medicare fraud. Names of faculty used to endorse reports of outside readers. ...(illegible) review films and sign. Fellows met last year to decide whether to turn in faculty. 1/2 of fellows cannot legally bill. Forman signed residents reports.*

87.    Upon information and belief, several thousands of such instances of fraud were perpetrated from July 1997 to July 1998.

88.     Upon information and belief, tens of thousands of additional instances of fraud in the signing of Reports has occurred since July 1998 and continues to the present time.  See e.g., recent admission of Dr. Gordon Sze. [ASK JJP].

**B.     Billing for the Professional and Technical Components of Radiology Studies not Medically Indicated or Necessary Violate the FCA**

89.     It is a long-standing practice in the YNHH Emergency Department that certain panels of diagnostic tests, including Radiology Studies, are routinely ordered as a matter of practice, regardless of whether the tests are medically indicated, and prior to patients being examined or evaluated by appropriate medical providers.  Billing for panel studies not medically indicated violates applicable Medicare and Medicaid billing requirements and also subject patients to needless, potential harmful radiation.

90.     In support of this long standing practice, on or about June 1998, Yale's Department of Radiology issued a memorandum which, *inter alia*, directed YNHH's Emergency Department Residents and Fellows to perform all cross-sectional imaging procedures, ultrasounds and CT examinations on Emergency Department patients without regard to or determination of medical necessity.  The policy furthered the practice of ordering Radiology Studies which were medically unnecessary.

91.     On numerous occasions, Relator Smith and other members of the Radiology Department along with YNHH's Residents and Fellows protested to Dr. McClennan against

40

Emergency Department policies, but they were told by Dr. McClennan to perform the protocol Studies regardless of medical indication.

92.      At all times relevant hereto, Defendants have been aware of the fact that as a result of the practice they were providing unnecessary Radiological Services to Medicare and Medicaid beneficiaries and they knowingly submitted claims for payment from the Medicare and Medicaid Programs for both the Technical and Professional Components of those Services.

## C.     Billings Based on Inflated Medicare Cost Reports

93.      In addition to resulting in false billings to Medicare and Medicaid (and other private payers), the above-described practices also resulted in the knowing overstatement or inflation of YNHH's costs as reported in its annual Medicare Cost Reports filed with the federal government.  As a result of such fraudulent acts, a substantial portion of the payments made by the Medicare fiscal intermediary and received by YNHH and Yale for the Radiology Services were inflated and constituted overpayments.

94.      Relator Smith estimates that, as a result of the false claims alleged above for inpatient and outpatients diagnostic studies, YNHH reported millions of dollars in excess Medicare radiology costs.

41

## VI.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729

95.    Relator Smith adopts by reference paragraphs 1-94 above.

96.    By virtue of the acts described above, Defendants Yale and YNHH, individually and in combination or conspiracy, knowingly presented or caused to be presented to officers, employees, or agents of the United States Government and the State of Connecticut, false or fraudulent claims for payment or approval, and have used false statements to conceal obligations to refund money to Medicare and Medicaid.  The United States has been damaged as a result in an amount to be proven at trial.

97.    Defendants, and each of them are liable, jointly and severally, to the United States for treble the United States' damages, and an additional amount of $11,500 for each false claim together with prejudgment interest on the entirety.

### SECOND CAUSE OF ACTION

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3730(h)

98.    Relator Smith adopts by reference paragraphs 1-97 above.

99.    Because of his investigation and reporting of the frauds alleged herein, Relator Smith was harassed and was discriminated against in the terms and conditions of his

employment, by and through the acts of the Defendants' officers, agents, and employees,

including Dean Kessler Bruce McClennan, M.D, James Brink, M.D., Howard Forman, M.D. in

one or more of the following ways:

    a.    he was repeatedly harassed, threatened and subjected to intimidation by

Bruce McClennan, M.D and others;

    b.    his salary was cut;

