a.    **There Is No Evidence That Smith Voluntarily Provided the Information Underlying the Complaint to the Government Prior to the Public Disclosures.**

Smith has not properly alleged that he brought the allegations in the Complaint to the attention of the government in advance of filing the State Court Action. Courts have held that to qualify as an original source under § 3730(e)(4), the disclosure to the government must occur before the public disclosure. See United States ex rel. Findley v. FPC-Boron Employees' Club, 105 F.3d 675, 690 (D.C. Cir. 1997) ("[A]n 'original source' must provide the government with the information prior to any public disclosure"); Settlemire, 198 F.3d at 916 ("An original source is a plaintiff with 'direct and independent knowledge' of the relevant facts who has revealed his knowledge to the Government before public disclosure and before filing suit."); Jones, 160 F.3d at 335 n.7 ("It is [the relator's] prior [state court] complaint, that constitutes the public disclosure that must be preceded by disclosure to the federal government to comply with the original source requirements. . . ."). In United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13 (2d Cir. 1990), the Second Circuit articulated the reason behind this rule:

> By barring those who come forward only after public disclosure of possible False Claims Act violations from acting as qui tam plaintiffs, it discourages persons with relevant information from remaining silent and encourages them to report such information at the earliest possible time.

Id. at 16; see also Aflatooni, 163 F.3d at 522 ("Where the information underlying the relator's complaint has already been publicly disclosed, the government receives no additional benefit from the relator's filing of a qui tam suit.").

Instead of reporting the alleged activity to the government at the earliest possible time and proceeding with his FCA claims, Smith chose to proceed with a self-serving civil action seeking redress for his employment grievances. To Smith, the qui tam action is apparently an afterthought posed to exert leverage in his employment dispute.

ny-559915                                    18

**b.** **There Is No Evidence That Smith Voluntarily Provided the Information Underlying the Complaint to the Government Prior to Filing the Original Complaint.**

As discussed above, there were substantial public disclosures prior to July 19, 2000, when the Original Complaint was filed. Where, as here, *qui tam* complaints have been filed after public disclosure has occurred, courts have held that failure to make the disclosure to the government required under § 3730(e)(4) before filing suit prevents relators from demonstrating original source status. See Bank of Farmington, 166 F.3d at 866 ("More must be done to qualify as an original source than to file the action. The government must be voluntarily notified beforehand."); United States ex rel. King v. Hillcrest Health Ctr., 264 F.3d 1271, 1280-81 (10th Cir. 2001) ("It is also clear from the statutes that compliance with the disclosure requirement of § 3730(b)(2) at the time of filing does not satisfy the pre-filing disclosure requirement of § 3730(e)(4)."); Ackley, 76 F. Supp. at 668 (D. Md. 1999) ("[T]he requirement of voluntary disclosure before filing suit [is] nothing less than a jurisdictional pre-requisite.").

Thus, Smith must either present to the Court his pre-complaint disclosures of "the information on which [his] allegations are based," or his suit must be dismissed for want of subject matter jurisdiction. See United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 803 (10th Cir. 2002) (remanding case to ascertain whether relator, who had previously been held to be an original source, made pre-filing disclosure to government).[9]

---

[9] See also United States ex rel. Cericola v. Ben Franklin Bank, 99-cv-6311, 2003 WL 22071484, at *3 (N.D. Ill. Sept. 4, 2003) (ordering production of disclosure statements to determine whether plaintiff was original source); United States ex rel. O'Keefe v. McDonnell Douglas Corp., 918 F. Supp. 1338, 1346 (E.D. Mo. 1996) (finding written disclosures "will assist MDC in understanding the allegations against it and in assessing whether the relator had standing to sue as the 'original source' of information"); United States ex rel. Stone v. Rockwell Int'l Corp., 144 F.R.D. 396, 401-02 (D. Colo. 1992) ("[W]ithout access to the plaintiff's disclosure statement, the defendant cannot make the critical comparison between the facts purportedly revealed by the plaintiff as an original source and facts which may have previously been available for public consumption."); but see United States ex rel. Bagley v. TRW Inc., 212 F.R.D. 554 (C.D. Cal. 2003) (involving no allegations that relator was not an original source).

**III.    THE FCA CLAIMS SHOULD BE DISMISSED FOR FAILURE TO MEET THE PARTICULARITY REQUIREMENTS OF RULE 9(b).**

It is well-settled that the heightened pleading standard of Rule 9(b) applies to claims brought under the FCA. See Gold v. Morrison-Knudsen Co., 68 F.3d 1475, 1477 (2d Cir. 1995).[10] Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Specifically, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) (internal citations omitted)). "In other words . . . the plaintiff must plead the who, what, when and where of his allegations." United States ex rel. Barmak v. Sutter Corp., 95-cv-7637, 2003 WL 21436213, at *4 (S.D.N.Y. June 20, 2003).

In now its third iteration, Smith's complaint remains devoid of the particulars required under Rule 9(b). Smith's complaint, while not short on words, is short on the required details regarding the alleged fraud. Thus, it is not surprising that the government decided not to intervene in this case. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 242 n.31 (1st Cir. 2004) ("[T]he government's decision not to intervene in the action also suggested that Karvelas' pleadings of fraud were potentially inadequate.").

---

[10] Every circuit court of appeals addressing this issue has concluded the same. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 228 (1st Cir. 2004) (listing cases).

A.    **The Complaint Must Be Dismissed for Failure to Plead Any Particulars Regarding a Single Fraudulent Claim.**

1.    **An FCA Complaint Must Allege Details Regarding Actual False Claims Submitted to the Government.**

Because the FCA attaches liability only to an actual false or fraudulent claim, "[e]vidence of an actual false claim is 'the *sine qua non* of a False Claim Act violation.'" Karvelas, 360 F.3d at 225 (quoting United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1311 (11th Cir. 2002)). Thus, an FCA claim must contain "allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA qui tam action." Karvelas, 360 F.3d at 232. Merely assuming that false claims were submitted to the government would strip all meaning from Rule 9(b)'s specificity requirement. Clausen, 290 F.3d at 1312 n.21.[11]

Clausen and Karvelas both involved FCA claims based on allegations of Medicare fraud, and in each the dismissal under Rule 9(b) was affirmed on appeal because plaintiffs had failed to allege with particularity the actual submission of any false claim to the government. In Clausen,

