D.    Plaintiff Has Alleged Each Element Required to Satisfy Rule 9(b)

1.    Plaintiff Has Identified the Fraudulent Statements

Paragraph One of Plaintiff's Second Amended Complaint alleges that "Defendants violated the FCA, *inter alia*, by billing and retaining payments from the Medicare and Medicaid Programs for Radiological Services which were (1) worthless and not used for patient diagnosis or treatment, (2) not medically indicated and medically unnecessary, (3) substandard, and/or (4) never actually provided."

Paragraph Two alleges that "Defendants . . . submitted bills which they knew were in violation of Medicare and Medicaid billing requirements and falsely certified conformity with regulations."

Paragraphs Twenty-One through Forty of Plaintiff's Second Amended Complaint explain and identify the relevant Policies and Regulations with which Defendants were required to comply under Medicare. Relying on the requirements set forth in those Regulations, Plaintiff alleges that Defendants made fraudulent statements including those which falsely certified and billed for the performance of and interpretation of radiological studies that were not medically necessary. "Defendants represented to the Medicare and Medicaid Programs and to beneficiaries that: (1) they were committed to providing high quality patient care; (2) they had policies and procedures in place to ensure patient safety and that the quality of care provided to such beneficiaries was consistent with the prevailing standard of care and federal and state laws; and (3) they were committed to ethical business practices." (Second Am. Compl. ¶ 50.) Plaintiff also alleges that "[r]eads of old [radiological] studies are performed long after the point in time when they can be considered medically necessary," (*id.* ¶ 55), and Defendants "directed and made numerous attempts to intimidate . . . faculty members to review and interpret these old Radiology Studies and furnish

31

finalized reports for which Yale could and would bill the Professional Component, even though the delayed interpretations have no therapeutic or diagnostic value and they did not constitute 'physician services' which can be properly billed and paid for by the [government]," (*id.* ¶ 56).

Plaintiff alleges that the Hospital made fraudulent statements when it utilized "Autosign" to bill the Technical Component for studies for which a Teaching Physician played no role and never reviewed the preliminary report prepared by the Resident or Fellow; in essence the Hospital utilized Autosign to falsely certify and bill Medicare for incomplete "radiological services" that were either worthless, unnecessary and/or potentially dangerous as the interpretations of the resident or fellow and the images themselves were never reviewed by a Teaching Physician. Plaintiff alleges that, through "Autosign," the Hospital falsely finalized and billed for for the Technical component of radiology tests interpreted reports done by Residents and Fellows that had never been reviewed by a Teaching Physician, (*see id.* ¶ 58-61), and engaged in "improper billing, falsification of records." (*Id.* ¶ 67). Plaintiff alleges that he personally discovered thousands of reports reflecting the initial interpretations o f R esidents and Fellows which had been finalized by "Autosign," or finalized by physicians who had never reviewed the films and had not supervised the Resident or Fellow when the Studies were interpreted. (*Id.*. ¶ 69.) (*See also id.* ¶¶ 73-76, 77-79.)

Plaintiff also alleges that in the Neuroradiology fellow fraud Defendants made fraudulent statements through the fraudulent finalization of Radiology Reports of Residents and Fellows by Teaching Physicians who had never reviewed the images associated with the Reports at issue. Plaintiff alleges that Defendants fraudulently finalized several thousand reports "for billing purposes," including one instance in 1998 where Dr. Gordon Sze finalized 88 reports in four minutes without reading the reports or viewing the associated images. (*See id.* ¶¶ 83-86.)

32

It is evident from a cursory review of the allegations in Plaintiff's Second Amended Complaint that Plaintiff has identified numerous fraudulent statements underlying Defendant's fraudulent practices. As the *Karvelas* court has acknowledged, a false statement may be, in addition to a claim submitted to the government for reimbursement, a false certification of compliance with Medicare Regulations that are a condition for reimbursement. *See Karvelas*, 360 F.3d at 232 n.15. These statements include submitting claims for procedures that were not medically necessary, falsely certifying that a procedure was medically necessary, falsely certifying that a Teaching Physician had independently reviewed the radiological reports and associated images or supervised the Residents or Fellows while they were interpreting the films or procedures and then edited and/or reviewed the final report.

2.      Plaintiff Has Identified the Speaker

Plaintiff identifies numerous individuals who were responsible for implementing and monitoring the finalization billing for Radiological Services and Defendants' compliance with Medicare Regulations. Plaintiff also identifies numerous individuals who fraudulently finalized reports done by Residents or Fellows without viewing the images or reading the reports in violation of Medicare Regulations. (*See* Second Am. Compl. ¶ 46-48, 52,54, 56, 58, 60, 73, 75, 80-81, 83, 85.)

3.      Plaintiff Has Identified Where and When the Fraudulent
        Statements Were Made

Plaintiff has identified the several years when Defendants engaged in their fraudulent practices. Plaintiff alleges that some of the fraudulent practices have been going on since 1995. (*See id.* ¶ 55, 56.) Further, Plaintiff alleges that certain developments occurred on specific dates in 1998 and 1999 involving specific individuals. (*See, e.g., id.* ¶ 58-66, 79-81.) Plaintiff alleges that the use of Autosign has been extensive since April 1998. (*See id.* ¶ 71, 74-76.) Finally, Plaintiff alleges that the fraudulent finalization and certification by Teaching Physicians of studies interpreted

33

and reports made by Residents and Fellows has been ongoing since July 1997. (*See id.* ¶ 83-87.)
Plaintiff alleges that on one specific occasion on March 9, 1998 between 10:14 and 10:18 A.M., Dr.
Sze finalized 88 reports without reading them or viewing the associated images. (*Id.* ¶ 85.)

4.    Plaintiff Has Explained Why Defendants' Conduct Was Fraudulent

Throughout his Second Amended Complaint, Plaintiff explains why and how the conduct
alleged constituted fraud against the government. From the first paragraph, Plaintiff introduces and
explains the complicated maze of relevant Medicare Regulations and explains why Defendants'
failure to comply with those Regulations constitutes a fraud upon the government.

Plaintiff repeatedly alleges that, through the Neuroradiology fellows fraud and the clean up
project, reports and the associated images which were never reviewed by a faculty member were
fraudulently finalized. Although Defendants assert that Plaintiff's allegations are insufficient
because he has not provided evidence that Yale actually billed Medicare for these studies, both
parties are well aware that Yale University School of Medicine has a long-standing practice of
billing the Professional Component of Radiology Services for all reports that are signed (and thereby
"finalized") by Yale faculty and submitting claims under the name of the faculty member that signs
the report. (*See, e.g.,* Smith Aff. ¶¶ 9-11, 16, 18; attached as Ex. A.) There is no question that if
Plaintiff's allegations are accepted as true, Yale University must have submitted claims for
reimbursement from the Medicare program (under the name of the faculty signing each report) for
all such signed reports for Medicare patients.