    c.    he was stripped of administrative positions and titles Chief of MRI,

Abdominal Imaging, Fellowship Program Director and Coordinator of Abdominal

Schedule;

    d.    he was forced to resign from Yale and YNHH;

    e.    he was interfered with in his attempts to obtain employment elsewhere;

    f.    he was forced to leave the state of Connecticut which had been his home

for 19 years;

    g.    he was forced to give up his extensive research activities at YNHH and

Yale;

    h.    he was publicly defamed by multiple persons at YNHH and Yale

including but not limited to David Kessler, M.D. and Bruce McClennnan, M.D.;

and

    i.    he was retaliated against in blatant violation of the YNHH and Yale

University corporate compliance plans and the Yale Medical School Billing

Compliance Plan.

100.    Because of his investigation and reporting of the frauds alleged herein, Dr.

Rosenfield was harassed and discriminated against in the terms and conditions of employment,

by and through the acts of the Defendants' officers, agents, and employees, including Dean

Kessler, Bruce McClennan, M.D, James Brink, M.D., Howard Forman, M.D., Joseph

Zaccagnino (President and CEO, YNHH), Marna Borgstrom (Executive Vice President and

COO, YNHH), Marvin Lender (Chairman, Board of Trustees, YNHH) and Kurt Schmoke and

other Fellows of the Yale Corporation, in one or more of the following ways:

      a.      he was repeatedly harassed, threatened and subjected to intimidation by

Bruce McClennan, M.D.;

      b.      he was forced to carry an unacceptable work load, even after numerous

protests to Dr. McClennan and his Vice-Chairs, Drs. McCarthy, Forman, and

Brink, about the inadequate coverage for CT services;

      c.      he was stripped of administrative positions and titles at Yale and YNHH

and deprived of a major portion of his livelihood;

      d.      he has not been permitted to work on the clinical services at YNHH;

      e.      he has had his salary cut by 61% for the past three years;

      f.      he was removed from his office at the hospital;

      g.      he has been denied a hearing before the Medical Board of YNHH as the

result of a conspiracy between YNHH and Yale to prevent such a hearing;

      h.      he was publicly defamed by multiple persons at YNHH and Yale

including but not limited Dean Kessler and Bruce McClennnan, M.D;

      i.      he was denied help or protection by the highest level officers of YNHH

and Yale including all of the Fellows of the Yale Corporation; and

j.       he was retaliated against in blatant violation of the YNHH and Yale

corporate compliance plans and the Yale School of Medicine Billing Compliance

Plan.

101.    Because of his investigation and reporting of the frauds alleged herein, Dr. Burrell

was harassed discriminated against in the terms and conditions of employment, by and through

the acts of the Defendants' officers, agents, and employees, including Dean Kessler, Bruce

McClennan, M.D, James Brink, M.D., Howard Forman, M.D., and Irwin Birnbaum for reporting

and complaining about the Defendants' improper conduct as hereinbefore stated, in one or more

of the following ways:

a.      he was repeatedly harassed, threatened and subjected to intimidation by

Bruce McClennan, M.D., Dean Kessler, James Brink, M.D., Howard Forman,

M.D., and Irwin Birnbaum;

b.      his salary was cut;

c.      he was stripped of administrative positions and titles at Yale and YNHH;

d,      he was removed from his office at YNHH; and

e.      he was retaliated against in violation of the YNHH and Yale corporate

compliance plans and the Yale School of Medicine Billing Compliance Plan.

102.    Relator Smith believes and asserts that he was the object of such discrimination

and retaliation because of his investigation and reporting of the frauds alleged herein, including

his reports of the substandard patient care issues, improper billing practices and corporate

relationships and falsification of documents to, among others, the General Counsel of Yale University, Dorothy Robinson, Esq.

103.    Because of the Defendants' retaliatory conduct set forth above, Relator Smith has suffered actual and special damages in an amount to be proven at trial, together with prejudgment interest thereon.