---

[11] Courts in other circuits have also held that, to survive a motion to dismiss, a complaint alleging violations of the FCA must specify the actual fraudulent claims submitted to the government. See Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 563-64 (6th Cir. 2003); United States ex rel. Doe v. Dow Chem. Co., 343 F.3d 325, 329 (5th Cir. 2003) (the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby must be stated in a complaint alleging violation of the FCA in order to satisfy Rule 9(b)") (citation and quotation omitted); United States ex rel. Garst v. Lockheed-Martin Corp., 328 F.3d 374, 378 (7th Cir. 2003) (affirming dismissal of 155-page FCA complaint which failed to link allegations of deceit to a single claim for payment); United States ex rel. Aflatooni v. Kitsap Physician Serv., 314 F.3d 995, 1003 (9th Cir. 2002) (affirming dismissal of *qui tam* action for failure to "describe in any detail any actual false claims . . . either in the form of the false claim itself or evidence sufficient to identify such a claim") (emphasis added); United States ex rel. Schwartz v. Coastal Healthcare Group, Inc., 99-3105, 2000 WL 1595976, at *6 (10th Cir. Oct. 26, 2000) (affirming dismissal of FCA claim where relator "merely described the allegedly illegal contracts and arrangements without identifying any person, place or time when an actual false claim or other illegal activity occurred"); Gross v. AIDS Research Alliance-Chicago, 01-cv-8182, 2003 WL 22508153, at *2 (N.D. Ill. Nov. 3, 2003) (dismissing complaint for failure to "specify which forms the Defendants falsely submitted . . ., on what dates the Defendants submitted these forms, or the amount of the Defendants' false claims"); United States ex rel. Gublo v. NovaCare, Inc., 62 F. Supp. 2d 347, 354 (D. Mass. 1999) ("[P]laintiffs simply allege three methods by which NovaCare is said to have inflated its bills to the government, without citing a single instance of a false claim"); United States ex rel. Cox v. Iowa Health Sys., 29 F. Supp. 2d 1022, 1025 (S.D. Iowa 1998) (dismissing claims "[b]ecause relator did not set forth in his pleadings the precise claims submitted to the United States . . . .").

while the relator's second amended complaint alleged a decade-long scheme of Medicare fraud,

it failed to specify the dates, amounts, and sources of information about the allegedly fraudulent

claims. The court held that the complaint suffered from a "lack of specific information about the

actual submission of claims to the Government." Clausen, 240 F.3d at 1311. The court further

explained that "[n]o amounts of charges were identified [and no] actual dates were alleged." Id.

at 1312.

In Karvelas, in a 93-page complaint, plaintiff alleged 16 schemes of Medicare fraud in

violation of the FCA. Karvelas, 360 F.3d at 232. Specifically, the complaint alleged that "the

defendants submitted false claims to the federal government including cost reports that were

falsely certified as complete, true and correct. It state[d] that the defendants wrongfully billed

Medicare and Medicaid, and refer[red] generally to false confirming orders and progress notes."

Id. at 233. The court found these allegations insufficient under Rule 9(b), stating that "the

complaint never specifies the dates or content of any particular false or fraudulent claim allegedly

submitted for reimbursement by Medicare or Medicaid." Id. (emphasis added). Information

missing from Karvelas's complaint included: identification numbers or amounts charged in

individual claims for specific services and supplies, the individuals involved in the improper

billing, the dates on which such claims were filed, the nature and content of any documents

submitted to the government, and the source of information and factual basis for the conclusory

allegations. Id.

Courts within the Second Circuit agree. See In re Cardiac Devices Qui Tam Litig., 221

F.R.D. 318, 336 (D. Conn. 2004) (finding Rule 9(b) satisfied because the government "provided

categorical information in the complaints about the actual claims that were submitted to the

government" and separately identified the patient's account and medical record numbers, the

ny-559915                    22

make and model of the device implanted, the date of service and discharge dates, and the specific

amount of the Medicare or Medicaid reimbursement for the specific procedure); United States ex

rel. Vallejo v. Investronica, Inc., 2 F. Supp. 2d 330, 336-37 (W.D.N.Y. 1998) (dismissing FCA

claims for failure to satisfy Rule 9(b) where plaintiff alleged false statements were made during

certain months and at certain locations but failed to allege "exactly where and when those

statements were made," "the date or dates on which these statements were made," or "the

individuals responsible for making the statements"); Barmak, 2003 WL 21436213, at *4

(dismissing FCA claims because complaint did not "outline the who, what, when, and where" of

fraudulent claims submitted to the government); United States ex rel. DeCarlo v. Kiewit/AFC

Enters., Inc., 937 F. Supp. 1039, 1050-51 (S.D.N.Y. 1996) (dismissing FCA claims where

complaint failed to refer to specific employees who may have been involved in submitting false

claims and lacked specificity in describing the respective dates of instances of fraud).  Without

specificity regarding fraudulent claims actually submitted to the government, an FCA claim must

be dismissed.

### 2.    Smith Fails to Allege Any Detail About a Single False Claim That Was Actually Submitted to the Federal Government.

Smith's complaint must be dismissed because it does not identify a single false claim that

Defendants in fact submitted to Medicare for reimbursement, much less contain any details

regarding the "time, place and content" of such claims.  See United States ex rel. Walsh v.

Eastman Kodak Co., 98 F. Supp. 2d 141, 147 (D. Mass. 2000) ("Without citing a single false

claim arising from an allegedly false invoice, Plaintiff has not met even a barebones Rule 9(b)

test.")  Rather, the Second Amended Complaint is limited to broad and conclusory averments of

fraudulent billing.

ny-559915                                23

Throughout the 49-page Second Amended Complaint, only a handful of paragraphs even allege fraudulent billing to the federal government. All such paragraphs proceed in a general and conclusory manner and without a factual basis. Two of the allegations are general statements of the case located in the "Introduction." (2d Am. Compl. ¶ 1 ("Defendants violated the FCA . . . by billing and retaining payments from the Medicare and Medicaid Programs. . . ."); id. ¶ 2 ("Defendants . . . submitted bills which they knew were in violation of Medicare and Medicaid. . . .").) A third allegation asserted in Count I mirrors this conclusory language. (Id. ¶ 96.) These allegations do not satisfy the specificity that Rule 9(b) requires.

The remaining allegations are general and conclusory statements that Defendants submitted false claims to the government. With respect to the alleged "Neuroradiology Fellow and Resident fraud" (id. ¶¶ 83-88), Smith alleges that the physicians "who finalized the Report had contributed nothing to the diagnosis and/or care of the patient and that both the Technical and the Professional Component were improperly billed to the United States government" (Id. ¶ 84). Smith, however, gives none of the required particulars about the bills that he alleges were submitted to the government. Likewise, with respect to his allegations regarding the "clean up project," Smith discusses at length how Dr. Burrell refused to finalize certain reports (id. ¶¶ 62-65), but nowhere specifies what claims, if any, were submitted to the government.

Smith's allegations that Defendants billed for medically unnecessary studies are based on the conclusory statement that "[b]illing for panel studies not medically indicated violates applicable Medicare and Medicaid billing requirements." (Id. ¶ 89; see also id. ¶ 92 ("[Defendants] have been aware of the fact that as a result of the practice they were providing unnecessary Radiological Services to Medicare and Medicaid beneficiaries and they knowingly submitted claims for payment from the Medicare and Medicaid Programs for the Technical and

Professional Components of those Services."); <u>id.</u> ¶ 94 ("YNHH reported millions of dollars in excess Medicare radiology costs").) These general allegations – without the required details as to the scope, content, date, or amount of the "improper" bills – are patently insufficient.

With respect to allegations about billing for old studies, Smith identifies certain individuals who "directed and made numerous attempts to intimidate Yale's Radiology Department faculty members to review and interpret these old Radiology Studies and furnish finalized reports for which Yale <u>could and would</u> bill the Professional Component, even though the delayed interpretations had no therapeutic or diagnostic value. . . ." (<u>Id.</u> ¶ 56 (emphasis added).) Smith does not, however, allege anyone actually submitted bills for these interpretations to the government. Moreover, there is no allegation regarding any specific fraudulent claim, when and whether it was submitted to the government, and at what amount. These omissions are fatal. See <u>United States ex rel. Riley v. Alpha Therapeutic Corp.</u>, 96-cv-0704, 1997 WL 818593, at *3 (N.D. Cal. Nov. 10, 1997) (identifying persons engaged in the fraud insufficient if complaint fails to identify "a specific false claim made by any of the named persons.").