Furthermore, Yale New Haven Hospital has a long-standing practice of submitting claims for
the Technical Component of Radiology Services for all exams that are completed and placed in the
"C" status in the DecRad system. (*See, e.g.,* Smith Aff. ¶¶ 7, 12, 21; attached as Ex. A.)
Furthermore, YNHH never checks or verifies at the time such a claim is submitted or at any future

34

time that a finalized or preliminary report for such services is ever made or placed in the DecRad system. Therefore, since all reports finalized by Autosign must necessarily have first been completed, the Hospital must have billed for the Technical Component for all exams for which reports were finalized by Autosign without the reports or the associated images ever being reviewed by a member of the faculty.

Accordingly, as Plaintiff has alleged the who, what, where, when, and how of the alleged fraudulent conduct, Defendants' Motion to Dismiss on the basis of Rule 9(b) should be denied.

## III. THE FIRST CAUSE OF ACTION PLED BY PLAINTIFF STATES A CLAIM UNDER RULE 12(b)(6)

### A. Standard of Review of a Motion to Dismiss Under Rule 12(b)(6)

"In considering a motion to dismiss under the Federal Rules of Civil Procedure, th[e] Court must take as true the facts alleged in the complaint and draw all reasonable inference in the plaintiff's favor. Th[e] court may dismiss [a] [p]laintiffs' . . . claims pursuant to Rule 12(b)(6) only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims which would entitle them to relief." *In re MTC Electronic Technologies Shareholder Litigation*, 74 F. Supp. 2d 276, 283 (E.D.N.Y. 1999) (internal citations and quotations omitted).

### B. Requirements Imposed by the Relevant Medicare Regulations

Under the federal regulations implementing Medicare,[5] if a resident or fellow participates in any procedure, a teaching physician must be present during the key portion of that procedure. 42 C.F.R. § 415.172. Medicare does not provide payment for services which are not reasonable and necessary for "the diagnosis and treatment of an injury . . ." 42 C.F.R. § 415.15(k)(1). Under 42 C.F.R. § 415.102, Defendant is only entitled to reimbursement for services provided if they

---

[5] Under 42 U.S.C. § 1395hh, the Secretary of the Department of Health and Human Services has the authority to promulgate regulations as are necessary to administer Medicare and Medicaid.

35

"contribute directly to the diagnosis or treatment of an individual beneficiary." 42 C.F.R. § 415.102(a)(2).

In a teaching setting, such as the one at issue in this case, radiological services provided by residents cannot be billed to Medicare Part B unless the Teaching Physician is physically present during the key portion of the procedure. 42 C.F.R. §§ 415.170, 415.172. In the case of Radiology tests and procedures this means that the interpretation of the test or procedure must be "performed or reviewed by a physician other than a resident" and records "<u>must</u> indicate that the physician performed the interpretation or reviewed the resident's interpretation with the resident."[6] 42 C.F.R. § 415.180 (emphasis added).

Compliance with the terms of these regulations is a condition for governmental payment. *See* 42 C.F.R. § 415.180 ("payment is made. . . **if** the interpretation is performed or reviewed by a physician other than a resident.") (emphasis added). Medicare will not pay for the interpretation of a radiological test if the documentation simply shows a countersignature of the resident's interpretation by the teaching physician. The teaching physician must review the film with the resident or perform an independent interpretation. 42 C.F.R. § 415.172; 60 Fed. Reg. 63124(E)(3)(d); Medicare Carrier Manual § 15016.

    C.    <u>Elements that Must be Pled Under Section 3729 of the False Claims Act</u>

The False Claims Act should be broadly construed. *Harrison v. Westinghouse Savanah River Co.*, 176 F.3d 776, 786, 788 (4th Cir. 1999); *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419, 439 (E.D.N.Y. 1995). Liability under the False Claims Act occurs when a person (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid

_____

[6] The term "resident" is synonymous with the terms "intern" and "fellow." 42 C.F.R. 415.152.

36

or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid. 31 U.S.C. § 3729(a). *State v. Evans*, 155 Misc. 2d 348, 589 N.Y.S. 2d 223, 1992 N.Y. Misc. LEXIS 424 (1992); *Mikes v. Straus*, 274 F.3d 687, 697 (2nd Cir. 2001). "The False Claims Act requires both knowledge of a claim's falsity and some action by the defendant which causes the claim to be presented to the government." *United States ex rel. Piacentile v. Wolk*, Civ. A. No. 93-5773, 1995 WL 20833 at *4 (E.D. Pa. Jan. 17, 1995) (citing 31 U.S.C.A. § 3729(a)(1), (b) (Supp.1994)).

Knowledge sufficient to establish liability is either actual knowledge, action with deliberate indifference or action with reckless disregard for the truth. 31 U.S.C. § 3729(b). Under the FCA, "the requisite *scienter* is 'the knowing presentation of what is known to be false' and that 'known to be false' does not mean scientifically untrue; it means a lie." *United States ex. rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (citations omitted.)

D.    Plaintiff Has Pled Each Required Element Of His FCA Claims Under Section 3729

    1.    Plaintiff Alleges that Defendants Submitted a False or Fraudulent Claim

The FCA prohibits making knowingly false statements in order to satisfy a requirement for payment by the federal government, referred to as the "false certification theory." 31 U.S.C. § 3729(a)(1). A "legally false certification" differs from the "factually false certification," which involves a request for payment for goods or services that were never provided. Under the "legally false certification theory," FCA liability is predicated upon a false certification of compliance with a federal statute, regulation or contractual term that is a condition of payment. *Mikes v. Straus*, 274 F.3d at 697; *United States ex. re. Siewick v. Jamieson Science and Engineering, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000); *Harrison v. Westinghouse Savanah River Co.*, 176 F.3d 776, 786-87, 793 (4th

37

Cir. 1999); *United* States *ex. rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *United States ex. rel. Hopper v. Anton,* 91 F.3d 1261, 1266-1267 (9th Cir. 1996); *State v. Evans*, 155 Misc. 2d 348, 589 N.Y.S. 2d 223, 1992 N.Y. Misc. LEXIS 424 (1992). "Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." *United States v. President & Fellows of Harvard College*, 2004 WL 1447307 at *20 (D. Mass. June 28, 2004) (quoting *United States ex re. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

Falsely certifying compliance with the requirements set forth in the regulations in order to obtain reimbursement from Medicare runs afoul of the False Claims Act. *See Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001). Liability occurs under the False Claims Act where a legally false certification is made "as a condition to governmental payment." *Id.* The Second Circuit held in *Mikes* that falsely certifying compliance with the terms set forth in the HCFA 1500 form in order to bill for services constitutes a violation of the False Claims Act in two ways: express false certification and implied false certification. *Id.* at 698. A defendant commits express false certification, for example, by affirmatively stating that it is in compliance with the terms set forth on the 1500 form.[7] A defendant commits implied false certification by submitting a claim for reimbursement when it has knowingly failed to comply with other regulations that are a condition for governmental payment. *See id.* at 700-701 (holding that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states that the provider must comply in order to be paid. . . . Liability under the Act may properly be found . . . when a defendant submits a claim for reimbursement while knowing . . . that

[7] Courts have acknowledged that the HCFA 1450 form (also known as the UB-92 form) requires the same certification as the 1500 form. *See, e.g., United States ex rel. Riley v. St. Lukes Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). Thus, false certification of compliance with the terms of the 1450 form must also constitute express false certification.

payment expressly is precluded because of some noncompliance by the defendant.") In the instant action, Defendants' conduct constitutes both express and implied false certification.