### THIRD CAUSE OF ACTION

### DEFAMATION

104.    Relator Smith adopts by reference paragraphs 1-103 above.

105.    Various Yale and Yale representatives made false and injurious statements to third parties, including but not limited to employees, agents and/or representatives of Cornell University Medical College, New York Presbyterian Hospital, Northwestern University and Boston University, as well as colleagues and staff at Yale and YNNH.

106.    The statements made about Relator Smith were reckless and wanton in that they were false and known to be false at the time they were made by Yale and YNHH's representatives.

46

107.    The falsity of the allegations caused Relator Smith to suffer harm to his reputation and professional image with his professional colleagues and in the community, as well as severe mental and emotional distress.

**WHEREFORE,** Relator Smith prays for the following relief:

1.      An order directing Defendants Yale and YNHH to cease and desist from violating 31 U.S.C. § 3729 *et seq.*;

2.  Judgment against the Defendants, jointly and severally, and in favor of the United States, in an amount equal to three times the amount of damages the United States Government has sustained because of the Defendants' actions, plus a civil penalty of $11,500.00 for each violation of 31 U.S.C. § 3729 (a) proven at trial;

3.  An award to Relator Smith, of the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) including all costs and expenses of this action, expert fees and expenses and reasonable attorneys fees;

4.      An award against Defendants Yale and YNHH representing money damages for discrimination including compensatory damages for lost wages, interest, harm, humiliation, embarrassment, mental anguish as well as expert fees and costs and reasonable attorneys' fees for violation of 31 U.S.C. § 3730(h);

5.      Reinstatement of Relator Smith to his faculty position at Yale University as a tenured Full Professor (the position he would have held by this point in time had Defendants not constructively discharged Relator Smith) and restoration of all of his prior administrative titles;

6.      The issuance of an Order to Defendants Yale and YNHH to issue a public retraction of the false statement made against Relator Smith and a public acknowledgement and apology that the representations were made in error;

7.      Compensatory and punitive damages for injury to Relator Smith's reputation and for his resulting humiliation and mental suffering.

48

8.    Injunctive relief to restrain the Defendants and their officers, agents, employees and servants from harassing, penalizing, or otherwise discriminating and/or retaliating against Relator Smith and other members of the faculty at Yale and YNHH for reporting and complaining about possible Medicare and Medicaid fraud and program abuses;

9.    An assessment of prejudgment and post-judgment interest; and

10.   Such other and further and different relief, whether preliminary or permanent, legal or equitable as the Court deems just and proper.


## VII.    <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator Smith hereby respectfully demands a trial by jury on all counts herein alleged.


Respectfully submitted,


By: _____
Mary Alice Leonhardt
Federal Bar No. ct 02996

LAW OFFICES OF
MARY ALICE LEONHARDT, LLC
102 Oak Street
Hartford, CT 06106
Tel:    (860) 727-8874
Fax:    (860) 525-2194

ATTORNEYS FOR
PLAINTIFF-RELATOR SMITH


49

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent this 23rd day of January 2004 via regular U.S. Mail to the following counsel of record:

Peter B. Prestley, Esq.
Jacques J. Parenteau, Esq.
Madsen, Prestley & Parenteau, LLC
44 Capitol Avenue, Suite 201
Hartford, CT 06106

Patrick M. Noonan, Esq.
Delaney, Zemetis, Donahue & Noonan, P.C.
741 Boston Post Road
Concept Park
Guilford CT 06437

William J. Doyle, Esq.
Kenneth D. Heath, Esq.
Wiggin & Dana
One Century Tower
265 Church Street, Box 1832
New Haven, CT 06508

And that three (3) copies have been hand delivered, in accordance with Rule 5 of the Federal Rules of Civil Procedure and Rules 7(d) and 7(e) of the Local Rules of Civil Procedure to:

John Hughes, Esq.
Richard Molot, Esq.
Assistant United States Attorney
Office of the United States Attorney
157 Church Street, 23rd Floor
New Haven, CT  06510

_____
Mary Alice Leonhardt, Esq.

50