Two of Smith's allegations of fraudulent billing are made "on information and belief." (2d Am. Compl. ¶¶ 77-78.) As a general rule, Rule 9(b) pleadings cannot be based upon information and belief. <u>Segal v. Gordon</u>, 467 F.2d 602, 608 (2d Cir. 1972).[12] In alleging that

---

[12] The one exception to this rule – when pertinent information is exclusively within the defendant's knowledge – is inapplicable here. See <u>Phipps</u>, 152 F. Supp. 2d at 455 (dismissing FCA case where it was not shown that allegations on information and belief were particularly within defendant's knowledge). Smith has not alleged – as he cannot – that the information missing from the complaint is exclusively in Defendants' control. Information about Medicare billing is obviously not within the exclusive control of the party submitting the bill. The government possesses all claims submitted by Defendants, and Smith can obtain that information through sources such as the Freedom of Information Act. See, e.g., <u>Claussen</u>, 290 F.3d at 1314 n.25 (refusing to apply a more lenient pleading standard to relator's allegations of Medicare fraud because he was "not without avenues for obtaining information"); <u>Barmak</u>, 2003 WL 21436213, at *4 n.6 (dismissing complaint under Rule 9(b) because "[t]he government, physicians, and patients also possess the information in question"); <u>United States ex rel Russell v. Epic Healthcare Mgmt. Group</u>, 193 F.3d 304, 308 (5th Cir. 1999) (affirming Rule 9(b) dismissal because the necessary information was possessed by outside entities, including the Health Care Financing Administration).

Defendants billed for studies by radiologists who were not qualified teaching physicians, Smith

points to certain reports finalized by Drs. Simmonds and Haims. (2d Am. Compl. ¶ 75.) Smith

deems the doctors unqualified and concludes, based solely on "information and belief," that

Defendants sought reimbursement for the reports from Medicare. (Id. ¶¶ 75, 77-78.) Similarly,

Smith makes allegations about a number of reports and concludes, again based only on

"information and belief," that the radiologists did not review the reports or associated images and

that Defendants submitted bills to Medicare for reimbursement. (Id. ¶¶ 77-78.)

Even where allegations are based on information and belief, the complaint must set forth

a factual basis for such belief. DeCarlo, 937 F. Supp. at 1050. Smith's general allegations

provide no facts upon which his belief that false claims were submitted can be based. Under

Rule 9(b), a FCA plaintiff is not permitted "to allege simply and without any stated reason for his

belief that claims requesting illegal payments must have been submitted, were likely submitted or

should have been submitted to the Government." Clausen, 290 F.3d at 1311; see also Karvelas,

360 F.3d at 233-34 (allegations that defendants "knowingly filed improper claims in that they

presented claims for medical items or services that they knew were not provided as claimed" and

"filed claims that were based on codes that the defendants knew would result in greater payments

than what an appropriate code would have provided" are insufficient).

B.    **The Complaint Must Be Dismissed for Failure to Plead Particulars
      Regarding the Conduct Resulting in the Alleged Fraudulent Claims.**

      1.    **An FCA Complaint Must Plead Specific Details Regarding the
            Alleged Fraudulent Scheme.**

In addition to identifying the specific false claims submitted to the government, an FCA

complaint must set forth with sufficient particularity the details of the underlying conduct that

allegedly resulted in fraudulent claims being submitted to the government. General allegations of

fraudulent methodologies do not pass muster under Rule 9(b).  See, e.g., In re Cardiac Devices Qui Tam Litig., 221 F.R.D. at 337 (It is insufficient to plead "only a general scheme of fraud that might have resulted in the submission of false claims"); United States ex rel. Butler v. Magellan Health Servs., Inc., 101 F. Supp. 2d 1365, 1369 (M.D. Fla. 2000) (same); United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc., 96-cv-1380, 2000 WL 17838, *4 (E.D. La. Jan. 10, 2000) (dismissing FCA claim where plaintiff failed "to identify a single fraudulent urinalysis test that was unordered or unauthorized, a single date on which such testing was performed, or a single patient on whom such a test was performed"); see also United States ex rel. Bledsoe v. Cmty Health Sys., 342 F.3d 634, 643 (6th Cir. 2003) (affirming dismissal of complaint that "failed to set forth dates as to the various FCA violations or any particulars as to the incidents of improper billing Relator supposedly witnessed first-hand"); Karvelas, 360 F.3d at 232 ("Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b).").

In Karvelas an allegation that "from 1994 to 1997 the Hospital was certifying 12 respiratory therapists when in reality the hospital had only 7 full time respiratory therapists" was held insufficient because it provided "no details concerning the dates and content of the alleged certification." Karvelas, 360 F.3d at 234.  Allegations that the defendant performed "21,000 arterial blood gas tests [from] June, 1994 through April, 1997 at $50.00 per test" and "billed Medicare for the costs of the testing on a large percentage of these patients with each bill certified to Medicare or Medicaid that the ABG laboratory had in fact complied with CAP and CLIA standards" were insufficient, because plaintiff did not "specify which of the 21,000 tests were billed to the government, supply any details about the particular bills and certifications

submitted, or provide a factual basis for his allegation that the defendants falsely certified

compliance with federal standards in order to secure Medicare or Medicaid benefits." Id.; see

also Yuhasz, 341 F.3d at 565 (affirming dismissal under Rule 9(b) of FCA claims based on

general allegations such as: "certain testing that was outsourced . . .," "Yuhasz . . . often

discovered," and "approximately 5% of the product") (emphasis added).

> **2.    Smith Fails to Plead Required Particulars Regarding the Alleged
> Fraudulent Scheme.**

Not only does Smith fail to identify a single false claim submitted to the government,

which is reason enough to dismiss the complaint, Smith fails to allege with specificity the

underlying schemes that ostensibly resulted in the submission of a false claim to the government.

For example, in claiming that Defendants billed for medically unnecessary studies, Smith alleges

that YNHH hired a "staff person" to locate old radiology studies and present the studies to

"Yale's Radiology Department faculty for purposes of obtaining their interpretations and final

reports of the old Studies." (2d Am. Compl. ¶ 55.) Smith then lists several doctors and

managers at Yale and YNHH who allegedly "directed and made numerous attempts to

intimidate" faculty members to review and interpret the old studies. (Id. ¶ 56.) Nowhere does

Smith identify a single detail regarding an old study that was improperly interpreted. He does not

allege dates, locations, radiologists, content of reports, or sources of information.

Smith's allegations regarding the performance of panels of radiology studies not

medically indicated or necessary (id. ¶¶ 89-92) fair no better. Smith fails to allege the dates on

which the studies were performed, by whom, the content of the studies or corresponding report,

or any other particulars. Rather, he alleges only that certain studies "are routinely ordered as a

matter of practice, regardless of whether the tests are medically indicated" (id. ¶ 89) and that

doctors were told "to perform the protocol Studies regardless of medical indication" (id. ¶ 91).
These general allegations fail to satisfy Rule 9(b). See Butler, 101 F. Supp. 2d at 1369
(allegation that doctor was pressured to lengthen patient hospital stays when not medically
appropriate insufficient under FCA).