In another case, where the plaintiff established an FCA violation, the Ninth Circuit held that a claim may be false "even if the services billed were actually provided, if the purported provider did not actually render or supervise the service." *United States v. Mackby*, 261 F.3d 821, 826 (9th Cir. 2001) (citing *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (holding that a Medicare claim may be false even if the services were provided). *See also United States ex. rel. Riley v. St. Lukes Episcopal Hosp.*, 355 F.3d 370, 378 (5th Cir. 2004) ("A certifying doctor who is not the doctor who rendered or personally supervised the services is subject to liability for a false claim."); *United States ex. rel. Piacentile v. Wolk*, 1995 WL 20833 (E.D. Pa.) (finding False Claims Act violation where defendant altered Medicare Certificates of Medical Necessity without doctor's authorization, because the forms contained a certification that the claims represented the physician's judgment).

In *Mackby*, the Court held that the owner of a physical therapy clinic was liable under the False Claims Act for submitting false Medicare claims for reimbursement. *Mackby*, 261 F.3d at 824. The Court found that the defendant "knowingly cause[d] false claims to be submitted to Medicare . . . by [using] his physician father's Provider Identification Number (PIN) on claim forms to bill for physical therapy services provided at the clinic." *Id.* The Court rejected the defendant's argument, essentially that the Court should adopt a "no-harm, no foul" approach where a defendant actually provided the services for which it submitted claims, because "Medicare was led to believe that [the defendant's father] was providing the physical therapy services for which [the defendant] was billing, or at least that such services were rendered 'incident to' his supervision." *Id.* at 825-26. The Court held that the mere false representation that the defendant's father had some involvement in the

39

services provided was sufficient to satisfy the first element of an FCA claim, that a false claim was submitted to the government. *Id.* at 826-27.

The Ninth Circuit's decision in *Mackby* is in accord with an earlier decision rendered by the Fifth Circuit in *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975). In *Weinberger*, the Fifth Circuit found in favor of the government on its FCA claim against the defendant. The defendant argued that there was no violation because the services for which it submitted claims were actually provided by qualified individuals. The Court rejected the defendant's argument, however, explaining that the defendant violated the FCA by falsely certifying that the services were personally rendered by, or under the personal direction of, the physician whose name appeared on the claim forms. *See id.*

Plaintiff's Complaint alleges facts sufficient to state an FCA claim against Defendants on the basis of both express and an implied false certifications. Plaintiff alleges that Defendants, through the actions of their agents, made expressly false certifications by falsely certifying compliance with the terms set forth in the 1500 form. (Second Am. Compl. ¶¶ 31, 55-91.) The HCFA 1500 form is used for submission of claims by Yale for the Professional component of Radiology tests and procedures. YNHH would use the HCFA 1450 form (also known as the UB-92 form, previously the UB-82 form) to submit claims for the Technical component of Radiology tests and procedures. The HCFA 1450 form contains the same express certification as the 1500 form. *St. Luke's Episcopal Hosp.*, 355 F.3d at 376.

As the Second Circuit held in *Mikes*, a defendant can expressly certify false compliance with the terms set forth in the 1500 form in two ways: by falsely certifying that the services performed were medically necessary and that they were performed under the signatory's immediate supervision. Plaintiff-Relator Smith alleges that Defendants falsely certified that: (1) the "old"

40

radiological services for which the Government was billed were medically necessary and were provided by the physician who finalized the associated report, (2) the radiological studies performed by Residents and Fellows were done under the direct supervision of the Teaching Physician whose name appears on the reports that were fraudulently finalized, and (3) the Teaching Physician whose name appears on the finalized reports supervised the Resident or Fellow who performed the radiological studies or conducted an independent review of the preliminary report and the accompanying images.

When Defendants submitted claims to Medicare, they certified that the procedures justifying payment were medically necessary and were provided by the physician whose name appears on the final report. Plaintiff's allegations that Defendants billed for interpretation and finalization of old studies that were not medically necessary and/or were not provided by the physician whose name appears on the final report constitutes a false certification. (Second Am. Compl. ¶¶ 55, 56.)

Defendants also falsely certified that the services for which the Government was being billed were performed under the supervision or at the direction of the physician whose name certified compliance with the 1500 form. As a result of the clean-up project, the Teaching Physicians at Yale had no knowledge whatsoever that the tests were even performed until the reports were deposited in their respective queues for finalization and electronic signature. (*See* Second Am. Compl. ¶¶ 58-63, 73-87.) Furthermore, regarding the neuroradiology fellow fraud, Plaintiff alleges that Dean Glickman and Dr.'s Sze, Forman, and other Teaching Physicians neither reviewed the films with the resident or fellow nor performed an independent interpretations of the films as the regulations required, before they finalized the associated radiology reports in their respective queues. (Second Am. Compl. ¶¶ 83-87.) Those Doctors simply signed off on the reports without performing an independent interpretation of the films or the report, in direct violation of Medicare regulations and

41

the terms set forth in the 1500 form.  With regard to the Autosign fraud, for submission of the Technical and/or Professional component of these services, Defendant's falsely certified that the tests were medically necessary since a teaching physician never reviewed the associated images or the report and falsely certified that the services were provided or supervised by the physician whose name appears on the report.

Defendant's conduct in the instant action also constitutes an implied false certification. When it submits a Medicare claim, Defendants certify that they are in compliance with all regulations that are a condition for governmental payment.  Defendants knowingly submitted claims to Medicare, notwithstanding the fact that they were knowingly violating the requirements set forth in the regulations for Teaching Physician involvement that are a precondition for reimbursement for radiological tests.  *See* 42 C.F.R. §§ 415.170, 415.172, 415.180.

In order to be paid for the professional component under Medicare Part B, the regulations require a minimum level of involvement by a teaching physician in the interpretation and review of radiological tests and reports performed by residents.  Plaintiff alleges that Teaching physicians at Yale signed off on reports without exerting the minimum level of involvement required under the law: to review and interpret the radiological tests and reports written by residents and fellows before finalizing them. (*See* Second Am. Compl. ¶¶ 58-63, 73-87.)  At one point, Dr. Sze signed off on 88 reports in less than four minutes. (*Id.* ¶ 85.)  To perform such a rapid finalization, Dr. Sze never reviewed the reports of the radiological tests in connection with his finalization of the Reports nor was he present when the films were first reviewed and the preliminary report was created. (*Id.*)

In addition, the Hospital is only permitted to bill for the Technical Component of complete radiological studies, i.e., those which have a corresponding Professional Component.  Through the use of Autosign, the Hospital billed Medicare for the Technical Component on radiological studies

42

that were never reviewed by a Teaching physician, and therefore, which were incomplete radiological studies for which Medicare should never have been billed.

>    2.    Plaintiff Has Pled Causation

"The causation element under 31 U.S.C. § 3729 is satisfied if a person 'presents, or causes to be presented,' a false or fraudulent claim to the United States for payment or approval. The FCA reaches any person who knowingly *assisted in* causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government. Thus, a person need not be the one who actually submitted the claim to be liable." *Mackby*, 261 F.3d at 827 (internal citations and quotations omitted).