Smith's allegations that Defendants billed for studies by radiologists who were not
qualified teaching physicians and for studies for which the signing radiologist did not review the
associated image and/or preliminary report are similarly deficient.[13] While Smith alleges
generally that groups of studies and reports were performed improperly, he does not identify
individual reports. For example, Smith alleges that "at least 81 patient radiological reports
initially interpreted by Residents and Fellows have been altered to reflect the names of Qualified
Radiologists as the Responsible Radiologists . . ." (2d Am. Compl. ¶ 73) and that "[s]ince July
17, 1998, at least 67 preliminary reports reflecting the initial interpretation by Clinical Faculty
members have been finalized by other Yale Radiologists and/or nonprofessional personnel who
have never even reviewed the Radiology Studies associated with the preliminary reports" (Id. ¶
74). These allegations, however, fail to delineate the specific dates or content of the reports,
much less whether Defendants submitted claims for reimbursement for these reports.[14]

---

[13] While Smith devotes a large portion of his 49-page complaint to these allegations, the length of a pleading cannot remedy its lack of particulars. See Williams v. WMX Techs, Inc., 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. . . . [A] garrulous style is not an uncommon mask for an absence of detail."); Karvelas, 360 F.3d at 235 (dismissing a 93-page complaint under Rule 9(b)).

[14] The Second Amended Complaint is replete with similar vague allegations. (2d Am. Compl. ¶¶ 63, 75-76.) Smith makes several allegations regarding "thousands" of reports that were finalized by physicians who never reviewed the studies, but fails to provide sufficient identifying detail. (Id. ¶ 69 ("[Since 1998,] thousands of reports of Radiology Studies reflecting the initial interpretations of Residents and Fellows had been finalized by 'Autosign' or physicians who had never reviewed the films and had not supervised the Resident or Fellow. . . ."); id. ¶ 83 ("from on or about July 1997 to July 1998, several thousands of Radiology Reports read by Residents and first year Neuroradiology Fellows were fraudulently finalized by Yale Faculty who never reviewed the images," including Drs. Glickman, Forman, and Sze); id. ¶¶ 87-88 (same).).

There is only one allegation in the Second Amended Complaint that provides any details about the underlying conduct about which he complains. (Id. ¶ 85 ("Dr. Gordon Sze finalized 88 Reports in four minutes between 10:14 A.M. and 10:18 A.M. on March 9, 1998.").) Smith, however, nowhere alleges that Defendants submitted a claim to Medicare and Medicaid for any of these 88 reports. Smith does not even claim that these reports involved Medicare beneficiaries. United States ex rel. Barrett v. Columbia Healthcare Corp., 251 F. Supp. 2d 28, 35 (D.D.C. 2003) (finding complaint failed to satisfy Rule 9(b) where "[t]he allegations are not connected specifically to Medicare patients") (emphasis added).

As in Karvelas and Yuhasz, Smith's allegations of large groups of studies and reports that were improperly performed fail to provide the requisite details under Rule 9(b). Of course, even if Smith provided specific details about the reports, he would still need to identify the reports for which Defendants sought reimbursement from Medicare.

**C.    Smith Should Not Be Given Leave to Amend the Second Amended Complaint.**

Smith should not have yet another chance to allege a claim properly under the FCA. Where dismissal is based on Rule 9(b), leave to amend should not be granted if such amendment would be futile. See Acito v. IMCERA Group, 47 F.3d 47, 55 (2d Cir. 1995). After three attempts to get it right, Smith has failed to identify a single claim of fraud or to allege sufficient details of fraudulent conduct to meet the Rule 9(b) standard. Allowing Smith a fourth bite at the apple would be futile.

IV.    **THE FCA CLAIMS SHOULD BE DISMISSED PURSUANT TO RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM.**

Peppering the complaint with citations to provisions of the Medicare regulations and vague allegations of fraudulent schemes, Smith apparently hopes that the Court will throw up its hands and allow him to move forward with his claims.  Smith seeks to capitalize on the fact that the statutory provisions governing Medicare "are among the most completely impenetrable texts within human experience." Dameron Physicians Med. Group v. Shalala, 961 F. Supp. 1326, 1328 (N.D. Cal. 1997) (citing Rehabilitation Ass'n of Va., Inc. v. Kozlowski, 42 F.3d 1444, 1450 (4th Cir. 1994)).[15]

Although the Medicare regulations are especially complex, when it comes to allegations of Medicare fraud one simple principle governs.  To state a claim, Smith must allege that Defendants submitted a bill that the government would not have paid.  United States ex rel. Mikes v. Straus, 274 F.3d 687, 696-697 (2d Cir. 2001) (holding the FCA "reaches only those claims with the potential wrongfully to cause the government to disburse money [and that since] the Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay"); United States ex rel. Cappella v. Norden Sys., Inc., No. 3:94-cv-2063, 2000 WL 1226487, at *8 (D. Conn. Aug. 24, 2000) ("In order for a false statement to raise FCA liability . . . it must serve as a prerequisite for payment by the government.").

Accepting all of his allegations as true for the purposes of Rule 12(b)(6), including his unsupported allegations that claims for reimbursement were submitted to the Government, Smith

---

[15] The Department of Justice considers the complexity of the regulations at issue an important factor in deciding whether it will pursue an FCA claim. See Eric J. Holder, Jr., Deputy Attorney General, Guidance on the Use of the False Claims Act in Civil Healthcare Matters (June 3, 1998) (issues to be considered include: "The Clarity of the Rule or Policy") (http://www.usdoj.gov/04foia/readingrooms/chcm.htm).

fails to allege that any false statement was made to the government as a prerequisite to Medicare reimbursement, and he has, thus, failed to state a claim under the FCA.

### A.    Smith's Allegations That Defendants Billed for Studies By Radiologists Who Were Not Qualified Teaching Physicians Do Not State a Claim Under the FCA.

Smith's allegation that "reports by residents and fellows were finalized by . . . outside clinical attending physicians [i.e., Drs. Simmonds and Haims] who are not authorized to bill Medicare as Teaching Physicians" (2d Am. Compl. ¶ 75) misinterprets the applicable Medicare regulations and fails to state a claim for which relief can be granted under the FCA. The Medicare regulations define a teaching physician as "a physician (other than another resident) who involves residents in the care of his or her patients." 42 C.F.R. § 415.152. Smith does not – and under this broad definition of "teaching physician" cannot – assert that the outside clinical attending physicians did not qualify as "teaching physicians" under the applicable regulations. Further, the regulations provide that faculty physicians may bill either for their own services or for the review of services performed by a resident. See 42 C.F.R. § 415.180 ("Physician fee schedule payment is made for the interpretation of diagnostic radiology and other diagnostic tests if the interpretation is performed or reviewed by a physician other than a resident."). Thus, the finalization of reports by outside clinical attending physicians falls squarely within the bounds of permissible billing practices and does not constitute the filing of a false claim.

Smith also misconstrues the Medicare regulations when he claims that Medicare would not provide reimbursement for services performed by physicians whom he deems "non-qualified." (2d Am. Compl. ¶ 78.) Except in limited circumstances not alleged here, the Medicare regulations do not consider a physician's experience or specialty in determining whether a service is reimbursable or the amount of that reimbursement. See 42 C.F.R. § 414.20.

ny-559915                                          32

Such allegations cannot form the basis of an FCA claim. See McAllan, 1999 WL 280416, at *5 (dismissing allegations in complaint where "[p]laintiff does not allege [that] the federal government would have paid even one dollar less in reimbursement fees.").