"To 'cause' the presentation of false claims under the FCA, some degree of participation in the claims process is required. . . actually delegating the submission of claims to one who then files a false claim suffices." *United States v. President & Fellows of Harvard College*, 2004 WL 1447307 at *27 (D. Mass. June 28, 2004). "A defendant [also] may be liable if it operates under a policy that causes others to present false claims to the government" and has knowledge of the submission of false claims to the government. *Id.* at *28.

In *Mackby*, the Court held that the defendant caused the false claims to be submitted to the government because he instructed others to place his physician father's PIN on the 1500 form. *Id.* at 828. "In so doing, he caused the claims to be submitted with false information." *Id.*

Likewise, in the instant action, University and Hospital Administrators such as Dr. McClennan, Chair of Department of Diagnostic Radiology at the University and Chief of Diagnostic Imaging at the Hospital, caused the false claims to be submitted to the government by directing faculty members to comply with fraudulent practices. In addition, Dr. Forman, Vice Chair for Finance, Dr. Sze, Chief of MRI, and Dr. Glickman, the Associate Dean, caused false claims to be

<center>43</center>

submitted to the government when they falsely finalized reports in their respective queues, or directed assistants to do so, without reviewing them.

Furthermore, Yale University is liable for the actions of faculty members who fraudulently finalized reports and/or certified compliance with Medicare regulations because those physicians acted within the scope of their apparent authority. *See United States ex rel. Rosales. et. al v. San Francisco Housing Authority*, 173 F. Supp.2d 987, 1003 (N.D. Cal. 2001) ("When, as here, managers and executives are implicated in the knowing submission of false claims to the government, there can be little question that the entity itself is answerable for their conduct.") "There is nothing in the language of the [FCA] proscribing vicarious liability." *United States v. O'Connell*, 890 F.2d 563, 567-69 (1st Cir. 1989) (holding employer liable for actions of agent with apparent authority even when employer did not benefit from agent's fraud.) "Several circuits have held that vicarious liability applies to a principal corporation under the Act either when an agent of the corporation acts with apparent authority, or when an employee acts within the scope of his employment for the benefit of the corporation." *United States, ex. rel. McCarthy v. Straub Clinic & Hospital, Inc.* 140 F. Supp.2d 1062, 1070 n.7 (D. Hawaii. 2001); *United States v. Incorporated Village of Island Park*, 888 F. Supp. 419, 438 (E.D.N.Y. 1995) (determining that vicarious liability applies to FCA violations committed by employee who acts within the scope his authority for the benefit of the employer, or when the employee has apparent authority to act, whether or not the activity benefits employer).

The above-described billings were not inadvertent submissions. The clean up project, the neuroradiology fellows fraud, and Autosign were all projects and policies that were implemented under the direction of Dr. McClennan and his administration. In addition, the Autosign procedure

44

was established under the direction of Yale-New Haven Hospital Attorney and Director of Legal
Affairs.

3.     <u>Plaintiff Has Pled that Defendant Had Knowledge of the
Fraudulent nature of the Claims Submitted</u>

"Under the FCA, 'knowing' and 'knowingly' mean that a person, with respect to
information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the
truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the
information, and no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b) (1994).
The requisite intent is the knowing presentation of what is known to be false. 'Known to be false'
does not mean scientifically untrue, but a lie." *Mackby*, 261 F.3d at 828 (internal citations and
quotations omitted).

The *Mackby* court held that the government also satisfied this final element of its FCA claim.
The Court held that the government presented evidence that the defendant acted with reckless
disregard or with deliberate ignorance for the requirements of Medicare billing. *Id.* The Court
explained that the defendant had an "obligation to be familiar with the legal requirements for
obtaining reimbursement from Medicare for physical therapy services, and to ensure that the clinic
was run in accordance with all the laws. . . . By failing to inform himself of those requirements, . . .
he acted with reckless disregard or in deliberate ignorance of those requirements, either of which
was sufficient to charge him with knowledge of the falsity of the claims in question." *Id.* at 828.

Plaintiff has alleged each required element of an FCA violation. The knowing submission of
fraudulent claims and the false certification of compliance with the Medicare regulations by agents
acting within their apparent authority and pursuant to the direction of University and Hospital
Administrators constitute clear violations of the FCA. Accordingly, Plaintiff's claim passes muster
under Rule 12(b)(6) and Defendants' Motion to Dismiss for failure to state a claim should be denied.

45

## IV.    THE SECOND CAUSE OF ACTION PLED BY PLAINTIFF STATES A CLAIM UNDER RULE 12(b)(6)

### A.    Plaintiff's Retaliation Claim is Not Barred by the Statute of Limitations

Defendants contend that Plaintiff's FCA retaliation claim is barred by the applicable statute of limitations. Specifically, Defendants contend that the six-year statute of limitations contained in § 3731(b)(1) of the FCA does not extend to retaliation claims brought under § 3730(h). Defendants argue further that, in lieu of the six-year limitations period, the 90-day statute of limitations set forth under Connecticut General Statutes § 31-51m applies to Plaintiff's retaliation claim and thus, it is time-barred.

Defendants' contentions should be rejected. First, the Ninth Circuit notwithstanding, all other circuits to address the issue have concluded that the FCA's six-year statute of limitations period applies to retaliation claims. In the alternative, however, Plaintiff's FCA retaliation claim is still not time-barred as the Court should apply the three-year statute of limitations which applies to common law wrongful discharge claims and those brought under Connecticut General Statutes § 31-51q, not – as Defendants contend – the 90-day limitations period established under § 31-51m.

### 1.    The Six-Year Statute of Limitations of the FCA Applies

The Ninth Circuit notwithstanding,[8] a clear majority of courts which have considered this issue have held, on the basis of the plain language rule, that the FCA's six-year statute of limitations applies to retaliation claims brought under § 3730(h).[9] *See Neal v. Honeywell, Inc.*, 33 F.3d 860 (7th

---

[8] The Ninth Circuit, and two district courts therein, have held that the six-year statute of limitations set forth in § 3731(b)(1) does not apply to retaliation claims brought pursuant to § 3730(h). *See United States ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027 (9th Cir. 1998). *See also United States ex rel. Truong v. Northrop Corp.*, No. CV 88-967, 1991 WL 496831 (C.D. Cal. Nov. 26, 1991); *United States ex rel. Satalich v. City of Los Angeles*, 160 F. Supp. 2d 1092 (C.D. Cal. 2001);

[9] Before the Fourth Circuit's recent decision in *Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245 (4th Cir. 2004), a Judge in the District Court for the District of Maryland assumed, without deciding, that the FCA's six-year statute of limitations did not apply to retaliation claims under § 3730(h). *See United States ex rel. Ackley v. Int'l Business Machines Corp.*, 110 F. Supp. 2d 395 (D.Md. 2000). The assumption by the *Ackley* court is no longer good, however, after the Fourth Circuit's recent decision in *Wilson. See* 367 F.3d at 249-252, & n.3.