**B.      Smith's Allegations That Defendants Billed for Studies for Which the Signing Radiologist Did Not Review the Associated Image and/or the Preliminary Report Do Not State a Claim Under the FCA.**

**1.      Smith's Allegations Involving the Neuroradiology Fellows Do Not State a Claim.**

Smith's allegations regarding the review of reports by neuroradiology fellows and residents (2d Am. Compl. ¶¶ 14, 83-88) are likewise based on the false assumption that Defendants cannot bill Medicare for services rendered by fellows and residents without review by a supervising physician. Such billing is permissible under the Medicare regulations and cannot, therefore, form the basis of an action under the FCA.

Medicare carriers "must pay for the [Professional Component] of radiology services furnished by a physician to an individual patient in all settings under the fee schedule for physician services regardless of the specialty of the physician who performs the service." Medicare Claims Processing Manual, Ch. 13, § 20.1. Fellows and residents are licensed physicians, and services rendered by them must be paid by Medicare under this provision. The regulations further provide that the services of "moonlighting" residents and fellows may be billed to Medicare without teaching physician supervision, approval, review, or participation, provided that certain conditions not applicable here are met. 42 C.F.R. § 415.208; [16] see also

---

[16] Specifically, the regulations require that (1) the services be unrelated to the approved Graduate Medical Education ("GME") program; (2) the services are performed in an outpatient department or emergency department of a hospital (including a teaching hospital); (3) the services are identifiable physician services which meet the conditions for payment of physician services to beneficiaries and providers, as provided in § 415.102(a); (4) the resident performing the services is fully licensed to practice medicine or osteopathy by the state in which the services are performed; and (5) the services can be separated from those that are required as part of the approved GME program.

Med. Carr. Man. § 2020.8(C) (1999).  Smith ignores the clear language of these regulations and instead asserts that the regulations require that a "Qualified Radiologist" review and sign all studies of fellows or residents.  (2d Am. Compl. ¶ 14.)  The term "Qualified Radiologist" is Smith's creation; it appears nowhere in the applicable regulations.  Smith's assertion has no support in the applicable regulations and, as such, cannot support a claim under the FCA.

Furthermore, the fellows to whom Smith refers are board-certified radiologists and, as such, are qualified to interpret all radiology studies and legally capable of billing for any work performed outside the context of their training program.  42 C.F.R. §§ 415.102; 415.120.  Thus, the fellows can bill for their work in the emergency department.  Smith admits that the fellows reviewed the reports.  (2d Am. Compl. ¶ 83.)  To avoid the possibility that fellows might inadvertently bill Medicare for training work, however, a system was put in place whereby an attending physician would review all studies reviewed by fellows in the emergency department before the studies were billed.  As discussed above, Medicare reimburses the same amount regardless of the level of experience of the billing physician.  42 C.F.R. § 414.20.  Smith cannot claim that Medicare would have paid a cent more because, for administrative reasons, Defendants had attending faculty radiologists sign off on reports that the fellows had already reviewed.  See United States ex rel. Willard v. Humana Health Plan of Tex., Inc., 336 F.3d 375, 381 (5th Cir. 2003) ("The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe."); Clausen, 290 F.3d at 1311 (same); Gross, 2003 WL 22508153, at *2 (granting motion to dismiss holding the relator "must do more than simply plead that Defendants were not in compliance

with all applicable regulations. . . . He must plead sufficient facts [to] demonstrate that the Defendants intended to deceive the United States").

        **2.**      **<u>Smith's Allegations Regarding the "Clean Up Project" Do Not State a Claim.</u>**

        With respect to the clean up project, in which attending faculty radiologists were asked to finalize reports that voluntary faculty members had not finalized, Smith does not claim that the voluntary faculty members failed to interpret the report and associated images contemporaneously with providing care for the patient. (2d Am. Compl. ¶¶ 58-65, 80-82.) Smith further does not allege that Medicare was asked to pay twice for the same service. In fact, Smith does not claim that Medicare was asked to pay a cent more than if the voluntary faculty members had themselves finalized the reports. Taking what he says as true, Smith has simply not stated a claim under the FCA.

        **3.**      **<u>Smith's Allegations Regarding the Use of "Autosign" Do Not State A Claim.</u>**

        With respect to his claim that the use of the "Autosign" function constitutes Medicare fraud (2d Am. Compl. ¶¶ 20, 57-61, 66-74, 76-78), Smith fails to state a claim. In the complaint, Smith quotes extensively from an April 27, 1998 email from Felicia Tencza, in which she notifies the staff that the Autosign function was to be used in the event a preliminary report was dictated by a staff member and the films were subsequently lost before an attending could review the images. (<u>Id.</u> ¶ 58.) Smith, however, selectively omits that Ms. Tencza stated in that very email that the purpose of Autosign was to flag these preliminary reports so that Medicare would not be billed. Ms. Tencza states: "<u>It is VERY important that we do not bill for the study</u>. A 'generic' position has been created: 'Auto Sign,' who will be put in the position of responsible

radiologist, in addition to the attending's name." (Doyle Decl. Ex. M) (emphasis added).[17]

Likewise, Smith quotes from an April 30, 1998 email from Ms. Tencza (2d Am. Compl. ¶ 60), in

which she reiterates "NO BILL WILL GO OUT FOR 'AUTO SIGN'.  THAT IS THE PURPOSE

OF CREATING 'AUTO SIGN.'" (Doyle Decl. Ex. N.)  Smith clearly cannot state a claim based

on the use of Autosign.

### C.   Smith's Allegations that Defendants Billed for Medically Unnecessary Studies Do Not State a Claim.

Smith's claims that Defendants billed Medicare for the professional component of

radiology studies performed when such studies were not medically necessary, whether by billing

for old reports or by billing for unnecessary panels of tests (2d Am. Compl. ¶¶ 55-56, 89-92), are

so vague and conclusory that Defendants cannot respond.  Smith's claims should be dismissed

under Rule 12(b)(6), as well as under Rule 9(b).  See Contemporary Mission, Inc. v. United

States Postal Serv., 648 F.2d 97, 107 (2d Cir. 1981) (holding complaints containing only

conclusory, vague, or general allegations cannot survive a motion to dismiss).

### FALSE CLAIMS ACT

### SECTION 3730(h) RETALIATION CLAIMS

## I.   SMITH'S RETALIATION CLAIM IS TIME-BARRED.

Smith's § 3730(h) claim for retaliation should be dismissed as untimely.  Section 3730(h)

does not contain a limitations provision, and Smith's retaliation claim is, therefore, governed by

---

[17] Although the email is not attached to the complaint, it is nevertheless incorporated by reference and therefore may be considered on a motion to dismiss. Stuto v. Fleishman, 164 F.3d 820, 826 n. 1 (2d Cir. 1999) (consideration of a document permissible on a motion to dismiss because it was discussed in the complaint); Nat'l Ass'n of Pharm. Mfrs. v. Ayerst Lab., 850 F.2d 904, 910 n. 3 (2d Cir. 1988) (letter incorporated by reference where complaint referred thereto); see also Phillip Morris Inc. v. Heinrich, 95-cv-0328, 1997 WL 781907, at *5 (S.D.N.Y. Dec. 18, 1997) ("It is appropriate for this Court to consider the 1989 letter while resolving the motions to dismiss because the letter was incorporated by reference into the Complaint."); see also supra note 1.

the 90-day limitations period of Connecticut's whistleblower statute. As such, Smith's retaliation claim is time-barred.