Cir. 1994); *Wilson v. Graham County Soil & Water Conservation Dist.*, 367 F.3d 245 (4th Cir. 2004); *Storey v. Patient First Corp.*, 207 F. Supp. 2d 431 (E.D. Va. 2002); *Grand ex rel. United States v. Northrop Corp.*, 811 F. Supp. 333, 335 (S.D. Ohio 1992).

While the Second Circuit has not yet addressed the issue, it has repeatedly relied upon the plain language rule of statutory interpretation in previous cases. In this Circuit, when "interpreting a statute, [courts] must first look to the language of the statute itself. If the statutory terms are unambiguous, [the] review generally ends, and the statute is construed according to the plain meaning of its words." *Torres v. Walker*, 356 F.3d 238, 242 (2d Cir. 2004) (internal citation and quotations omitted).

The plain language of the False Claims Act states that the statutes six-year statute of limitations applies to retaliation claims brought under § 3730(h). Section 3731(b)(1) states that "[a] civil action under section 3730 may not be brought . . . more than six years after the date on which the violation of section 3729 is committed . . . ." 31 U.S.C. § 3731(b)(1) (emphasis added). Section 3731(b)(1), by its very terms, applies to civil actions under section 3730. The provision of the FCA providing for retaliation claims, § 3730(h), was enacted as a part of § 3730. The statutory terms are unambiguous. Therefore, § 3731(b) must be construed according to the plain meaning of its words and the six-year statute of limitations for which it provides must be applied to retaliation claims brought under § 3730(h).

> 2.    In the Alternative, the Applicable Statute of Limitations Under
>        Connecticut Law is Three Years, Not Ninety Days

"[W]hen Congress does not supply an express statute of limitations governing a federal cause of action, then 'Congress intended that the courts apply the most closely analogous statute of limitations under state law.'" *United States ex rel. Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027, 1035 (9th Cir. 1998) (quoting *Reed v. United Transport Union*, 488 U.S. 319, 323 (1989)).

Defendants contend that in lieu of the six year statute of limitations provided for under the False Claims Act, the applicable statute of limitations under Connecticut law for a retaliation claim under § 3730(h) is that set forth General Statutes § 31-51m: 90 days. Although similar to a retaliation claim under the FCA, Defendants' contention that § 31-51m provides the applicable statute of limitations is erroneous because it is not the "most analogous" cause of action available under Connecticut law.

<div style="text-align:center">a.　The Scope of Conduct Protected Under Section 31-51m is More Limited Than That Under Section 3730(h)</div>

Section 31-51m is not the most analogous cause of action in Connecticut to § 3730(h) under the False Claims Act. When determining which state law cause of action is the "most analogous" to a federal cause of action, the elements of the causes of action which make an individual eligible to bring each cause of action should be compared. *See United States ex rel. Truong v. Northrup Corp.*, No. CV 88-967, 1991 WL 496831 (C.D. Cal. Nov. 26, 1991) ("Since the same facts support plaintiffs' state-law claims for wrongful termination in violation of California public policy and plaintiffs' federal claims for violation of 31 U.S.C. § 3730(h), it is appropriate for the same statute of limitations to apply to both sets of claims."). A comparison of the elements of a claim under § 31-51m with the elements of a claim under § 3730(h) reveals that § 31-51m is not the "most analogous" cause of action under Connecticut law to § 3730(h).

Principally, § 31-51m is distinguishable from § 3730(h) because the scope of protected conduct for which it provides protection is much narrower. Section 31-51m provides, "No employer shall discharge, discipline, or otherwise penalize any employee because the employee . . . reports . . . a violation or a suspected violation of any state or federal law or regulation to a public body . . . ." Conn. Gen. Stat. § 31-51m(b) (emphasis added). Section 3730(h) of the False Claims Act, however, protects employees who engaged in lawful acts, on behalf of themselves or others "in furtherance of

<div style="text-align:center">48</div>

an action under this section, including <u>investigation for, initiation of, testimony for, or assistance in</u> <u>an action filed or to be filed under this section</u> . . . ." 31 U.S.C. § 3730(h) (emphasis added).

A comparison of the two statutes reveals that § 31-51m protects employees from far fewer activities than does § 3730(h). Section 3730(h) protects employees who engage in any protected conduct in furtherance of an action under the FCA, including "investigation for, initiation of, testimony for, or assistance in an action to be filed." In order to claim protection from retaliation under § 31-51m, however, you must have reported a violation or a suspected violation of a state or federal law or regulation to a public body. *See* Conn. Gen. Stat. § 31-51m(b). While the conduct protected under § 31-51m, reporting information to a public body, would be protected under § 3730(h), a great deal of the conduct protected under § 3730(h) would not be protected under § 31-51m.

An analysis of the conduct for which Plaintiff was retaliated against by Defendants in the course of his employment with Yale highlights this distinction. Defendants retaliated against Plaintiff for investigating and reporting violations of the False Claims Act to University and Hospital Administrators and representatives. Under § 3730(h), Plaintiff's investigation of Defendants' fraudulent conduct is protected conduct. Under § 31-51m, however, Plaintiff's activities would not have been protected conduct because while Defendants retaliated against Plaintiff for investigating and then reporting violations of federal law internally – Defendants did not retaliate against Plaintiff for reporting violations of federal law to a public body.[10] Accordingly, § 31-51m does not provide the applicable statute of limitations in lieu of that set forth in the False Claim Act in § 3731(b)(1).

---

[10] Plaintiff was engaged in discussions with the Department of Justice at this time, *see, e.g.*, Smith Aff. ¶ 12, but because Defendants had no knowledge of Plaintiff's meetings with Asst. U.S. Attorney Hughes, Plaintiff does not allege that Defendants retaliated against Plaintiff for engaging in that protected conduct.

49

b.    The Three Year Statute of Limitations Provided For Under
       Connecticut General Statutes Section 31-51q or Common Law
       Wrongful Discharge Is the Most Analogous Cause of Action
       Under Connecticut Law

Connecticut General Statutes § 31-51q prohibits employers from disciplining or discharging employees "on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4, or 14 of article first of the Constitution of the State." Conn. Gen. Stat. § 31-51q. In order for speech to be protected under § 31-51q, it must be on a matter of public concern. *See Cotto v. United Technologies Corp.*, 48 Conn. App. 618, 630, 711 A.2d 1180 (1998). The Connecticut Appellate Court stated in *Cotto* that "an issue of public concern is one involving the expenditure of public funds." *Id.* The Second Circuit has likewise held that speaking out about fraud concerning the misallocation and loss of public funds is a matter of public concern. *See, e.g., Vasbinder v. Ambach*, 926 F.2d 1333, 1339-1340 (2d Cir. 1991); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 553 n.4 (2d Cir. 2001); *A.F.C. Enterprises v. New York City School Construction Auth.*, No. 98CV4534, 2001 WL 1335010 at **14-15 (S.D.N.Y. Sept. 6, 2001).

Thus, in the instant action, Plaintiff's investigation and subsequent internal complaints about submitting fraudulent bills to Medicare for reimbursement would certainly be protected speech on a matter of public concern under § 31-51q. Like § 3730(h), § 31-51q protects employees who investigate and report complaints internally, as well as externally to a public body. Thus, § 31-51q, not § 31-51m, is the most analogous cause of action under Connecticut law to that provided for under § 3730(h).