A.    **The Six-Year Limitations Period of the FCA Is Inapplicable.**

The six-year limitations period set forth in § 3731(b)(1) is inapplicable to a retaliation claim under § 3730(h).[18]  By its terms, § 3731(b)(1) applies only to the underlying false claims violation. Section 3731(b)(1) provides, "A civil action under 3730 may not be brought . . . more than six years after the date on which the violation of Section 3729 is committed. . . ." 31 U.S.C. § 3731(b)(1) (emphasis added). A violation of § 3730(h) is not a violation of § 3729 and thus is not within the purview of § 3731(b)(1). See United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027, 1035 (9th Cir. 1998) ("Section 3729 specifically and strictly addresses false claims, not retaliation claims.").

The legislative history of the FCA makes clear Congress's intention that the limitations period of § 3731(b)(1) apply only to claims brought under § 3729 and not to claims for retaliation brought under § 3730(h). At the same time that Congress added the retaliation provision, Congress reworded the statute of limitations provision. Lujan, 162 F.3d at 1034 (citing False Claims Amendments Act of 1986, Pub. L. 99-562, 100 Stat. 3153). Congress changed § 3731(b) from stating simply that "[a] civil action under section 3730 of this title must be brought within 6 years from the date the violation is committed" id. (quoting 31 U.S.C. § 3731(b) (1983)), to providing more narrowly that "[a] civil action under 3730 may not be brought . . . more than six

---

[18] The Circuits are split as to whether the limitations period of § 3731(b)(1) applies to an action for retaliation under § 3730(h). Compare United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027 (9th Cir. 1998), with Wilson v. Graham County Soil & Water Conservation Dist., 367 F.3d 245 (4th Cir. 2004), and Neal v. Honeywell, Inc., 33 F.3d 860 (7th Cir. 1994). The Second Circuit has not yet addressed the issue, but the reasoning of the Fourth and Seventh Circuits is unconvincing and contrary to Congress's intention that the limitations period articulated in § 3731(b) apply only to claims brought under § 3729. The Court should follow the Ninth Circuit and find § 3731(b) inapplicable to a retaliation claim under § 3730(h).

years after the date on which <u>the violation of Section 3729 is committed</u>. . . ." 31 U.S.C.

§ 3731(b)(1) (emphasis added).  Thus, cognizant that it was creating a new cause of action for

retaliation, Congress reworded the statute of limitations provision to make clear that it pertains

only to violations of § 3729.  <u>Lujan</u>, 162 F.3d at 1035 ("In the absence of some meaningful

indication to the contrary, we must therefore presume that, in amending section 3731(b) so that

the limitation runs only from the date of a violation of section 3729, Congress did not intend that

the statute apply to section 3730(h).").

      Congress's addition of § 3731(b)(2) further illustrates that the 1986 amendments to the

statute of limitations provision were aimed at false claims, not retaliation.  <u>Id</u>. at 1035.  Section

3731(b)(2) is an alternative to § 3731(b)(1) and provides that an action may not be brought "more

than three years after the date when facts material to the right of action are known or reasonably

should have been known <u>by the official of the United States charged with responsibility to act in</u>

<u>the circumstances</u>." 31 U.S.C. § 3731(b)(2) (emphasis added).  The legislative history indicates

that this section was added to "ensure the Government's rights are not lost through a wrongdoer's

successful deception" and because "fraud is, by its nature, deceptive."  <u>Lujan</u>, 162 F.3d at 1035

(quoting S. Rep. No. 99-345, at 15 (1986), <u>reprinted in</u> 1986 U.S.C.C.A.N. 5266, 5280).  This

rationale is inapplicable to a claim for retaliation under § 3730(h), which cannot be brought by

the government and which is not based on fraud.  Unlike fraud, which is often not readily

discoverable, retaliation is known to its victim immediately.  <u>United States ex rel. Truong v.</u>

<u>Northrup Corp.</u>, 88-cv-967, 1991 U.S. Dist. LEXIS 21802, at *3-4 (C.D. Cal. Nov. 26, 1991)

("The reason for the lengthy [limitations] period [under § 3731] was because fraud is deceptive

and adequate time is necessary to ensure the government's rights are not lost through the

violator's deception.  These reasons are inapplicable to a private action [for retaliation].") (citing

ny-559915                                                    38

S. Rep. No. 99-345, at 15 (1986)); see also Lujan, 162 F.3d at 1035 ("There is nothing covert or deceptive about retaliation—the victim feels its sting immediately.").

Moreover, in adding § 3730(h) to the FCA, Congress noted that the provision was modeled after the "whistleblower protection" provisions of other federal statutes. John T. Boese, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 4.11[A] (2d ed. 2004) (citing S. Rep. No. 99-345, at 34-35 (1986)). Such provisions typically carry 30-day limitations periods. Id. (citing statutes).

Application of the six-year limitations period of § 3731(b)(1) to an action under § 3730(h) would lead to "illogical consequences." Truong, 1991 U.S. Dist. LEXIS 21802, at * 5. For example, a *qui tam* plaintiff would be time-barred from bringing a retaliation claim where the underlying *qui tam* action was brought immediately before the expiration of the limitations period, and the retaliation did not occur until the employer learned of the *qui tam* action -- that is, immediately after the expiration of the § 3731(b)(1) limitations period. Id. at *3. "Congress cannot have meant for an employee's private claim for retaliation against an employer to be time-barred before that employee suffers the retaliation." Id. at *5. Equally illogical would be the inevitable result that individual employees asserting retaliation claims would be subjected to widely varying limitations periods. Id. at *5-6 ("It is both unreasonable and unfair for identically situated plaintiffs to be held to widely varying periods of limitation because the accrual date for the limitations period is unrelated to their claim."). For these reasons, the limitations period provided under § 3731(b) is inapplicable to a claim for retaliation under § 3730(h).

**B.     The Applicable Statute of Limitations Is The 90-Day Limit Provided by Connecticut's Whistleblower Statute.**

Where, as here, a federal statute does not supply a specific limitations period for the cause of action at issue, the "most closely analogous" statute of limitations under state law applies.

Reed v. United Transp. Union, 488 U.S. 319, 323 (1989). The most closely analogous statute is § 31-51m of the Connecticut General Statutes, Connecticut's "whistleblower" statute, which provides, "No employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports . . . a violation or a suspected violation of any state or federal law or regulation to a public body. . . ." Conn. Gen. Stat. § 31-51m(b). The controlling limitations provision states, "Any employee who is discharged, disciplined or otherwise penalized by his employer in violation of the provisions of subsection (b) may, after exhausting all available administrative remedies, bring a civil action, within ninety days of the date of the final administrative determination or within ninety days of such violation, whichever is later. . . ." Conn. Gen. Stat. § 31-51m(c).