Several other courts, including those relied upon by Defendants, have held that the state law cause of action that was most analogous to the cause of action provided for under § 3730(h) was the common law claim for wrongful discharge in violation of public policy. *See United States ex rel.*

50

*Lujan v. Hughes Aircraft Co.*, 162 F.3d 1027, 1035 (9th Cir. 1998); *United States ex rel. Truong v. Northrup Corp.*, No. CV 88-967, 1991 WL 496831 at *3 (C.D. Cal. Nov. 26, 1991); *United States ex rel. Ackley v. Int'l Business Machines Corp.*, 110 F. Supp. 2d 395, 404-405 (D.Md. 2000). Connecticut also recognizes a common law claim for wrongful discharge in violation of public policy. *See Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 427 A.2d 385 (1980). Other federal causes of action without express statutes of limitations have already been analogized to Connecticut's cause of action for wrongful discharge for purposes of determining the applicable limitations period. *See Jaskilka v. Carpenter Technology Corp.*, 757 F. Supp. 175 (D. Conn. 1991). The Connecticut Appellate Court has held that it violates an important public policy of the State of Connecticut for an employer to retaliate against an employee who complains about fraudulent business practices. *Smith v. Yardney Electric Corp.*, 4 Conn. App. 69, 492 A.2d 512 (1985). More recently, the Connecticut Supreme Court held that an employee who was retaliated against for reporting a scheme to defraud the federal government had a common law wrongful discharge claim under *Sheets*. *See Faulkner v. United Technologies Corp.*, 240 Conn. 576, 693 A.2d 293 (1997). Thus, a common law wrongful discharge claim would also be more analogous to § 3730(h) than § 31-51m.

Both causes of action, common law wrongful discharge and § 31-51q, provide for a three year statute of limitations. *See* Conn. Gen. Stat. § 52-577; *Jaskilka v. Carpenter Technology Corp.*, 757 F. Supp. 175 (D. Conn. 1991); *Holub v. Babcock*, 16 Conn. L. Rptr. 55, 1996 WL 57076 (Conn. Super. Jan. 8, 1996).

Plaintiff alleges that he was retaliated against for investigating as well as reporting complaints about Medicare fraud to University and Hospital Administrators during 1998 and 1999, until he was forced to resign from Yale. Plaintiff filed his Original Complaint in the instant action

51

on July 19, 2000 – well within the three year statute of limitations period. Accordingly, Plaintiff's

FCA retaliation claim under § 3730(h) is not barred by the applicable statute of limitations.

B.    Plaintiff's Second Cause of Action for Retaliation States a Claim Under Rule
      12(b)(6)

Section 3730(h) prohibits an employer from retaliating against an employee because of the

actions taken by the employee "in furtherance of an action under [the FCA], including investigation

for . . . an action filed or to be filed under this section." 31 U.S.C. § 3730(h). It is "intended to

encourage employees with knowledge of false or fraudulent claims to come forward with such

evidence." *Faldetta v. Lockheed Martin Corp.*, No. 98 Civ. 2614, 2000 WL 1682759 at *11

(S.D.N.Y. Nov. 9, 2000). "To state a claim under § 3730(h), [a] plaintiff must allege that: (1) he

was engaging in conduct protected under the statute; (2) the defendants knew he was engaging in

such conduct; and (3) the defendant discriminated against him because of the protected conduct."

*United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330, 338 (W.D.N.Y. 1998) (citations

omitted).

1.    Plaintiff Alleges He Was Engaged in Protected Conduct

"Under the FCA, 'protected activity' is to be interpreted broadly. Therefore, an employee's

activities may be protected even where an FCA suit has not been filed." *Faldetta v. Lockheed*

*Martin Corp.*, No. 98 Civ. 2614, 2000 WL 1682759 at *11 (S.D.N.Y. Nov. 9, 2000) (internal

citations omitted). In order to satisfy the protected conduct element, a plaintiff need "only [allege]

that [he] engaged in acts . . . *in furtherance of* an action under [the FCA]." *United States ex rel.*

*Yesudian v. Howard Univ.*, 153 F.3d 731, 739 (D.C. Cir. 1998) (emphasis in original). The scope of

protected conduct includes actions taken "in furtherance of" an FCA claim because Congress sought

to "protect employees while they are collecting information about a possible fraud, *before they have*

52

put all the pieces of the puzzle together." *Id.* at 740 (holding that the district court erred when it ruled that the plaintiff's conduct was not protected because he never initiated an FCA claim).

In *Yesudian*, the D.C. Circuit held that "it is sufficient that a plaintiff be investigating matters that 'reasonably could lead' to a viable False Claims Act case." *Id.* (emphasis added).[11]

Moreover, the Circuit courts agree that a plaintiff need not even know of the FCA's existence or of the availability of a private cause of action for his conduct to be protected under the statute. *See Yesudian*, 153 F.3d at 741 (and cases cited). Courts do not require any such knowledge because (1) an employee conducting an initial investigation may be unknowing furthering an FCA action, and (2) such a requirement would limit the protection of the FCA to lawyers, or those well versed in the law. *Id.*

Courts have held that internal reporting of false claims constitutes protected activity under § 3730(h). *See Yesudian*, 153 F.3d at 741, n.9 (citing *United States ex rel. McKenzie v. Bellsouth Telecommunications, Inc.*, 123 F.3d 935, 944 (6th Cir. 1997); *United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996); *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994); *Mikes v. Strauss*, 889 F. Supp. 746, 752 (S.D.N.Y. 1995)); *Karvelas*, 360 F.3d at 238, & n.25 (holding that investigation and internal reporting of fraudulent billing practices to supervisors constitutes protected conduct under the FCA, even though the plaintiff never reported to supervisors that conduct violated the FCA). Thus, Defendants' contention that Plaintiff's allegations are insufficient because they do not "demonstrate that he

---

[11] Other Circuits have adopted similar or identical tests. *See Childree v. UAP/GA Chem, Inc.*, 92 F.3d 1140, 1146 (11th Cir. 1996) (requiring only a "distinct possibility" of suit); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) ("plaintiff must be investigating matters which are calculated, or could reasonably lead, to a viable FCA claim"); *Neal v. Honeywell, Inc.*, 33 F.3d 860, 864 (7th Cir. 1994) (limiting protection under § 3730(h) to situations where an FCA claim was a "distinct possibility" or could have been "filed legitimately"); *Wilkins v. St. Louis Housing Auth.*, 314 F.3d 927, 933 (8th Cir. 2002) (good faith and objectively reasonable belief that the employer was committing fraud against the government); *Karvelas*, 360 F.3d at 236 ("conduct that reasonably could lead to a viable FCA action"). In the recent Connecticut Superior Court trial, in which Plaintiff-relator Smith was also a Plaintiff, Yale University stipulated that Smith had a "good faith belief" in the truth of all the allegations he made regarding patient care, patient safety, and fraud

53

intended to do more with his concerns than voice them, however adamantly, at internal meetings," (Defs' Mem. Law Supp. Motion at 42), is erroneous and based on a flawed interpretation of the law.