Smith failed to assert his claim for retaliation within the 90-day limitations period, and his claim should be dismissed as untimely. The Original Complaint was filed on July 19, 2000, and amended pleadings were filed on September 12, 2003, and January 23, 2004. Each of these dates is well over 90 days from the time when any alleged violation of § 3730(h) could logically have occurred. Smith resigned from Yale on June 30, 1999 (2d Am. Compl. ¶ 7), making that date the latest on which any retaliatory action could have been taken against Smith in connection with the terms of his employment. Further, immediately following his resignation from Yale, Smith took a position at Cornell, and therefore no retaliatory action could have been taken against Smith in connection with his search for employment after about June 30, 1999. (Id.) Smith's retaliation claim, therefore, had to have been brought no later than September 30, 1999 – 90 days after Smith's last day of employment at Yale.

## II.    THE RETALIATION CLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

Smith's claim for retaliation should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In order to establish a claim for retaliation, the complaint must show:  (1) that Smith engaged in protected conduct under the FCA; (2) that Smith's employer knew that he engaged in the protected conduct; and (3) that Smith's employer retaliated against him because of his protected conduct.  Karvelas, 360 F.3d at 235; Yuhasz, 341 F.3d at 566.  Smith has failed to allege facts sufficient to establish any of the required elements of a § 3730(h) claim for retaliation, and his claim should be dismissed.

### A.    Smith Has Failed To Allege That He Was Engaged In Protected Conduct Under The FCA.

Smith has failed to allege any facts to demonstrate that, prior to his resignation from Yale, he was engaged in protected conduct under the FCA.  "Protected conduct" is conduct taken "in furtherance of an action" under the FCA.  31 U.S.C. § 3730(h) (providing cause of action for retaliation for those who take lawful action "in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section"); see also Faldetta v. Lockheed Martin Corp., 98-cv-2614, 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000) (The "in furtherance of" requirement is satisfied by "investigating matters that were calculated, or reasonably could have lead, to a viable FCA action"); McKenzie v. Bellsouth Telecomm., Inc., 219 F.3d 508, 515 (6th Cir. 2000) ("'[P]rotected activity' requires a 'nexus' with the 'in furtherance of' prong of an FCA action.") (citation omitted).  "[T]he term 'protected conduct' . . . is interpreted more narrowly when applied to FCA claims than to common or state law retaliatory discharge actions. . . .  The plaintiff must demonstrate that her investigation, inquiries, and/or testimony were directed at

exposing a fraud upon the government." <u>Moor-Jankowski v. Bd. of Trs. of New York Univ.</u>, 96-cv-5997, 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998) (internal quotations and citations omitted); <u>see also</u> <u>McKenzie</u>, 219 F.3d at 516 ("The 'protected activity' must relate to 'exposing fraud' or 'involvement with a false claims disclosure.'") (citation omitted). That is, an employee must plead facts to demonstrate that he or she was either taking action in pursuit of a private *qui tam* action or assisting the government in an FCA action. <u>Vallejo</u>, 2 F. Supp.2d at 338.

Smith has failed to allege that he was engaged in conduct in furtherance of an action under the FCA. The generalized inquiries and complaints that Smith alleges he made fall far short of an expressed intent to investigate or pursue a claim of fraud against the federal government. Nowhere in the complaint does Smith demonstrate that he intended to do more with his concerns than voice them, however adamantly, at internal meetings. (2d Am. Compl. ¶ 59 ("On April 30, 1998, Relator Smith . . . made certain inquiries about the process as he was concerned that the 'Autosign' process was unethical and illegal."); <u>id.</u> ¶ 61 ("On May 4, 1998, Relator Smith reported his concerns about the 'Autosign' process to Dr. McClennan. He also reported his concerns about other instances of possible Medicare fraud. . . ."); <u>id.</u> ¶ 66 ("On May 21, 1998, the 'Autosign' process was discussed at the Abdomen Section Meeting. . . . Smith [was] adamant [in his] opposition to the 'Autosign' policy as set forth in the April 28, 1998 memorandum from Ms. Tencza."); <u>id.</u> ¶ 67 ("Smith reported and complained about the deficiencies in patient care, improper billing, falsification of records and deficiencies in the GME Residency Program to Defendants' representatives . . . and the Defendants failed to take any corrective action in response to those reports and complaints."); <u>id.</u> ¶ 81(d) (at a meeting with General Counsel Robinson, Smith stated that if doctors at other hospitals sign unreviewed reports, "they are committing fraud according to Medicare regulations").) Such complaints do

not constitute investigation for, initiation of, or assistance in an action under the FCA and are, therefore, insufficient to state a cause of action under § 3730(h).  See McKenzie, 219 F.3d at 516 (to constitute protected activity, plaintiff's actions must have "sufficiently furthered 'an action filed or to be filed under' the FCA") (emphasis added); Zahodnick v. IBM, 135 F.3d 911, 914 (4th Cir. 1997) ("Simply reporting his concern of a mischarging to the government to his supervisor does not suffice to establish that [the plaintiff] was acting 'in furtherance of' a qui tam action.") (citation omitted).

**B.    Smith Has Failed to Allege That His Employer Knew He Was Engaged in Protected Conduct.**

Even assuming *arguendo* that Smith was engaged in protected conduct, there is no basis in the Complaint from which it can be concluded that Yale knew of such conduct.  To state a claim under 3730(h), a plaintiff must allege that his employer was on notice that he intended to report the employer's conduct to the government or that he was contemplating instituting a *qui tam* action against his employer.  Vallejo, 2 F. Supp. 2d at 339; see also United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d 1514, 1522 (10th Cir. 1996) ("If defendants were not afforded such notice, then, a fortiori, their actions could not constitute retaliation.").  At a minimum, a plaintiff must allege engaging in activities that gave "the employer reason to believe that the employee was contemplating a *qui tam* action against it."  Id. (quoting Mikes v. Strauss, 889 F. Supp. 746, 753 (S.D.N.Y. 1995), aff'd, 274 F.3d 687 (2d Cir. 2001)).

Complaining is not the same thing as filing a complaint.  As the Sixth Circuit stated, "a plaintiff must show that his employer was aware of his protected activity. . . . Merely grumbling to the employer about . . . regulatory violations does not satisfy the requirement." McKenzie, 219 F.3d at 518.  Moreover, a complaint such as Smith's, which asserts nothing more than vague

allegations of fraud, will not "support an inference that there was a distinct possibility of or a reasonable basis for a qui tam action." <u>Moor-Jankowski</u>, 1998 WL 474084, at *12. Smith's complaint fails to demonstrate that Yale was on notice that Smith was contemplating reporting his complaints to the federal government, instituting a *qui tam* action, or in any way acting in furtherance of an FCA action.

### C.    Smith Has Failed To Allege That He Was Retaliated Against Because of His Protected Conduct.

Smith fails to allege that he was retaliated against because of his conduct in furtherance of a § 3730 action.  Smith portrays a nasty academic power struggle and personality clash, which is a far cry from an allegation that Yale retaliated against him <u>because of</u> FCA-related conduct.  In asserting that he was discriminated against in the terms or conditions of his employment, Smith does nothing more than rely on vague conclusions without setting forth a factual basis.  (2d Am. Compl. ¶ 99(a) (alleging that "he was repeatedly harassed, threatened and subjected to intimidation by Bruce McClennan, M.D. and others"); <u>id</u>. ¶ 99(b) (alleging that "his salary was cut"); <u>id</u>. ¶ 99(e) (alleging that "he was interfered with in his attempts to obtain employment elsewhere").)  Indeed, some of Smith's allegations are so far-fetched as to be unsupportable by any amount of facts.  (<u>Id</u>. ¶ 99(d) (alleging that "he was forced to resign from Yale and YNHH"); <u>id</u>. ¶ 99(f) (alleging that "he was forced to leave the state of Connecticut which had been his home for 19 years").)