Therefore, Plaintiff's conduct in the instant action --- his investigation and reporting of Medicare fraud to University and Hospital Administrators --- constitutes protected activity under § 3730(h). Through his own personal investigation, Plaintiff alleges that he discovered thousands of false claims and fraudulently finalized and certified radiological interpretations and reports for which Defendants s ubmitted b ills t o M edicare. ( Second A m. C ompl. ¶¶ 6 8-78.) Furthermore, Plaintiff alleges that he and his colleagues, Dr. Rosenfield and Dr. Burrell, reported these incidents of Medicare fraud to Dr. McCllennan, President Levin, and General Counsel Robinson. (*Id.* ¶¶ 79-81.) The conduct alleged by Plaintiff certainly constitutes "investigations . . . or activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." *Karvelas*, 360 F.3d 236. Accordingly, Plaintiff has alleged he engaged in protected conduct under the FCA.

    2.    <u>Plaintiff Alleges that Defendants Knew He was Engaging in Protected Conduct</u>

"To meet the knowledge element of an FCA retaliation claim, the whistleblower must show the employer had knowledge the employee engaged in protected activity. In other words, the employer must be on notice that the employee is engaged in conduct that 'reasonably could lead to a False Claims Act case.' However, . . . the employer need not know that the employee has filed or plans to file a qui tam action, nor even necessarily be aware of the existence of the FCA." *Karvelas*, 360 F.3d at 238 (internal quotations and citations omitted). An employee can put an employer on notice by "characterizing the employer's conduct as illegal, or fraudulent or recommending that legal counsel become involved. These types of actions are sufficient because they let the employer know . . . that litigation is a reasonable possibility." *Eberhardt v. Integrated Design & Const., Inc.*, 167

<div align="center">54</div>

F.3d 861, 868 (4th Cir. 1999). "[O]nce an investigation involves [false or fraudulent] claims and the employee expresses concern to his employer that there is a likelihood of fraud or illegality, then the notice requirement is met." *Id.* at 868-69.

"[T]he kind of knowledge the defendant must have mirrors the kind of activity in which the plaintiff must be engaged. What the employer must know is that the plaintiff is engaged in protected conduct, that is investigation or other activity concerning false or fraudulent claims that the employer knowingly presented to the federal government." *Karvelas,* 360 F.3d at 238-239 (internal citations and quotations omitted).

The *Karvelas* court held that the defendant had knowledge of the plaintiff's protected conduct because the plaintiff "notified his employers about the results of his investigation concerning false claims for payment that the hospital knowingly submitted to the government . . . ." *Karvelas,* 360 F.3d at 239. *See also Mikes v. Strauss,* 889 F. Supp. 746, 753 (S.D.N.Y. 1995) (holding that knowledge requirement was satisfied because plaintiff's actions towards supervisors implied an accusation of Medicare fraud); *Yesudian,* 153 F.3d at 740 (relating evidence of fraud against government to employer).

Likewise, in the instant action, Defendants had knowledge of Plaintiff's protected activity. Just as in *Karvelas,* Plaintiff alleges that he reported incidents of Medicare fraud and the submission of false claims to the government to Hospital and University Administrators, including Dr. McCllennan, President Levin, and General Counsel Robinson, on numerous occasions. (*See* Second Am. Compl. ¶¶ 79-81.)

Defendants erroneously contend that, in order to satisfy the knowledge requirement of § 3730(h), "a plaintiff must allege that his employer was on notice that he intended to report the employer's conduct to the government or that he was contemplating instituting a *qui tam* action

55

against his employer." (Def's Mem. Law Supp. Motion at 43) (emphasis added).  In support of its

contention, D efendants m isrepresent l anguage f rom t wo d istrict c ourt d ecisions f rom t his C ircuit,

*United States ex rel. Vallejo v. Investronica, Inc.*, 2 F. Supp. 2d 330 (W.D.N.Y. 1998), and *Mikes v.*

*Strauss*, 889 F. Supp. 746 (S.D.N.Y. 1995), and advocate for the adoption of a rule which is contrary

to the law.

Defendants misrepresent the language in *Vallejo*.[12]   The *Vallejo* court dismissed the

plaintiff's retaliation claim under § 3730 because "[a]lthough plaintiff s tates t hat h e b elieved t he

false statements were in violation of United States law, he does not allege that he ever informed the

defendants of that fact."[13]  *Id.*  After making that conclusion, the Court continues, and provides

language upon which Defendants rely, when it states, "For example, plaintiff does not allege that he

told the defendants that he was going to report such impropriety to officials of the Government or

that he was contemplating his own *qui tam* action.  Moreover, plaintiff has not alleged that he was

engaged in activities that would have given 'the employer reason to believe that the employee was

contemplating a *qui tam* action against it.'"  *Id.* (quoting *Mikes v. Strauss*, 889 F. Supp. at 553)).

The *Vallejo* court's dicta provided examples of conduct which, if alleged, would have satisfied the

knowledge requirement of the FCA.

While the *Vallejo* court gave hypothetical examples of conduct which, if alleged, would have

satisfied the knowledge requirement of the FCA, it did not state that the hypothetical allegations it

proffered were the minimum requirements that must be alleged in order to satisfy the FCA's

knowledge requirement.  The *Vallejo* court's dicta only provided examples of allegations that would

---

[12] The language from *Vallejo* cited by Defendants was dicta.  Thus, it was misleading for Defendants to characterize it in a fashion which suggests that it represents a well settled rule.  Compare the language as it was used in *Vallejo*, 2 F. Supp. 2d at 339, with how it was used by Defendants, (*see* Def's Mem. Law Supp. Motion at 43) (employing the words "must" to suggest that the requirements for which Defendants advocate are a well-settled rule).

[13] In addition to the fact that Defendants misrepresented the language in *Vallejo*, *Vallejo* is distinguishable from this case because, unlike the plaintiff in *Vallejo*, Plaintiff in this case actually did report his investigation and incidents of Medicare fraud and the knowing submission of false claims to the government for reimbursement.

be adequate or satisfactory to satisfy the knowledge requirement; that is why it prefaced its statement with the words, "for example." It did not state, as Defendants disingenuously contend, that those hypothetical allegations were to be construed as a rule, or a floor, which the allegations of all future FCA litigants must exceed. The language from *Vallejo* should be construed only as what it was: hypothetical allegations that provided an example of what is adequate, not --- as Defendants disingenuously contend --- what is required, to satisfy the knowledge requirement of § 3730(h). *See Yesudian*, 153 F.3d at 743 ("Threatening to file a qui tam suit or to make a report to the government . . . clearly is one way to make an employer aware. But it is not the only way.").