### D.    Smith Cannot Assert Claims Under § 3730(h) on Behalf of Non-Parties Burrell and Rosenfield

The claims under § 3730(h) asserted by Smith on behalf of Drs. Rosenfield and Burrell should be dismissed for lack of standing. (2d Am. Compl. ¶¶ 100, 101.)  A plaintiff in a

ny-559915                                    44

retaliation case may not seek redress for the alleged injury of other persons.  Section 3730(h)

provides in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in
> any other manner discriminated against in the terms and conditions of employment
> by his or her employer because of lawful acts done by the employee on behalf of the
> employee or others in furtherance of an action under this section . . . shall be
> entitled to all relief necessary to make the employee whole. . . .

31 U.S.C. § 3730(h).  The relief offered an employee under § 3730(h) is for the harm suffered by

that employee, not for harm suffered by other employees.  It is well-settled that, to have standing,

a plaintiff must himself have suffered the alleged injury.  See e.g., Lujan v. Defenders of

Wildlife, 504 U.S. 555, 560-61, 561 n.1 (1992) (stating that to have standing, a plaintiff must

have suffered a "particularized" injury, which means that "the injury must affect the plaintiff in a

personal and individual way"); Valley Forge Christian Coll. v. Americans United for Separation

of Church & State, 454 U.S. 464, 472 (1982) ("[A]t an irreducible minimum, Art. III requires the

party who invokes the court's authority to 'show that he personally has suffered some actual or

threatened injury as a result of the putatively illegal conduct of the defendant. . . .'") (quoting

Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 99 (1979)).  Smith cannot assert claims

based on injury allegedly suffered by Drs. Burrell and Rosenfield.

## DEFAMATION

## I.    SMITH HAS FAILED TO STATE A CLAIM FOR DEFAMATION.

Smith's claim for defamation should be dismissed pursuant to Rule 12(b)(6) for failure to

state a claim upon which relief can be granted.  To establish a claim for defamation, a plaintiff

must prove (1) that the defendant published a false and defamatory statement about the plaintiff;

(2) that the publication was not privileged; (3) that the defendant acted with intent, recklessness,

or negligence; and (4) that the statement caused damage to the plaintiff.  See RESTATEMENT

ny-559915                                            45

(SECOND) OF TORTS §§ 558, 580B.  While a plaintiff need not allege the exact defamatory words that were published, vague allegations of defamation will not suffice.  Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986).  Rather, a claim for defamation must be "detailed and informative enough to . . . afford [the] defendant sufficient notice of the communications complained of to enable him to defend himself."  Id. (internal quotations omitted).[19]

To survive a motion to dismiss, the plaintiff "must plead 'what defamatory statements . . . were made . . ., when they were made, [and] to whom they might have been made."  Anthony v. Young & Rubicam, 979 F. Supp. 122, 128 (D. Conn. 1997) (Dorsey, J.) (quoting Bramesco v. Drug Computer Consultants, 834 F. Supp. 120, 122 (S.D.N.Y. 1993)); see also Croslan, 974 F. Supp. at 170 (finding complaint setting forth subject matter of allegedly defamatory statements did not state defamation claim with sufficient specificity where complaint "fail[ed] to state who heard [the statements], when they were made, and the context in which they were made"); Wannamaker v. Columbia Rope Co., 713 F. Supp. 533, 545 (N.D.N.Y. 1989) (allegation of defamation lacked sufficient specificity where it did not specify who made the statements, when and in what context the statements were made, whether they were made to a third party, whether they were written or oral, and what words were actionable), aff'd, 108 F.3d 462 (2d Cir. 1997).

Smith's vague allegations of defamation fail under this standard.  Smith alleges only in vague and conclusory terms that "[v]arious Yale [sic] and Yale representatives made false and injurious statements to third parties, including but not limited to employees, agents and/or

---

[19] See also, Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 271 (2d Cir. 1999) (affirming dismissal of defamation claim for failure to put defendant on notice of allegedly defamatory communications); Northrup v. Conn. Comm'n on Human Rights & Opportunities, Civ. No. 3:97-211, 1998 U.S. Dist. LEXIS 3111, at *14 (D. Conn. Feb. 2, 1998) (dismissing defamation claim for failure to meet specific pleading requirements); Croslan v. Housing Auth. for City of New Britain, 974 F. Supp. 161, 169-70 (D. Conn. 1997) (granting summary judgment motion on defamation claim where claim not pled with sufficient specificity).

representatives of [Cornell], Northwestern University and Boston University, as well as colleagues and staff at Yale and YNNH [sic]." (2d Am. Compl. ¶ 105; see also id. ¶ 99(h) ("Smith . . . was publicly defamed by multiple persons at YNHH and Yale including but not limited to David Kessler, M.D. and Bruce McClennan, M.D.").) Smith fails to specify the content of the alleged statements, when the alleged statements were made, the context in which they were made, and by and to whom the statements were made.

Because of the inadequacy of Smith's allegations, Defendants are unable to assert an informed defense. See Kelly, 806 F.2d at 46 (noting that allegation of defamation must "afford defendant sufficient notice of the communication complained of to enable him to defend himself") (quoting Liguori v. Alexander, 495 F. Supp. 641, 647 (S.D.N.Y. 1980)). For example, even though Smith added his defamation claim only in January 2004 to a suit originally filed in July 2000, Defendants are unable to assert an informed statute of limitations defense to the defamation claim.[20] Indeed, without information with which to identify the alleged statements, Defendants are unable to assess the availability of any defense to Smith's defamation claim.

---

[20] Under Connecticut law, the statute of limitations for defamation is two years. Conn. Gen. Stat. § 52-597 ("No action for libel or slander shall be brought but within two years from the date of the act complained of.") The two-year limitations period provided by § 52-597 begins to run on the date that the statement was published. L. Cohen & Co., Inc. v. Dun & Bradstreet, Inc., 629 F. Supp. 1425, 1429 (D. Conn. 1986).

ny-559915    47

## CONCLUSION

For the reasons stated herein, all claims against Defendants Yale and YNHH should be dismissed with prejudice.

Dated:  July 15, 2004

Respectfully submitted,

By: _William Doyle (WP s/z)_
William J. Doyle (CT04190)
Kenneth D. Heath (CT23659)
WIGGIN & DANA LLP
265 Church Street, One Century Tower
New Haven, CT  06508-1832
(203) 498-4400

By: _Carl H Loewenson h (WP s/z)_
Carl H. Loewenson, Jr. (CT07774)
Stanley R. Soya (CT25883)
J. Alexander Lawrence (CT25884)
MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, NY  10104-0185
(212) 468-8000

Attorneys for Defendant
Yale University

By: _Patrick M Noonan (WP s/z)_
Patrick M. Noonan (CT00189)
DELANEY, ZEMETIS, DONAHUE,
DURHAM & NOONAN, P.C.
741 Boston Post Road
Guilford, CT 06437
(203) 458-9168

Attorneys for Defendant
Yale-New Haven Hospital, Inc.

ny-559915