Likewise, the Court in *Mikes v. Strauss*[14] stated that "a reasonable jury could conclude that defendants had reason to believe that plaintiff was investigating their alleged fraudulent billing practices in contemplation of a possible *qui tam* action." 889 F. Supp. at 753-54 (emphasis added). Although the language employed by the *Mikes* court might lend credence to the rule proposed by Defendants, the facts of the case do not. The plaintiff in *Mikes* did not tell her employer that she intended to report her employer's fraudulent conduct to the government or that she was contemplating instituting a *qui tam* action against her employer. In fact, the plaintiff in *Mikes* did not even go so far as to expressly accuse her employer of fraud. *Mikes*, 889 F. Supp. at 753 ("Although these discussion clearly stop short of a specific accusation of fraud, they clearly imply that defendants' activities were unlawful."). Notwithstanding the failure of the plaintiff in *Mikes* to expressly accuse her employer of fraud, let alone notify her employer that she intended to file a *qui tam* action, the *Mikes* court held that she satisfied the knowledge requirement of § 3730(h). *See id* at

---

[14] Defendants' citation of *Mikes v. Strauss*, 889 F. Supp. 746, 753 (S.D.N.Y. 1995) is also erroneous. Defendants erroneously assert that the decision upon which it relies was affirmed by the Second Circuit at 274 F.3d 687 (2d Cir. 2001). (*See* Defs' Mem. Law Supp. Motion at 43.) The district court decision upon which Defendants rely was never appealed to the Second Circuit; it was compelled to arbitration following the decision. The Second Circuit case cited by Defendants, which bears the same name, did not involve any of the employment issues before the District Court six years earlier. It was an appeal of a subsequent District Court decision involving entirely different issues. *See Mikes v. Strauss*, 274 F.3d at 693-94 (discussing procedural history of case).

57

753-754. Thus, it is obvious from a full reading of *Mikes* that the Court was requiring a plaintiff to plead allegations which would allow an employer to infer or appreciate that an employee could potentially report an FCA violation to the government or contemplate instituting an FCA claim – not that the employee must have actually done either of those things -- for an employer to be on notice. Thus, the language from *Mikes* should not be transformed into the rule for which Defendants advocate.

This Court should follow the holding of the *Mikes* court, in light of the facts upon which it is based, not necessarily adopt all of the suggestive language the *Mikes* court employed. Such a reading of the *Mikes* decision would be consistent with the subsequent decisions by several Circuit courts which have uniformly looked to what is considered "protected activity" when construing the knowledge requirement of § 3730(h), and not required a plaintiff to tell an employer that he is contemplating instituting a *qui tam* action or making a report to the government. *See, e.g., Yesudian,* 153 F.3d at 742-43 (expressly rejecting such a requirement); *Karvelas,* 360 F.3d at 236-39. This approach has even been taken by a case relied upon by Defendants to support their contention on this issue, *McKenzie v. Bellsouth Telecommunications, Inc.,* 219 F.3d 508, 518 (6th Cir. 2000) ("It is not necessary that McKenzie know the particulars of an FCA action or *qui tam* possibility or use appropriate language when internally reporting wrongdoing, but she must set forth some connection to fraudulent or false claims against the federal government.")(cited by Defendants at Def's Mem. Law Supp. Motion at 43-44).

Moreover, the rule for which Defendants' advocate would be contrary to well-settled law that an employee need not even know of the FCA's existence or the potential availability of a cause of action against an employer under the FCA in order for the employee's activities to be "in furtherance of" an action under the FCA. *See Yesudian,* 153 F.3d at 741 (and cases cited); *Karvelas,* 360 F.3d at

58

238-39. Finally, a rule requiring an employee to notify his employer that he intended to report the employer's conduct to the government or that he was contemplating filing a *qui tam* action against his employer would be contrary to common sense and the language of the statute, which protects employees who investigate and report fraudulent activity and the submission of false claims internally – not just the filing of *qui tam* actions in court or the reporting of an employer's conduct to the government.

Accordingly, as Plaintiff has alleged that he investigated, complained about, and reported Medicare fraud and the submission of false claims to University and Hospital Administrators, this Court should refuse to adopt the rule for which Defendants advocate and hold that Plaintiff has satisfied the knowledge requirement under § 3730(h).

3.    Plaintiff Has Alleged That Defendants Retaliated Against Him
Because of His Protected Conduct

"The FCA's legislative history states that the employee must show that the retaliation was motivated <u>at least in part</u> by the employee's engaging in protected activity." *McKenzie*, 219 F.3d at 518 (emphasis added) (internal citations and quotations omitted).

Plaintiff has alleged that "[b]ecause of his investigation and reporting of" Defendants' fraudulent conduct and submission of false claims for reimbursement to Medicare, Defendants harassed and discriminated against him in the terms and conditions of his employment. (Second Am. Compl. ¶ 99.) Plaintiff identifies the specific individuals who were responsible for retaliating against him, such as Dean Kessler, Dr. McClennan, Dr. Brink, and Dr. Forman. (Second Am. Compl. ¶ 99.) Finally, Plaintiff identifies the individual ways in which Defendants retaliated against him. For example, Plaintiff alleges that he was repeatedly harassed, threatened, and subjected to intimidation, his salary was cut, he was stripped of administrative positions and titles, he was forced

59

to resign, he was forced to give up extensive research activities, he was publicly defamed. (Second Am. Compl. ¶ 99(a-i)).

## V.   THE THIRD CAUSE OF ACTION PLED BY PLAINTIFF STATES A CLAIM UNDER RULE 12(b)(6)

"Under Connecticut law, a defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. To establish a prima facie case of defamation, a plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Iosa v. Gentiva Health Services, Inc.*, 299 F. Supp. 2d 29, 37-38 (D. Conn. 2004) (internal citations and quotations omitted).

Plaintiff has alleged each of these required elements. (*See* Second Am. Compl. ¶¶ 104-107.) Accordingly, Defendants' Motion to Dismiss Plaintiff's defamation claim should be dismissed.

## VI.   CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in its entirety. If, however, this Court finds any of the claims articulated in Plaintiff's Second Amended Complaint to be deficient in any regard, Plaintiff respectfully requests permission to replead.

60

PLAINTIFF-RELATOR,
ROBERT B. SMITH, M.D.

By: _____
Peter B. Prestley
Federal Bar No.: ct15799
MADSEN, PRESTLEY, & PARENTEAU
44 Capitol Avenue, Suite 201
Hartford, CT 06106
Tel:    (860) 246-2466
Fax:    (860) 246-1794

61

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 30th day of August, 2004, a copy of the foregoing was sent via mail delivery to the following counsel of record:

Mary Alice Leonhardt
Law Offices of Mary Alice Leonhardt, LLC
102 Oak Street
Hartford, CT 06106

Willam J. Doyle, Esq.
Kenneth D. Heath, Esq.
Wiggin & Dana LLP
One Century Tower
265 Church Street, Box 1832
New Haven, CT 06508-1832

Patrick M. Noonan, Esq.
Delaney, Zemetis, Donahue, & Noonan, P.C.
741 Boston Post Road
Concept Park
Guilford, CT 06437

Carl H. Loewenson, Jr., Esq.                    Stanley R. Soya, Esq.
J. Alexander Lawrence, Esq.                     Morrison & Foerster LLP
Morrison & Foerster LLP                         1650 Tysons Boulevard
1290 Avenue of the Americas                     Suite 300
New York, NY 10104-0185                         MacLean, VA  22102

And, pursuant to Rule 5(c) of the Local Rules of Civil Procedure, three copies by Overnight Delivery to:

John Hughes
Richard Molot
Assistant United States Attorney
157 Church Street, 23rd Floor
New Haven, CT  06510

_____
Peter B. Prestley, Esq.

62