## UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

UNITED STATES ex rel.,                    :
ROBERT C. SMITH, M.D.,                    :
            Plaintiff,                    :
                                          :
v.                                        :        Case No: 3:00cv1359 (PCD)
                                          :
YALE UNIVERSITY and YALE-NEW              :
HAVEN HOSPITAL, INC.,                     :
            Defendants.                   :

## RULING ON DEFENDANT YALE-NEW HAVEN HOSPITAL'S MOTION TO DISMISS

Pursuant to Rules 9(b), 12(b)(1), 12(b)(6) and 12(h)(3) of the Federal Rules of Civil

Procedure, Defendant Yale-New Haven Hospital, Inc. ("YNHH") moves to dismiss the Second

Amended Complaint.[1]  For the reasons stated below, Defendant's Motion [Doc. No. 169] is

**granted**.

## I.  BACKGROUND[2]

This lawsuit arises from Plaintiff-Relator's ("Relator") employment with Yale University

("Yale") and YNHH.  Relator alleges that Defendant YNHH violated the federal False Claims

Act, 31 U.S.C. § 3729, et seq., as amended ("FCA"), by falsely billing and retaining payments

from the Medicare and Medicaid Programs for certain radiological services (Count One).  Relator

also alleges that YNHH and Yale unlawfully retaliated against Relator in violation of the FCA,

31 U.S.C. § 3730(h) (Count Two) and brings a defamation claim against YNHH and Yale (Count

---

[1] Although the Motion to Dismiss was originally filed by Yale University and YNHH, Yale University was subsequently dismissed from the lawsuit, thus mooting the motion as to it.  Therefore, only the claims against YNHH will be dealt with in this Ruling.  Yale University will be discussed, as necessary, to explain the pending allegations and the background of the case.

[2] Unless otherwise noted, the account that follows is taken from Relator's Second Amended Complaint.

Three).

Relator Robert C. Smith is a medical doctor licensed to practice medicine in Connecticut and New York and is a resident of the State of New York.  Relator was employed by Yale beginning in July 1, 1990 until he was allegedly "forced out" on June 30, 1999.  He began as an Instructor at the Yale School of Medicine, was promoted to Assistant Professor in July 1991 and became an Associate Professor in July 1996.  Moreover, Relator has served as Associate Professor, Department of Diagnostic Imaging; Chief, Section of MRI, Department of Diagnostic Imaging at Yale's School of Medicine; Director, Magnetic Resonance Imaging Center; and attending staff physician at YNHH.  Most recently, Relator served as a Professor of Radiology and Associate Chair of Information Technology and Systems Administration, Department of Radiology, Cornell University Joan and Sanford I. Weill Medical College, New York Presbyterian Hospital from 1999 until the summer of 2003.

Defendant YNHH is reimbursed by Medicare for providing services to eligible patients. According to Relator, YNHH operates a graduate medical education ("GME") Residency Program paid for, at least in part, by the Medicare Program and under which members of Yale's School of Medicine faculty and attending physicians at YNHH train Residents and Fellows.

The Department of Health and Human Services, acting pursuant to the Medicare statute, has promulgated regulations governing reimbursement for medical services provided to Medicare beneficiaries, including radiological tests and studies.  In order to be reimbursed by Medicare for services provided to its beneficiaries, medical service providers must certify that they have complied with applicable requirements in the regulations.  Pertinent to this action, Medicare and Medicaid pay only for services that are reasonable, medically necessary and utilized for

diagnostic and therapeutic purposes in connection with health care services provided to Medicare and Medicaid beneficiaries. 42 U.S.C. § 1395y(a)(1). If a radiological test is performed by a Resident or Fellow participating in the GME Residency Program at a Teaching Hospital, Medicare and Medicaid will only pay for the Professional Component of diagnostic Radiology Services interpretations that are performed by, reviewed by or interpreted under the supervision of a Teaching Physician. 42 C.F.R. 415.172. Accordingly, the form that physicians must submit to Medicare and Medicaid in order to be entitled to reimbursement includes the following certification: "*Signature of Physician or Supplier*: I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision." CMS Form 1500 (the Medicaid certification is identical except that it does not include the word "immediate").

Relator alleges that during his employment, YNHH and Yale violated the FCA by improperly billing and retaining payments from the Medicare and Medicaid Programs for (1) radiological studies for which the signing radiologist did not review the associated image and/or the preliminary report, including alleged billing for: (a) the "clean up project," (b) the use of the "Autosign" function on the hospital computer system and (c) the review of reports of neuroradiology fellows; (2) studies by radiologists who were not qualified teaching physicians; and (3) medically unnecessary studies, including alleged billing for old studies and unnecessary panels of studies in the emergency room. In an effort to bill for these radiological studies, Relator alleges that YNHH and Yale knowingly engaged in improper billing schemes by falsifying and altering patient records, submitting bills which they knew were in violation of

3

Medicare and Medicaid billing requirements and falsely certifying that they were in conformity with applicable regulations and minimum standards of patient care.

A.  <u>Relator alleges that YNHH and Yale billed for radiological studies for which the signing radiologist did not review the associated image and/or the preliminary report</u>

Relator alleges that from July 1997 to July 1998, one or more Teaching Physicians finalized Radiology Reports for billing purposes without having ever reviewed the Radiology Study and without having dictated, edited or reviewed the final report.  According to Relator's allegations, the Teaching Physicians' practice of finalizing the reports in this way "contributed nothing to the diagnosis and/or care of the patient" and therefore "both the Technical Component and the Professional Component were improperly billed to the United States government."  2d Am. Compl. ¶ 84.

Relator also alleges that a "clean up project," involving the finalization of reports by Yale faculty members after the films had been reviewed by volunteer faculty members, took place between March and May 1998.  Relator alleges that Yale fraudulently billed for the Professional Component for interpretations of old radiological studies that were neither performed under the supervision of the attending physicians nor independently reviewed by the attending physician and which had no therapeutic or diagnostic value at the time they were finalized.  Relator's allegations concerning the clean up project principally involve a complaint by one of his colleagues, Dr. Burrell, alleging that he was coerced to sign off on or finalize reports of Radiology Studies for patients seen two years prior with whom Dr. Burrell had never been involved.  Dr. Burrell claims that the cases appeared on his sign out queue with his name listed as

the attending physician of record.  After he refused to sign off the reports, his name was removed

and Dean Glickman's, who allegedly promptly signed off on the reports, was substituted.  Id. ¶¶

58-65, 80-82.

        Relator alleges that YNHH used the "Autosign" function on the hospital computer system

to reflect a fictitious qualified "Responsible Radiologist" of record for the purpose of finalizing

radiology reports which were dictated by YNHH's radiology Residents and Fellows but were

never reviewed, approved, edited or certified by the Residents' or Fellows' Teaching Physician

as required pursuant to the Medicare laws.  According to Relator, Autosign was also created for

the purpose of finalizing preliminary reports which were dictated by Qualified Radiologists but

never reviewed, edited, approved or certified by them prior to finalization.  Id. ¶¶ 20, 58-72, 76-

78.  Relator further alleges that Autosign has additionally been used to move Radiology Studies

from "C" status, indicating that a study has never been interpreted, to "F" status, indicating that a

study has been interpreted and certified.  Id. ¶ 20.  Relator alleges that since January 1, 1998, at

least 1,594 reports of Radiological Studies have been finalized using the Autosign process.

Defendant claims that in the email from Felicia Tencza, Yale's Associate Business manager for

the Radiology Department, quoted by Relator in paragraph 58 of the Second Amended

Complaint, she made clear that Autosign was created "for the express purpose of flagging

preliminary reports for which the slides had been lost before the attending could review them so

that Medicare would *not* be billed."  Mem. Supp. at 3.[3]

_____

    [3] In the Second Amended Complaint, Relator quotes the Tencza email as stating that the Autosign process
would be "rarely used and then only in the most extenuating circumstances."  Although the sentence quoted by
Defendant is not included in the portions of the email exchange attached to Relator's Opposition as Exhibit C, there
are several other statements included that help to put the email in context.  Specifically, in the April 27, 1998 email,
Ms. Tenczaa wrote that "[i]t is VERY important that we do not bill for the study."  She also admits that Autosign
creates a "sticky problem," stating that physicians "must involve [the] billing [department] in order to avoid

5

Relator alleges that a number of faculty members, including himself, repeatedly complained to YNHH Administrators, on both ethical and legal grounds, about the use of Autosign, 2d Am. Compl. ¶ 58-62, and that as a result of his frustration with the University and Hospital's apathy towards his concerns, he undertook a "comprehensive review" of radiological records dating back to 1998. Upon review, Relator claims that he discovered that "thousands" of reports of Radiology Studies reflecting the initial interpretations of Residents and Fellows had been finalized by Autosign or by physicians who had never reviewed the films and who had not supervised the Resident or Fellow when the Studies were interpreted. Moreover, Relator alleges that "upon information and belief," the films and/or images associated with the Autosign studies were lost and were never repeated, retrieved or found. Id. ¶ 69.

B.     Relator alleges that YNHH and Yale billed for studies by radiologists who were not qualified teaching physicians

Relator further claims that since July 22, 1998, outside clinical attending physicians not authorized to bill Medicare as Teaching Physicians finalized reports by Residents and Fellows. Specifically, he names Bruce Simmons, M.D., who allegedly finalized 34 such reports, and Andy Haims, M.D., who allegedly finalized 1,024 such reports. Id. ¶ 75. Relator claims that "upon information and belief," Defendant YNHH billed Medicare and Medicaid for the Professional Component of Radiology Studies that were never reviewed by a Qualified Radiologist. Id. ¶ 76.

C.     Relator alleges that YNHH and Yale billed for medically unnecessary studies,

---

improper billing and its negative consequences." Moreover, in the April 30, 1998 email, Ms. Tencza concedes that she "would not know if the hospital charged" for the study. She also states again that "[i]t is anticipated that this will be a little used procedure." She makes clear that "no bill will go out for 'Auto Sign'" as "[t]hat is the purpose of creating 'Auto Sign,'" but says that this method of finalizing reports "cannot prevent an attending [physician] from finalizing a report without reviewing the images. Therefore, this procedure cannot correct an issue [the] billing [department] is not aware of. Viewing the images is the responsibility of the attending [physician]." Opp'n, Exh. C.

<u>including alleged billing for old studies and unnecessary panels of studies in the emergency room</u>

Relator alleges that since 1995, YNHH Radiology Department faculty has interpreted and issued final reports on "old" studies "long after the point in time when they can be considered medically necessary." <u>Id</u>. ¶ 55.  Relator claims that various Department Heads and Managers have "directed and made numerous attempts to intimidate Yale's Radiology Department faculty members to review and interpret these old Radiology Studies and furnish finalized reports for which Yale could and would bill the Professional Component, even though the delayed interpretations had no therapeutic or diagnostic value . . ." <u>Id</u>. ¶ 56.

Relator further alleges that pursuant to "long-standing practice" and as part of departmental policy at YNHH, certain panels of diagnostic tests are routinely ordered, regardless of whether they are medically indicated, prior to patients being examined or evaluated by "appropriate medical providers."  Relator claims that this practice violates Medicare and Medicaid billing requirements.  <u>Id</u>. ¶ 89.

After the Original Complaint was filed in this action, Relator deleted the "completed but not read" allegations against YNHH from this action and filed them in a subsequent action, discussed below as "Qui Tam Two."  In the Ruling on Relator's Motion for Reconsideration in the related action, docket number 03:02cv1205, the allegations against YNHH in that action were dismissed, but the two actions were consolidated and Relator has been granted leave to amend the Second Amended Complaint in this action in order to re-incorporate the particulars of the "completed but not read" allegations.  In the interests of efficiency, the related allegations against YNHH will be dealt with in conjunction with the similar issues raised by Cornell and New York

7

Presbyterian Hospital in their Motions to Dismiss filed in Qui Tam Two.

Relator claims to have met with Representatives from the Department of Justice several times in the fall of 1998 and the fall of 1999, at which times he says that he "outlined Defendant's practices which resulted in the submission of false claims to Medicare." Opp'n at 6 (citing Smith Aff., Opp'n Exh. A ¶¶ 12, 17, 19, 22).  Further, Relator alleges that he and two colleagues, Dr. Rosenfield and Dr. Burrell, met with Richard Levin, the President of Yale University, to discuss what they perceived to be fraudulent activity.  2d Am. Compl. ¶ 80. Following that meeting, Relator claims to have discussed the matter again, along with Drs. Rosenfield and Burrell, with Defendant's General Counsel.  Id. ¶ 81.

Relator alleges that after he began investigating and reporting the policies and procedures at issue here, YNHH and Yale, through their officers, agents and employees, harassed and discriminated against him in the terms and conditions of his employment by, *inter alia*, intimidating him, cutting his salary, stripping him of his administrative positions and titles, forcing him to resign, interfering with his attempts to obtain other employment, forcing him to leave the State of Connecticut and publicly defaming him.  Relator alleges that YNHH and Yale similarly retaliated against Dr. Arthur T. Rosenfield and Dr. Morton I. Burrell.  Relator asserts that he was discriminated against because of his investigation and reporting of the alleged frauds at issue here, including his reports of the substandard patient care issues, improper billing practices and corporate falsification of documents.  2d Am. Compl. ¶¶ 98-103.

Finally, Relator alleges that YNHH and Yale publicly defamed him by making statements to third parties which were false, injurious and known to be false at the time they were made and thus were reckless and wanton.  Relator claims that these statements caused harm to his

reputation and professional image with his colleagues and in the community and caused severe

mental and emotional distress.  2d Am. Compl. ¶¶ 104-107.

Relator filed the present qui tam action on or about July 19, 2000.  He filed a subsequent

qui tam action against Yale, YNHH and other defendants not parties to this action on or about

July 12, 2002.  For the purposes of this Ruling, the later filed action, 3:02cv1205 (PCD), will be

referred to as Qui Tam Two and the present action Qui Tam One.[4]  Following the filing of this

motion, the parties filed a stipulation dismissing defendant Yale University from both Qui Tam

One and Qui Tam Two.  On January 7, 2002, more than six months prior to filing either Qui Tam

One or Qui Tam Two, Relator brought an action in Connecticut state superior court alleging

violations of state law concerning his employment with YNHH and Yale.  See Burrell v. Yale

Univ., 00-cv-0159421-S (Conn. Super. Waterbury Dist.) (the "State Court Action").  The claims

asserted in the State Court Action include claims for retaliation under Section 31-51q of the

Connecticut General Statutes, breach of contract and constructive discharge.  The details of these

other actions will be discussed further, as necessary, below.

## II.  DISCUSSION

"The False Claims Act authorizes private citizens to sue on behalf of the United States to

recover treble damages from those who knowingly make false claims for money or property upon

the Government or who knowingly submit false statements in support of such claims or to avoid

the payment of money or property to the Government."  United States ex rel. Lissack v. Sakura

Global Capital Mkts., Inc., 377 F.3d 145, 146 (2d Cir. 2004) (citing 31 U.S.C. § 3729 et seq.).

---

[4] Pursuant to this Court's Ruling on Relator's Motion for Reconsideration in Qui Tam Two, the two actions have recently been consolidated for efficiency purposes.

The FCA imposes liability on any person who:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

31 U.S.C. § 3729(a).[5]

The Act also contains a "qui tam provision," which empowers persons—"relators"—to sue false claimants on behalf of the government. United States ex rel. Drake v. Norden Sys., 375 F.3d 248, 251 (2d Cir. 2004); 31 U.S.C. § 3730(b). A relator must bring the action in the name of the government, serve the complaint on the government, file the complaint under seal and allow the government to intervene. 31 U.S.C. § 3730(b). The government has an initial sixty-day period, extendable "for good cause shown," to decide whether to intervene. Id. Before expiration of its time limit, the government must intervene and prosecute the case or notify the court that it declines to do so, whereupon the relator has the right to proceed with the action. 31 U.S.C. § 3730(c). In either case, the relator is entitled to a percentage of any award received. 31 U.S.C. § 3730(d). The government has elected not to intervene in the instant action.

A.    False Claims Act: Section 3729 Claims

1.    Subject Matter Jurisdiction under 31 U.S.C. § 3730(e)(4)

The FCA contains a public disclosure bar that deprives courts of subject matter jurisdiction in cases based on publicly disclosed information unless the person bringing the

---

[5] The history of the FCA and the 1986 amendment have been outlined in detail by numerous courts and thus it is unnecessary to do so again here. See, e.g., United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prud. Ins. Co., 944 F.2d 1149, 1152-54 (3d Cir. 1991).

action is the original source of that information, 31 U.S.C. § 3730(e)(4)(A), which provides in

pertinent part:

> No court shall have jurisdiction over an action under this section based upon the
> public disclosure of allegations or transactions in a criminal, civil, or administrative
> hearing . . . unless the action is brought by the Attorney General or the person
> bringing the action is an original source of the information.

As is clear from the language of the statute, the satisfaction of section 3730(e)(4)(A) is an issue

of subject matter jurisdiction.  United States ex rel. Kreindler & Kreindler v. United

Technologies Corp., 985 F.2d 1148, 1157 (2d Cir. 1993).  This public disclosure bar was added

to the FCA in 1986 in an effort to strike a balance between encouraging "those with knowledge

of fraud against the government to bring that information to the fore" and "avoiding parasitic

actions by opportunists who attempt to capitalize on public information without seriously

contributing to the disclosure of the fraud."  United States ex rel. Doe v. John Doe Corp., 960

F.2d 318, 321 (2d Cir. 1992).

                    a.      Standard of Review

        Defendant moves to dismiss Relator's Second Amended Complaint for lack of subject

matter jurisdiction pursuant to Rules 12(b)(1) and 12(h)(3) of the Federal Rules of Civil

Procedure.[6]  The Relator, as the party asserting subject matter jurisdiction, has the burden of

establishing that it exists in this case, Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996), and

the court should not draw argumentative inferences in his favor.  Atlantic Mutual Ins. Co. v.

Balfour MacLaine Int'l, 968 F.2d 196, 198 (2d Cir. 1992).

_____

[6] "The distinction between a Rule 12(h)(3) motion and a Rule 12(b)(1) motion is simply that the former may
be asserted at any time and need not be responsive to any pleading of the other party.  For purposes of this case, the
motions are analytically identical because the only consideration is whether subject matter jurisdiction arises."
Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 879 n.3 (3d Cir. 1992) (internal citations omitted).

When considering a motion to dismiss, however, the court must accept the facts alleged in the complaint as true.  See Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997).  A court ruling on a Rule 12(b)(1) motion to dismiss must first determine whether the defendant is bringing a facial or factual challenge to its jurisdiction.  See United States ex rel. Cosens v. Yale-New Haven Hosp., 233 F. Supp. 2d 319, 320 (D. Conn. 2002) (citing Gould Elecs., Inc. v. United States, 220 F.3d 169, 176 (3d Cir. 2000); 2 Moore's Federal Practice § 12.30(4) (2002 3d ed.)).  The jurisdictional challenge in this case is factual in nature, since Defendant does not challenge the sufficiency of the pleadings, but argues, on a factual basis, that Relator's jurisdictional claims fail to comply with the requirements set forth in section 3730(3)(4) of the FCA.  Since Defendant's challenge is a factual one, the Court is not limited to the face of the complaint in considering this motion.  See Cosens, 233 F. Supp. 2d at 320 (citing Robinson v. Government of Malaysia, 269 F.3d 133, 141 (2d Cir. 2001); 2 Moore's at § 12.30(4)).  Rather, the Court is free, and even required, to weigh and consider evidence outside the pleadings to determine whether subject matter jurisdiction exists.  See id. (citing Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998); Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi, 215 F.3d 247, 253 (2d Cir. 2000) (in resolving a Rule 12(b)(1) motion, district courts may "resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings, such as affidavits, and if necessary, hold an evidentiary hearing"); see also Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) ("When the defendant has thus challenged the factual basis of the court's jurisdiction . . . the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.").  Therefore, a court must "look to the substance of the

allegations to determine jurisdiction." Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993).

As stated previously, Defendant is moving to dismiss Relator's Second Amended Complaint pursuant to Rules 9(b), 12(b)(1), 12(b)(6) and 12(h)(3) of the Federal Rules of Civil Procedure. When a party moves to dismiss pursuant to Rule 12(b)(1) in addition to other bases, such as Rule 12(b)(6), "the court should consider the Rule (12)(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." Rhulen Agency, Inc. V. Alabama Ins. Guaranty Ass'n., 896 F.2d 674, 678 (2d Cir. 1990).

> b.    Whether Rule 12(b)(1) is the Proper Vehicle for Challenging Subject Matter Jurisdiction under Section 3730(e)(4)

Relator challenges the propriety of considering YNHH's arguments in a Rule 12(b)(1) motion, arguing that the Second Circuit has never "squarely addressed" whether a 12(b)(1) motion is the appropriate vehicle to challenge subject matter jurisdiction. Opp'n at 8-11. As previously decided in this Court's Ruling on YNHH's Motion to Dismiss in Qui Tam Two, subject matter jurisdiction under § 3730(e)(4) may be resolved in a 12(b)(1) motion to dismiss. Therefore, the Court will consider the merits of YNHH's motion regarding jurisdiction as it did in the prior Ruling. See United States ex rel. Smith v. Yale-New Haven Hosp. Inc., 3:02cv1205 (PCD), 2005 U.S. Dist. LEXIS 19298, at *14-19 (D. Conn. 2005).

> c.    Whether there was a Public Disclosure Prior to the Filing of the Original Complaint

The first question in the public disclosure bar analysis is whether there has been a public

13

disclosure. Defendant argues that the public disclosure in this case took place on or about January 7, 2000, the date on which the State Court Action was filed. Mem. Supp. at 7. Section 3730(e)(4)(A) provides an exclusive list of the situations in which the public disclosure jurisdictional bar applies, such that if the public disclosure does not occur in "a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media," the qui tam action is not barred. See Doe, 960 F.2d at 323. The phrase "in the course of a civil, criminal, or administrative hearing" should be interpreted broadly, so as to include "allegations and information disclosed in connection with civil, criminal, or administrative litigation," including information disclosed during discovery. United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prud. Ins. Co., 944 F.2d 1149, 1156 (3d Cir. 1991); United States ex rel. Siller v. Becton Dickinson & Co., 21 F.3d 1339, 1350 (4th Cir. 1994) ("Given the fluidity in the meaning of the term 'hearing,' and the fact that we can discern no reason why Congress might have intended otherwise, we agree with our sister Circuits . . . that an entire civil proceeding can constitute a 'hearing' for purposes of section 3730(e)(4)(A)."). Under this approach, the "disclosure of discovery material to a party who is not under any court imposed limitation as to its use is a public disclosure under the FCA" regardless of whether such discovery has been filed with the court. Stinson, 944 F.2d at 1158; Kreindler, 985 F.2d at 1157 (adopting, without explanation, the approach set out in Stinson).[7]

---

[7] Although the Second Circuit adopted the Stinson approach in Kreindler, the circuits are split on how to treat discovery disclosed during litigation. Both the D.C. Circuit and the Seventh Circuit disagreed with the Stinson approach, holding that "discovery material which has not been filed with the court and is only theoretically available upon the public's request" is not "publicly disclosed" within the meaning of Section 3730(e)(4)(A). United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 652 (D.C. Cir. 1994); United States v. Bank of Farmington, 166 F.3d 853, 860 (7th Cir. 1999). Every Court of Appeals to consider whether discovery material which has been filed with a court has been publicly disclosed within the meaning of Section 3730(e)(4)(A), however, has answered that question in the affirmative. See Quinn, 14 F.3d at 861 n.4 (collecting cases). As the Second Circuit has already spoken on the issue, the approach adopted in Kreindler controls in this case and any information disclosed during

As the public disclosure jurisdictional bar applies only when a complaint is "based upon" publicly disclosed information, 31 U.S.C. § 3730(e)(4)(A), Defendant also argues that the allegations disclosed in the State Court Action are "substantially similar" to the allegations in the instant action.[8]  Id. at 8-9.  The Second Circuit, as well as a majority of other circuits, have held that a qui tam action is "based upon" a public disclosure when the allegations of fraud or the critical elements of the fraudulent transaction are "the same as those that have been publicly disclosed . . . . regardless of where the relator obtained his information."  Doe, 960 F.2d at 324; accord Kreindler, 985 F.2d at 1158; United States ex rel. Dick v. Long Island Lighting Co., 912 F.2d 13, 17 (2d Cir. 1990); United States ex rel. Springfield Terminal Ry. Co. v. Quinn, 14 F.3d 645, 654 (D.C. Cir. 1994); United States ex rel. Mistick PBT v. Hous. Auth., 186 F.3d 376, 388

---

discovery in the State Court Action to a party not under a "court imposed limitation as to its use" will be deemed "publicly disclosed."

[8] Defendant argues that in making the determination as to whether the two complaints are substantially similar, the Court should consider only the allegations in the initial complaint, asserting that "[w]here, as here, the relator has amended the complaint, the Court looks to the initial complaint in determining subject matter jurisdiction."  Mem. Supp. at 9 n.5.  Defendant cites no direct support for this proposition in this Circuit and the Court is aware of none.  United States ex rel. Kinney v. Stoltz, 327 F.3d 671, 675 (8th Cir. 2003), the only Circuit court case cited by Defendant in support of this proposition, said that the relator "was obligated to identify [direct knowledge of the asserted fraud] in his initial complaint," but did not directly deal with the propriety of considering an original versus an amended complaint.  Another case cited by Defendant, United State ex rel. Ackley v. IBM, 76 F. Supp. 2d 654, 660 (D. Md. 1999), held that because the original complaint was "framed before any possible distortions associated with discovery took place, [the original complaint] is the most reliable evidence of" direct and independent knowledge.  As stated in this court's Ruling on YNHH's Motion to Dismiss in Qui Tam Two, there is an intuitive reasonableness to this position that would seem to serve the FCA's avowed purpose of avoiding "parasitic" lawsuits based on publicly disclosed information.  See Smith, 2005 U.S. Dist. LEXIS 19298, at *24; Doe, 960 F.2d at 321 ("The 1986 amendments attempt to strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud.").  Even though the State Court Action was filed before this lawsuit, the trial in the State Court Action did not end until late July 2004, and thus it is possible that later amended complaints could contain information obtained by way of discovery in that action.  However, the reasonableness of Defendant's position on this issue is mitigated by the fact that the disclosure Defendant alleges is the filing of the State Court Action rather than any discovery therein, and thus it is unclear how Ackley, which was concerned with information disclosed during discovery in the same action, applies.  See 76 F. Supp. 2d at 659.  Since the filing of the State Court Action occurred before both the filing of the initial complaint and any amended complaints, there seems to be no basis for favoring one over the other.  As Relator does not contest that the qui tam action was based on a public disclosure, however, the Court need not decide the question at this time.

15

(3d Cir. 1999) (holding that "a qui tam action is 'based upon' a qualifying disclosure if the disclosure sets out either the allegations advanced in the qui tam action or all of the essential elements of the qui tam action's claims").  Relator does not dispute that the State Court Action constituted a disclosure or that the qui tam action was based on the disclosure, but simply argues that Relator qualified as an original source prior to the disclosure.  Opp'n at 11.

                d.      Whether Relator Qualifies as an "Original Source"

As there is no dispute in this case over whether there was a public disclosure of the allegations prior to filing the original complaint, the dispositive question here is whether Relator qualifies as an original source despite the public disclosure.  See 31 U.S.C. § 3730(e)(4)(A); Koch, 971 F.2d at 553 ("[A] plaintiff whose qui tam action is based in any part upon publicly disclosed allegations or transactions is subject to the 'original source' jurisdictional requirement."); see also United States ex rel. Wang v. FMC Corp., 975 F.2d 1412, 1417 (9th Cir. 1992) (holding that the fact of a subsequent public disclosure "does not rob [the relator] of what he saw with his own eyes").  An "original source" under the FCA is one who (1) "has direct and independent knowledge of the information on which the allegations are based," (2) "has voluntarily provided the information to the Government before filing an action under this section" and (3) has "directly or indirectly been a source to the entity that publicly disclosed the allegations on which the suit is based." 31 U.S.C. § 3730(e)(4)(B); United States v. New York Med. Coll., 252 F.3d 118, 120 (2d Cir. 2001) (citations omitted); see also Kreindler, 985 F.2d at 1159 (discussing the Second Circuit's decision to include the third requirement).[9]

_____

[9] The Ninth Circuit has also adopted the third requirement that the qui tam plaintiff must "have had a hand in the public disclosure of allegations that are part of one's suit."  Wang, 975 F.2d at 1418.  Other circuits, however, have rejected this requirement as having "no basis in text or legislative history."  Bank of Farmington, 166 F.3d at 865 (7th Cir.); accord Stinson, 944 F.2d at 1160 (3d Cir.); Siller, 21 F.3d at 1355 (4th Cir.); United States ex rel.

i.     Whether Relator has "Direct and Independent" Knowledge

Importantly, the statute requires the relator to have direct *and* independent knowledge. "Independent knowledge" is that which is not dependent on public disclosures.  See Stinson, 944 F.2d at 1160; Kreindler, 985 F.2d at 1158.  Although a relator need not possess *all* relevant information in order to have "independent" knowledge, he or she must possess "substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation." Stinson, 944 F.2d at 1160.

"Direct" knowledge is that which is "marked by [the] absence of an intervening agency, instrumentality, or influence: immediate."  Id. (quoting Webster's Third New International Dictionary 640 (1976)).  Clearly, "[a] relator has direct knowledge when he sees [the fraud] with his own eyes," and thus, the "paradigmatic 'original source' is a whistleblowing insider."  United States ex rel. Kinney v. Stoltz, 327 F.3d 671, 674 (8th Cir. 2003) (noting that the FCA "is intended to encourage individuals who are either close observers or involved in the fraudulent activity to come forward, and is not intended to create windfalls for people with secondhand knowledge of the wrongdoing"); Stinson, 944 F.2d at 1161 (referring to the Senate Report's statement that "individuals who are close observers or otherwise involved in fraudulent activity" are possible relators) (quoting S. REP. NO. 345, at 4, *as reprinted in* U.S.C.C.A.N. 5269).  Direct knowledge is that which comes from the relator himself and thus one cannot qualify as an "original source" if "a third party is the source of the *core information* upon which a qui tam

---

Fine v. Advanced Sciences, 99 F.3d 1000, 1006-07 (10th Cir. 1996); Cooper, 19 F.3d at 568 n.13 (11th Cir.). Although this issue is not contested here, it is clear that the approach set forth in Kreindler controls in this circuit.

complaint is based." New York Med. Coll., 252 F.3d at 121 (emphasis added); Kreindler, 958

F.2d at 1159. It is therefore not necessary for a relator to have all the relevant information in

order to qualify as independent so long as the relator possesses substantive, or core, information

about the particular fraud. See New York Med. Coll., 252 F.3d at 121; Kreindler, 985 F.2d at

1159. Merely possessing background information which enables the relator to understand the

significance of a publicly disclosed transaction or allegation, however, is insufficient. See

Stinson, 944 F.2d at 1160, cited by Kreindler, 985 F.2d at 1159 ("[The qui tam plaintiff] had no

significant direct knowledge . . . and certainly was not a source of that information . . . The fact

that [the qui tam plaintiff] conducted some collateral research and investigations . . . does not

establish 'direct and independent knowledge of the information on which the allegations are

based' within the meaning of § 3730(e)(4)(B).").

Relator cites Quinn, 14 F.3d at 657, for the proposition that a relator need only have

direct and independent knowledge of *any essential element* of the underlying fraud transaction in

order to qualify as an original source. Opp'n at 17. Relator cites no case from this Circuit in

support of that proposition. Moreover, as noted above, the Second Circuit has made clear that a

relator must possess, at the very least, substantive, or core, information about the particular fraud

in order to qualify as an original source. See New York Med. Coll., 252 F.3d at 121; see also

Kreindler, 985 F.2d at 1159. Moreover, the Quinn approach advocated by Relator has been

criticized for its deviation from the standard set forth in the FCA:

> The [Quinn] approach is inconsistent with the plain language of the FCA, which
> should govern the court's interpretation. As noted earlier, the statute provides that
> an original source is someone who has "direct and independent knowledge of the
> information on which the allegations are based and has voluntarily provided the
> information to the Government before filing an action under this section which is
> based on the information." 31 U.S.C. § 3730(e)(4)(B). The statute does not provide

18

that all that is necessary is that the relator have "direct and independent knowledge of *some* of the information on which the allegations are based." Even with the understanding that "based" should be construed to be "supporting," there is no indication in the language of the statute that the supporting information need only provide a fraction of the necessary elements of the allegation.

United States ex rel. Hafter v. Spectrum Emergency Care, Inc., 9 F. Supp. 2d 1273, 1277 (D. Kan. 1998) (citations omitted) (emphasis added); see also United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787, 802 (10th Cir. 2002) (explaining the Hafter holding and adding that "[t]he relator need not . . . have in his possession knowledge of the actual fraudulent conduct itself; knowledge 'underlying or supporting' the fraud allegation is sufficient"). Therefore, although Relator need not prove that he had direct and independent knowledge of *all* of the information on which the allegations are based, he must show that he had direct and independent knowledge of the *core* information upon which his allegations of fraud are based.

### A.   Conduct Allegedly Occurring After Relator Left Yale

Defendant argues that as many of the allegations in the Complaint took place at Yale after June 30, 1999, the date on which Relator left Yale, Relator cannot have "direct and independent knowledge" of any of the post-June 1999 allegations. Mem. Supp. at 12 (citing Compl. ¶¶ 7, 83-91; 2d Am. Compl. ¶¶ 7, 68-76, 79-81). In a similar context, Stone held that the defendant's argument that the relator could not be an "original source" because he no longer worked for the defendant corporation when the allegedly fraudulent activity commenced was "immaterial to the relevant question, which is whether [the relator] had direct and independent knowledge of the information underlying the claim," which, in that case, was defendant's awareness that it would be engaging in fraudulent activities. Stone, 282 F.3d at 802-803. To the extent that Relator is seeking to establish direct and independent knowledge of conduct that occurred after his

departure from YNHH, he is permitted so long as the allegations flow from matters over which he had direct knowledge while employed. See Stinson, 944 F.2d at 1160 (holding that a relator need not have direct knowledge of every fact alleged). Assuming that conduct substantially similar to that of which Relator has direct knowledge continued after his departure, it would not be in the ultimate interest of Government recovery to limit an action solely to conduct that occurred during his employment.

A review of the Second Amended Complaint reveals only a small number of allegations involving conduct taking place after June 30, 1999:

> 68. [Relator Smith's] review encompassed those reports . . . finalized by "Autosign" from the *period from January 1, 1998 to May 2000*, and other reports finalized "after-the-fact" which had never been interpreted or finalized . . . .
> 88. *Upon information and belief*, tens of thousands of additional instances of fraud in the signing of reports *has occurred since July 1998* and *continues to the present time*.
> 89. It is a *long-standing practice* . . . that certain panels of diagnostic tests, including Radiology Studies, are routinely ordered as a matter of practice . . . .

2d Am. Compl. ¶¶ 68, 88, 89 (emphasis added). All of these instances of alleged conduct occurring after Relator's departure involve conduct that began during his employment and continued after his departure. Therefore, as the "information underlying the claim" commenced during Relator's employment, he is not prevented from establishing "direct and independent knowledge" solely because the conduct continued after his departure.

Defendant also points to Relator's claim that he "reviewed a serious of radiology reports in the DecRad System [which had been] finalized for the period from January 1, 1998 to May 2000" and to Relator's following discussion of his investigation. Mem. Supp. at 13 (citing Compl. ¶¶ 83-91; 2d Am. Compl. ¶¶ 68-76). Defendant notes that Relator has not explained how, almost a year after leaving Yale to work at Cornell, he obtained access to YNHH's

computer system in order to conduct his review.  See id.  Although the key question is whether Relator has direct and independent knowledge of the information and not how he obtained it, Defendant does call the credibility of Relator's assertion into question.  See Stone, 282 F.3d at 802-03 (holding that the fact that the relator was no longer employed by and not "physically present" at the defendant company when the illegal activity began was irrelevant; the relevant question was whether he had "direct and independent knowledge of the information underlying his claim").  Relator's presence at YNHH when the activity occurred would be relevant as bearing on the question of Relator's ability to prove that he had "direct and independent knowledge" of the information in question.  The issue of how he obtained the knowledge is essential to his being an original as opposed to a secondary source.  This Court finds, on the present record, that Relator has not proved that he was an original source as to the information presented in paragraphs 68-76 of the Second Amended Complaint on the present record.

Relator also claims that he possesses firsthand, direct knowledge of "Yale's long standing practice of automatically submitting claims for reimbursement for the Professional Component of all radiology tests and procedures once they are in 'F' status in the DecRad system," Exh. A ¶¶ 9-11, 16, 18, and "YNHH's long standing practice of automatically submitting claims for the Technical Component of radiology tests and procedures once the exam is placed in 'C' status in the DecRad system." Exh. A ¶¶ 7, 12, 21.  Defendant maintains that these claims are "simply wrong," arguing that Relator cannot possess "direct and independent" knowledge sufficient to establish jurisdiction when such knowledge is "demonstrably false."  Def.'s Reply at 7.  As the Tenth Circuit Court of Appeals held in Stone, however:

> For a relator to be properly qualified as an original source, he must have had direct and independent knowledge of the information on which his claim is based. But

21

whether that claim is ultimately flawed on the merits is an analytically distinct question from the one mandated by the FCA for establishing jurisdiction. It is for the finder of fact to determine whether the plaintiff's theory has merit; to satisfy the direct and independent prong of the original source test, the relator need only show that he possessed direct and independent knowledge of the information upon which his claim is based, not that his claim is factually correct.

282 F.3d at 803. Similarly, Defendant's objection to Relator's knowledge here also does not

have merit; whether Relator's allegations are *true* is immaterial to the present inquiry.

## B.  Facts Obtained via Discovery in State Court Action

Defendant argues that the jurisdictional bar applies because a large part of the newly pled

allegations in the Second Amended Complaint come from information disclosed during the

discovery process in the State Court Action. Mem. Supp. at 15-16 (citing 2d Am. Comp. ¶ 85,

which states that "[a] review of Defendants' records provided thus far has revealed . . ." and ¶ 88,

which cites a "recent admission of Dr. Gordon Sze"). Although disclosure by itself is not

sufficient to defeat jurisdiction if the relator is the source of the information disclosed, Defendant

correctly asserts that if Relator had obtained information regarding post-June 1999 transactions

through discovery in the State Court Action, he would not, as a matter of law, have

"independent" knowledge of that information. See Kreindler, 985 F.2d at 1158 (holding that

relator is not an original source as to information produced during discovery); Dick, 912 F.2d at

18 ("[I]f the information on which a qui tam suit is based is in the public domain, and the qui tam

plaintiff was not a source of that information, then the suit is barred."); Stinson, 944 F.2d at 1158

(holding that discovery exchanged between private parties but not filed with the court is

"publicly disclosed" because it is potentially accessible to the public); United States ex rel.

Pentagen Techs. Int'l Ltd. v. CACI Int'l, Inc., 94-cv-2925 (RLC), 1996 WL 11299, at *8

(S.D.N.Y. Jan. 4, 1996) ("[T]he Second Circuit holds that the party divulging the information

deemed publicly disclosed by litigation papers, such as depositions, is the original source of that information despite the fact that another party initiated the court proceeding as part of its discovery investigation.").

Defendant argues that certain allegations in the Second Amended Complaint—specifically, those in paragraphs 85 and 88—were obtained by way of discovery in the State Court Action and should be dismissed. Mem. Supp. at 15-16. As the Section containing these allegations appears in the Second Amended Complaint but not in the Original Complaint, which was filed six months earlier, Defendant's argument appears to carry some weight. The statement that "[a] review of the Defendants' records provided thus far has revealed evidence of the alleged Neuroradiology Fellow and Resident Billing fraud," appears to indicate that the records were produced and the relevant evidence gathered during discovery. 2d Am. Compl. ¶ 85. Thus, as to the evidence mentioned in paragraph 85, it appears that YNHH and/or Yale—and not Relator—were the "original sources." See Kreindler, 985 F.2d at 1159 (holding, where the defendant produced documents and information during discovery, that the defendant "was clearly the source of the core information"). Similarly, Relator's citation in paragraph 88 of a "recent admission of Dr. Gordon Sze" in support of his assertion that "[u]pon information and belief, tens of thousands of additional instances of fraud in the signing of Reports has occurred since July 1998 and continues to the present time," bolsters the conclusion that these allegations are based on information produced during discovery and not on Relator's own direct and independent knowledge. Accordingly, the only question here is whether the information produced on which Relator relies is "core" information or whether it is merely additional

evidence supporting Relator's allegations.[10]

It seems, with regard to Relator's allegation that Residents and Neuroradiology Fellows were used to facilitate fraudulent billing practices in paragraphs 83-88 of the Second Amended Complaint, that Relator does not have direct knowledge of the information forming the "core" of the allegation. Although it is not clear from the face of the Complaint, Relator appears to not have direct knowledge of the allegation in paragraph 84, which says that "the essence of the claim" was "first raised by Resident Physicians." 2d Am. Compl. ¶ 84. Moreover, the evidence that Relator provides appears to have been obtained through discovery in the State Court Action. For example, Relator says that certain evidence was revealed by "[a] review of Defendants' records provided thus far," and discusses information "contained in a Hogan & Hartson investigative report." Id. ¶ 85. Similarly, Relator discusses other knowledge apparently "based on the handwritten notes taken by President Levin." Relator does not explicitly state where he obtained the information, but the statements in the complaint and the fact that the allegations were not present in the Original Complaint lead to the conclusion that these facts were discovered after the filing of the Original Complaint, most likely by virtue of discovery in the State Court Action.[11] Based on his review of the aforementioned documents, Relator makes his own "unavoidable inferences" and conclusions, but the basis of these allegations comes from information provided by other sources. As a matter of law, Relator cannot claim to be the

_____

[10] Aside from the paragraphs cited by Defendant (83-88), there are no "core, substantive" additions to Relator's allegations in the Second Amended Complaint that were not in the Original Complaint—in fact, aside from the paragraphs noted, the allegations in the two complaints are virtually identical. Both complaints were, however, framed after the State Court Action was filed.

[11] Relator does not specify the source of the information and does not dispute Defendant's contention that the information was obtained by way of discovery in the State Court Action. Thus, the Court sees no reason to speculate to the contrary.

original source of information disclosed during discovery in the State Court Action.

Accordingly, the Court finds that it does not have subject matter jurisdiction over the allegations

found in paragraphs 83-88 of the Second Amended Complaint.

### C.  Information Obtained from Third Parties

With respect to Relator's claims regarding the "clean up project," Defendant

argues that "it is clear from the face of the Complaint that the allegations are based on

secondhand information from Dr. Burrell." Mem. Supp. at 15 (citing Compl. ¶¶ 77-80; 2d Am.

Compl. ¶¶ 62-65).  As Defendant alleges, Relator's allegations in paragraphs 62-65 of the Second

Amended Complaint are clearly based on information provided to him by Dr. Burrell, however,

that fact will not defeat jurisdiction if, as discussed earlier, the information forming the basis of

the complaint is within Relator's "direct and independent" knowledge.  See Stone, 282 F.3d at

802-03 ("The relator need not . . . have in his possession knowledge of the actual fraudulent

conduct itself; knowledge 'underlying or supporting' the fraud allegation is sufficient.").  This is

not the case here, however, where it is evident that the core information about the clean up

project came from Dr. Burrell.  For Relator's knowledge to be "independent," it "must not be

derivative of the information of others, even if those others may qualify as original sources." See

United States ex rel. Fine v. Advanced Sciences, Inc., 99 F.3d 1000, 1007 (10th Cir. 1996)

(holding that the relator "did not qualify as an original source because his knowledge was

secondhand and derivative of the information generated by [others] who actually . . . uncovered

the facts"); Hays v. Hoffman, 325 F.3d 982, 991 (8th Cir. 2003) (holding that the relator was not

an original source as to information obtained from a co-worker; such information "is neither

direct nor independent").  Although Dr. Burrell may be an original source of the

information—which is not clear on the present record—Relator unquestionably obtained the information from him and therefore does not have direct and independent knowledge of it.  As a matter of law, Relator cannot claim to be an original source of information derived from third parties.  See Doe, 960 F.2d at 321 (discussing the purpose of the 1986 amendments to the FCA as "strik[ing] a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud"); Kinney, 327 F.3d at 674 ("The [FCA] . . . is not intended to create windfalls for people with secondhand knowledge of the wrongdoing."). Therefore, this Court finds that it does not have subject matter jurisdiction over the allegations in paragraphs 62-65 of the Second Amended Complaint.

Defendant cites further examples of Relator conceding that he does not have "direct or independent" knowledge of various allegations, including Relator's testimony in the State Court Action that he has "no idea" and is "not claiming one way or the other" whether YNHH was billing for Autosign.  Doyle Decl. Exh. J at 521:4-13; see also Compl. ¶¶ 20, 72-76, 81-89, 91-93; 2d Am. Compl. ¶¶ 20, 57-61, 66-74, 76-78 ("Autosign" claims).  Defendant also points to Relator's admission with respect to his claims that YNHH billed for medically unnecessary panels of tests, Compl. ¶¶ 96-99; 2d Am. Compl. ¶¶ 89-92, that he has "no way of knowing" whether the memo in question either ordered fraudulent billing or was even put into effect. Doyle Decl. Exh. K at 604:5-11, 607:10-14.  Relator's admissions that he does not know whether fraudulent billing occurred are troublesome.  It is clear that Relator must establish "direct and independent" knowledge of an actual FCA violation—which includes the actual submission of false claims.  See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 225

26

(1st Cir. 2004) (noting that evidence of an actual false claim is "the sine qua non of a False Claims Act violation").

Relator, however, maintains that he does have direct and independent knowledge of the information underlying the allegations of fraud, having obtained such information firsthand during his tenure as a Teaching Physician in Defendant's employ.  Opp'n at 13 (citing Exh. A ¶¶ 13-22).  Specifically, Relator argues that he possesses firsthand, direct knowledge "of Yale's long standing practice of automatically submitting claims for reimbursement for the Professional Component of all radiology tests and procedures once they are in "F" status in the DecRad system," Exh. A ¶¶ 9-11, 16, 18, "of YNHH's long standing practice of automatically submitting claims for the Technical Component of radiology tests and procedures once the exam is placed in "C" status in the DecRad system," Exh. A ¶¶ 7, 12, 21, as to how Autosign was going to be used, Exh. C, "of the fraudulent finalization of preliminary reports written by Residents and Fellows . . . because he discussed with actual Residents the fact that the respective faculty members were routinely signing off on the reports without reviewing the associated images or the reports," Exh. A ¶ 15, and "of the Clean up project because he discussed with actual faculty who were coerced into participating in the fraud and because Plaintiff independently investigated and reviewed the computer records of specific cases that were part of the fraud," Exh. A ¶¶ 18-19.  Relator argues that this direct knowledge is "clearly evident" in the independent review he performed of fraudulently finalized reports, his complaints to Felicia Tencza, and his meetings with Yale President Levin and Yale's General Counsel on the matter.  Opp'n at 14 (citing 2d Am. Compl. ¶¶ 58-61, 66-76, 80-82, 84, 89, 90, 98, 101; Exh. A ¶¶ 13-22).

Although Relator's investigation/review could lead to information which he would have

direct and independent knowledge of, if his admissions are to the contrary, then they would control over the allegations in his complaint.  As discussed above, Defendant cited several examples of Relator conceding that he does not have knowledge of the information forming the basis of the complaint, that is, that fraudulent billing occurred.  Since Relator presents no evidence that he had direct and independent knowledge of fraudulent billing and since his admissions suggest none, there is insufficient evidence for this Court to find that Relator is an original source as to the allegations in paragraphs 20, 57-61, 66-74, 76-78 and 89-92 of the Second Amended Complaint.

Similarly, Defendant argues that Relator has demonstrated that his claim about billing for reports prepared by Neuroradiology Fellows in paragraphs 83-88 of the Second Amended Complaint is based on information obtained from third parties and therefore is "derivative of the information of others" and not "independent."  Def.'s Reply at 9; see also Mem. Supp. at 13-15. Defendant alleges that Relator has admitted to not having direct and independent knowledge of these alleged fraudulent activities, citing a filing in the State Court action in which Relator conceded, along with the other plaintiffs in that action, that he "did not directly observe or participate" in those activities.  Doyle Decl. Exh. G at 2.  In that filing, the State Court plaintiffs stated that "the source of these allegations [of alleged fraudulent activities relating to the overreading of the neuroradiology fellows] are numerous current and former radiology residents who directly and reluctantly participated in these activities."  Id.  Similarly, in information produced during discovery in the State Court Action, Relator concedes that the plaintiffs in that action "did not claim that Yale had billed for these studies; it was enough of a violation of law and medical ethics for a physician to place his name on a report certifying he had reviewed the

film when he had not." Id. Exh. I at 5. For purposes of this action, however, the question of whether these practices violated law and medical ethics is irrelevant—it is false or fraudulent billing which is the *sine qua non* of an FCA violation. Since there is no violation without false or fraudulent billing, Relator's statement casts considerable doubt on the viability of these claims. His silence on the subject suggests that he possessed no knowledge of any fraudulent billing, for if he did, presumably, he would have made that fact clear. Therefore, the evidence on the record at this point suggests that all that Relator was told and all that he knew was that the reports were signed.

In the Reply, Defendant also claims that Relator admits in this action that he obtained the information secondhand, citing Relator's argument that he "has direct knowledge of the fraud[] . . . because he discussed [it] with actual Residents." Def.'s Reply at 8 (citing Opp'n at 14). Moreover, Defendant points to Relator's statement that he has "direct knowledge of the Clean up project because he discussed with actual faculty who were coerced into participating in the fraud and because Plaintiff independently investigated and reviewed the computer records specific cases that were part of the fraud," Exh. A ¶¶ 18-19, and argues that these statements "turn the meaning of 'direct' on its head," as Relator "concedes that his information . . . was obtained secondhand rather than by personal observation." Relator, on the other hand, claims that he followed the information up with his own independent investigation. Opp'n at 14.

Numerous courts have held that knowledge that is "unmediated by anything by [relator's] own labor" or derived from information obtained firsthand through relator's own labor is "direct." See, e.g., Wang, 975 F.2d 1412 (9th Cir.); Cooper, 19 F.3d at 568 (11th Cir.); Houck, 881 F.2d at 505 (7th Cir.); Quinn, 14 F.3d at 656 (D.C. Cir.); Stinson, 944 F.2d at 1160 (3d Cir.).

The Second Circuit has held, however, that "collateral research and investigations . . . do[] not

establish 'direct and independent knowledge of the information on which the allegations are

based,'" Kreindler, 985 F.2d at 1159.  Similarly, other Courts have held that information

obtained from third parties, such as co-workers, is neither direct nor independent.  See, e.g., Fine,

99 F.3d at 1007; Hays, 325 F.3d at 991; United States ex rel. Holmes v. Consumer Ins. Group,

318 F.3d 1199, 1207 (10th Cir. 2003) (characterizing a "parasitic qui tam action" as one "based

on knowledge obtained secondhand through other employees").  This would suggest that an

inquiry which confirmed information otherwise obtained is not sufficient to constitute plaintiff as

an original source.  If, as Defendant claims, Relator's information came from another source and

he confirmed it by independent investigation, he cannot claim, after the fact, that he was an

original source.  Based on the evidence presented thus far, this Court finds that Relator was not

an original source as to the information presented in paragraphs 83-88 of the Second Amended

Complaint and therefore, the Court does not have subject matter jurisdiction over those

allegations.

### D.  Information and Belief Allegations

Defendant argues that the allegations pled "on information and belief"—specifically,

those found in paragraphs 20, 69, 72, 77-78, 82-83 and 87-88 of the Second Amended

Complaint—should be dismissed.  Defendant claims that as to those allegations, Relator "has no

basis to claim original source status."  Def.'s Reply at 10.  Even if allegations are filed "on

information and belief," however, a relator can qualify as an original source if he or she had

independent, firsthand knowledge of fraudulent conduct before the allegations of fraud were

publicly disclosed.  See United States ex rel. DeCarlo v. Kiewit/AFC Enters., 937 F. Supp. 1039,

1049 (S.D.N.Y. 1996) (holding that DeCarlo, who was employed to work with the defendant on a specific project and who had "independent knowledge of [the defendant's] allegedly fraudulent conduct, obtaining information and making firsthand observations during the course of his employment on the Project", "is the type of plaintiff envisioned by the qui tam provisions of the False Claims Act.").  If Relator actually observed the allegedly fraudulent acts or conduct that he has described as of information and belief, he would still have direct, i.e., personal, knowledge. If, on the other hand, Relator infers acts or conduct based on sources of information other than his personal observations, his claims would not be based on direct, personal knowledge.

In his Affidavit, Relator outlines the "core" information he observed during his tenure at YNHH.  Opp'n, Exh. A ¶¶ 13-22.  Relator alleges to have direct knowledge of, *inter alia*, the resident schedules, the procedures for reviewing interpretations and associated images and finalizing reports, the alleged practice of some of the Emergency Department ("ED") faculty members of not reviewing the images or the interpretations of the ED radiology tests, the alleged discovery that many of these reports were signed in large batches in a very short period of time while films were still in the library, the fact that this was contrary to long-standing policies in the ED, Yale's "long standing practice" of automatically submitting claims for reimbursement for the Professional Component of all radiology tests and procedures that have been signed by faculty and placed in "F" status in the DecRad system (indicating that they had been finalized even though Relator alleges that many were never properly reviewed and corrected), the fact that Dr. Glickman's name was used to finalize reports that allegedly had never been reviewed or edited, the Autosign fraud and YNNH's "long standing practice" of automatically submitting claims for the Technical Component of radiology tests and procedures once the exam is placed in "C" status

in the DecRad system even if such tests and procedures were only finalized by Autosign. <u>Id</u>.

Some of Relator's concerns regarding the practice of signing radiology reports on patient studies

for which the films have been lost are indicated in a May 4, 1998 memo Relator sent to Dr. Bruce

McClennan, which Relator attaches as evidence of his direct knowledge of the fraud. <u>See</u> Opp'n

Exh. B. As a recipient of the Tencza memo explaining Autosign, Relator clearly had direct

knowledge of how Autosign was going to be used, <u>see</u> Opp'n Exh. C, but did not necessarily

have direct knowledge that fraud was actually committed. Moreover, some of Relator's

knowledge—regarding, for example, the fraudulent finalization of preliminary reports written by

Residents and Fellows and the Clean up project—stems from discussions with Residents and

faculty members and his own independent investigations, which, as stated earlier, renders the

information "indirect." The knowledge at issue was not "unmediated by anything but [Relator's]

own labor" and was not derived from information obtained firsthand through relator's own labor,

rather, much of it was obtained secondhand, through reports from Residents, other faculty

members and possibly, information produced during discovery in the State Court Action.

Many of the claims pled on information and belief make up the substance of Relator's

FCA claim. <u>See, e.g.</u>, 2d Am. Compl. ¶¶ 77 ("On information and belief, Defendants Yale and

YNHH billed Medicare and Medicaid for the Professional Component of these Radiological

Studies never reviewed by a Qualified Radiologist."); 78 ("Upon information and belief,

Defendants utilized the 'Autosign' process and the other afore-described non-Qualified

Radiologist Radiology Study report finalization methods to avoid and conceal the obligation of

said Defendants to repay the United States monies paid to Yale and YNHH for both the

Professional and Technical Components of these Radiological Services."); 83 ("Upon

information and belief, over a one-year period, from on or about July 1997 to July 1998, several

thousands of Radiology Reports read by Residents and first year Neuroradiology Fellows were

fraudulently finalized by Yale Faculty who never reviewed the images."); 87 ("Upon information

and belief, several thousands of such instances of fraud were perpetrated from July 1997 to July

1998."). These allegations cannot survive without proof that Relator has direct, independent,

firsthand knowledge of the information that does form the basis of the complaint and certainly

cannot support an FCA claim. To be an original source, Relator must have direct and

independent knowledge of facts, not mere suspicions of illegal conduct. Relator has not

demonstrated that any of the alleged failures—i.e., the non-review by a qualified radiologist,

billing for non-reviewed studies, finalization of reports of residents and/or fellows by faculty who

did not review the images—were performed or done as to constitute fraud in his presence or

observations. Therefore, this Court finds that it does not have jurisdiction over those allegations

pled on information and belief.

### E. Second Circuit Precedent

The Second Circuit, setting a high bar, has repeatedly found that qui tam plaintiffs did not

qualify as original sources. For example, in Kreindler, the qui tam plaintiff was an attorney who

had obtained knowledge of the underlying fraud during his representation of a widow in a

previous wrongful death action against defendant. 985 F.2d 1148. The Court held that the qui

tam plaintiff did not qualify as an original source because he would not have learned of the

alleged fraudulent practices but for the discovery in the prior lawsuit. Id. Similarly, in Dick,

although the qui tam plaintiffs were employees of the defendant corporation, their only

knowledge of the underlying fraud was obtained via public disclosures made during a prior suit

against the defendant with which they were not involved.  In that prior suit, the complaint and

other pertinent information were "widely reported" by the news media. 912 F.2d 13.  Importantly,

the Court found that the plaintiffs in <u>Dick</u> would not have obtained the information but for the

public disclosures.

More recently—and more similarly—the qui tam plaintiffs in <u>New York Medical College</u>

("NYMC") were found to not be original sources because the principal source of their knowledge

of the fraud was an audit initiated by New York City Health and Hospital Corporation ("HHC")

that found that NYMC had overcharged HHC.  252 F.3d 118, 119-21.  Like Relator, the <u>New</u>

<u>York Medical College</u> plaintiffs were former employees of the defendant who had repeatedly

complained to HHC's management about the level of services being provided by NYMC in

comparison to the amount of money being billed.  <u>Id.</u> at 120.  Before they filed a state court

action, the plaintiffs in <u>New York Medical College</u> requested an audit, which revealed that

NYMC had overcharged HHC.  This audit was subsequently found to be the source of the

plaintiffs' knowledge in the federal court action, depriving the court of subject matter

jurisdiction.  <u>Id.</u> at 122.  Even though the plaintiffs had publicly disclosed the information by

filing a state court action, the Court held that "[p]ublicly disclosing the information upon which a

qui tam suit is based [] is clearly different than being an original source of that information."  <u>Id.</u>

(citing <u>Kreindler</u>, 985 F.2d at 1159).

In this case, like in <u>New York Medical College</u>, Relator's information came from other

sources—e.g., information from Residents and from Dr. Burrell, discovery in the State Court

Action and the Hogan & Hartson report—and not from personal observation at the time or by

after-the-fact investigation which discovered documents such as records reflecting actual

wrongdoing.  As discussed herein, the evidence on the record does not establish that Relator's

knowledge was direct and independent rather than being based on information discovered in the

State Court Action or from the Hogan & Hartson investigative report.  In a situation like the one

at hand, it is virtually impossible for a qui tam plaintiff to directly observe all aspects of the

fraudulent conduct with his own eyes.  The decisive element, however, is the fact that Relator has

simply failed to show that he would have had knowledge of the fraud without the information

obtained from other sources.  See New York Med. Coll., 252 F.3d at 122; Kreindler, 985 F.2d

1148; Dick, 912 F.2d 13.  Without a stronger showing, this Court cannot find that Relator has

"direct and independent knowledge" of the core information on which the qui tam complaint is

based.  Although only certain allegations have been specifically mentioned, those mentioned

constitute the "core information" on which the FCA cause of action is based, and therefore,

Count One, Relator's FCA claim, is hereby **dismissed** for lack of subject matter jurisdiction.

> ii.     Whether Relator Voluntarily Provided the Information to
>         the Government Prior to Filing Suit

As this Court has already found that Relator does not qualify as an original source based

on his lack of direct and independent knowledge, it is not necessary to reach the second prong of

the original source analysis, i.e., whether Relator voluntarily provided the information to the

government prior to filing suit.

> iii.    Whether Relator was Directly or Indirectly a Source to the
>         Entity that Publicly Disclosed the Allegations on Which the
>         Suit is Based

Similarly, since this Court has already found that Relator does not qualify as an original

source based on his lack of direct and independent knowledge, we also need not reach the third prong of the analysis, i.e., whether Relator was directly or indirectly a source to the entity that publicly disclosed the allegations on which the suit is based.

    2.    <u>Whether the FCA Claims Should be Dismissed for Failure to Meet Rule 9(b)'s Heightened Pleading Standards</u>

    a.    <u>Principles Governing the Pleading Requirements of Rule 9(b)</u>

Defendant also moves to dismiss Relator's FCA claims pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. Although this Court already found that Relator's FCA cause of action should be dismissed for lack of subject matter jurisdiction, we also hold, in the alternative, that the FCA claims fail to satisfy Rule 9(b).

Notwithstanding the liberal standards applicable to a motion to dismiss, it is well-established that suits under the FCA are subject to the heightened pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, which requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." <u>See Gold</u>, 68 F.3d at 1476-77 (holding that "claims brought under the FCA fall within the express scope of Rule 9(b)"). Generally speaking, this requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Shields v. Citytrust Bancorp.</u>, 25 F.3d 1124, 1128 (2d Cir. 1994); <u>see also</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004). This requirement is intended to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information

during discovery." Karvelas, 360 F.3d at 226 (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996)); see also Rombach, 355 F.3d at 171 ("The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit.") (internal citations omitted).

Scienter may be pled generally under both the FCA and Rule 9(b). See Gold, 68 F.3d at 1477 (noting that the FCA's liberal scienter requirement is consistent with Rule 9(b)); 31 U.S.C. § 3729(b) ("no proof of specific intent to defraud is required" ); FED. R. CIV. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."). Although scienter, or fraudulent intent, may be pled generally, a plaintiff still must allege facts that give rise to a "strong inference" of fraudulent intent. Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994). A strong inference can be established either "(a) by alleging facts to show that defendants had both the motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id.

The general rule is that Rule 9(b) pleadings cannot be based on "information and belief." Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972). This rule may be relaxed, however, for matters "peculiarly within the adverse parties' knowledge." Id. Even when the requirement is relaxed, "information and belief" allegations remain subject to the particularity requirements of Rule 9(b) as well as the additional requirement that "the complaint set forth the facts on which the belief is founded," including the source of the information and the reasons for the belief. Karvelas, 360 F.3d at 226 (citing In re Cabletron Sys., Inc., 311 F.3d 11, 28 (1st Cir. 2002)); see

also <u>United States ex rel. Walsh v. Eastman Kodak Co.</u>, 98 F.Supp.2d 141, 147 (D. Mass. 2000)

(holding that even when the Rule 9(b) pleading standards are relaxed, "claims of fraud may not

be based upon speculation or conclusory allegations"); <u>Segal</u>, 467 F.2d at 608 (holding that when

the rule is relaxed, "the allegations must then be accompanied by a statement of the facts on

which the belief is founded").  The <u>Segal</u> Court noted that merely inserting statutory phrases into

the complaint will not satisfy the Rule 9(b) requirements, saying that a "complaint cannot escape

the charge that it is entirely conclusory in nature merely by quoting such words from the statutes

as 'artifices, schemes, and devices to defraud' and 'scheme and conspiracy.'" 467 F.2d at 608.

Although "[t]his may require investigation and research[,] such is the nature of Rule 9(b)." <u>Todd</u>

<u>v. Oppenheimer & Co.</u>, 78 F.R.D. 415, 423 (S.D.N.Y. 1978).

    Courts have also relaxed Rule 9(b)'s pleading requirements in cases involving

particularly complex or extensive fraudulent schemes.  <u>In re Cardiac Devices Qui Tam Litig.</u>, 221

F.R.D. 318, 333 (D. Conn. 2004) (collecting cases); <u>see also</u> <u>Payne v. United States</u>, 247 F.2d

481, 486 (8th Cir. 1957), <u>cert. denied</u>, 355 U.S. 923 (1958) (noting that "it is to be borne in mind

that . . . the sufficiency of a pleading must largely depend upon the nature of the case, the

complexity or simplicity of the transaction or occurrence, the relationship of the parties and the

determination of how much circumstantial detail is necessary to give notice to the adverse party

and enable him to prepare a responsive pleading") (internal citations omitted).  Similarly, courts

have frequently relaxed the Rule 9(b) pleading requirements where the alleged fraud occurred

over a period of time.  <u>In re Cardiac Devices</u>, 221 F.R.D. at 333 (collecting cases).  "To approach

the issue otherwise would allow the more sophisticated to escape liability under a False Claims

case due to the complexity of their scheme and their deviousness in escaping detection." <u>Id</u>.

(citing <u>United States ex rel. Johnson v. Shell Oil Co.</u>, 183 F.R.D. 204, 206-07 (E.D. Tex. 1998)).

When an alleged fraudulent scheme involves "numerous transactions that occurred over a long

period of time, courts have found it impractical to require the plaintiff to plead the specifics with

respect to each and every instance of fraudulent conduct." <u>Id</u>. (collecting cases).

b.    <u>Discussion</u>

The alleged fraud is extremely complex, involves thousands of instances, occurred over

an extended period and involves information "peculiarly within the adverse parties' knowledge"

or within Defendant's capacity to identify from the facts alleged.  Thus the Rule 9(b) particularity

requirements should be relaxed.  <u>See</u> <u>In re Cardiac Devices</u>, 221 F.R.D. at 333 (collecting cases).

It would be impractical, "unwieldy and [would] serve[] no useful purpose" to require Relator to

"plead the specifics with respect to each and every instance of fraudulent conduct." <u>Id</u>. at 333,

337; <u>accord</u> <u>Pogue</u>, 238 F.Supp.2d at 268; <u>Cooper</u>, 137 F.3d at 627.

The Second Amended Complaint adequately provides Defendant with notice as to the

claims asserted against it, thus serving the underlying purpose of Rule 9(b) and satisfying "the

'who, what, where, when, and why' requirements of the Second Circuit case law." <u>In re Cardiac

Devices</u>, 221 F.R.D. at 337.  In the instant case, the "who" is the defendant hospital, YNHH.

Relator has identified individuals allegedly responsible for implementing and monitoring the

finalization and billing for Radiological Services and Defendant's compliance with Medicare

regulations and individuals who allegedly fraudulently finalized reports done by Residents or

Fellows without viewing the images or reading the reports.  <u>See</u> 2d Am. Compl. ¶¶ 46-48, 52, 54,

56, 58, 60, 73, 75, 80-81, 83, 85.

The "what" is the submission of claims for payment to the Medicare and Medicaid

39

Programs based on: (1) reads of "old" studies performed long after the point in time when they can be considered medically necessary, with no therapeutic or diagnostic value and would not constitute "physician services," id. ¶¶ 55-56; (2) issuing reports of Radiology Studies based solely upon interpretations made by Residents and Neuroradiology Fellows not properly supervised by a Qualified Radiologist, id. ¶¶ 57-78; (3) fraudulently finalizing Radiology Reports which were read by Residents and first-year Neuroradiology Fellows but never reviewed or edited by Yale Faculty, id. ¶¶ 83-88; and (4) ordering certain panels of diagnostic tests without regard to whether the tests are medically indicated and prior to patients being examined or evaluated, id. ¶¶ 89-92.  Moreover, Relator claims that these allegedly fraudulent practices resulted in the "knowing overstatement" of YNHH's costs as reported in its annual Medicare Cost Reports filed with the federal government.  Id. at ¶ 93.  Importantly, however, although Relator alleges generally that false or fraudulent bills were submitted (on "information and belief"), Relator fails to identify a single false or fraudulent bill submitted to the federal government.  See Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986) (holding that "allegations[] which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations[] lack the 'particulars' required by Rule 9(b)").

The "where" is both YNNH, the place where the fraudulent activity took place, and the Medicare and Medicaid offices, the places the claims and reports were filed, facts that should be within the knowledge of Defendant.  The "when" is the time when these claims were filed—according to the complaint, the fraudulent activity took place between 1995 and 2000, with some allegedly continuing to the present day.  The "how" is detailed extensively in the portions of the complaint describing Defendant's alleged wrongdoing, in which Relator alleges

that Defendant employed a full-time staff person to find lost studies, id. ¶ 55, used Autosign to finalize Radiology Reports never reviewed by a Qualified Radiologist, id. ¶¶ 58-78, used Residents and Neuroradiology Fellows to facilitate billing fraud, id. ¶¶ 83-88, and issued memoranda dictating departmental policies that furthered fraudulent practices, id. ¶¶ 58, 90. Relator also describes the Medicare Regulations in detail in an effort to explain why the alleged conduct constituted fraud against the government.  See id. ¶¶ 21-40.

The Second Amended Complaint identifies the hospital and University involved, some of the doctors involved and the specific regulations allegedly violated.  This information gives Defendant notice of the specific activities constituting the allegations of fraud, thereby providing Defendant with arguably enough information to file an effective responsive pleading.

Defendant alleges, however, that Relator's Second Amended Complaint "remains devoid of the particulars required under Rule 9(b)," arguing that more details regarding the submission of actual false or fraudulent claims are required.  Mem. Supp. at 20; see Karvelas, 360 F.3d at 231 ("[A] qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery.").  Under the FCA, the submission of a false claim to the government is more than a "ministerial act," but is "the sine qua non of a False Claims Act violation."  United States ex rel. Clausen v. Lab. Corp. of America, 290 F.3d 1301, 1311 (11th Cir. 2002); see also Karvelas, 360 F.3d at 232 ("[T]he defendant's presentation of false or fraudulent claims to the government is a central element of every False Claims Act case.").  Standing alone, allegations of violations of federal regulations or laws are insufficient if a relator cannot identify with particularity any actual false claim submitted by defendant to the government.  Karvelas, 360 F.3d at 234-35; see also Clausen, 290 F.3d at

1311 (holding that if a relator fails to allege that defendants actually submitted false or fraudulent claims, while the defendant's practices may be unwise or improper, there is simply "no actionable damage to the public fisc as required under the False Claims Act").  Rule 9(b), as applied to the FCA, requires a relator to provide specific details identifying particular claims submitted to the government, including, *inter alia*, details concerning "the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices."  Karvelas, 360 F.3d at 232-33; accord Luce, 802 F.2d at 54.  Although no one detail is mandatory, at least some of the details for at least some of the claims must be pleaded in order to meet the Rule 9(b) pleading requirements. See Karvelas at 233; Clausen, 290 F.3d at 1311-12, 1312 n.21 (finding that a relator must present "some indicia of reliability" in the complaint in order to support an allegation that a false claim was submitted).  Importantly, allegations of fraud cannot be "entirely conclusory and unsupported by assertions of facts."  Luce, 802 F.2d at 54.

Relator contends that the rigid pleading standards should be relaxed in this case for facts which are in the exclusive control and possession of Defendant.  Defendant asserts that the information at issue is not within its exclusive control, arguing that the government possesses all claims submitted by Defendant and such information can be obtained through sources such as the Freedom of Information Act.  Mem. Supp. at 25, n.12.  The Court in Karvelas, however, has already rejected this argument, explaining that:

> [E]very FCA qui tam action involves allegations of false or fraudulent claims
> submitted to the government. In many of these cases, the information needed to fill

the gaps of an inadequately pleaded complaint will be in the government's hands. In addition, if the relator seeks to obtain the requisite information from the government, for example by submitting a request under the Freedom of Information Act (FOIA), he or she may encounter Section 3730(e)(4) of the FCA, which prohibits qui tam actions based upon publicly disclosed allegations unless the relator is an "original source" of that information.

360 F.3d at 230.  As the records of all claims submitted to the government and the billing records are in the possession and control of the Defendants, the requirements of Rule 9(b) should be relaxed as to permit pleadings based on "information and belief" as to this information.

Although the pleading standards are relaxed, the Second Circuit has imposed a requirement that pleadings based on information and belief must be accompanied by "a statement of facts upon which the belief is based." DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987); accord Segal v. Gordon, 467 F.2d 602, 608 (2d Cir. 1972). Importantly, "mere conclusory allegations" do not satisfy Rule 9(b).  Madonna v. United States, 878 F.2d 62, 66 (2d Cir. 1989).

In this case Relator has alleged a complex, specific scheme of fraud giving rise to an inference that fraudulent billing may have occurred.  The Second Amended Complaint alleges that fraudulent claims were submitted, but fails to set forth evidence of specific billing records for actual claims submitted to the government.  See 2d Am. Compl. ¶¶ 56, 77, 78, 87, 89, 92, 93, 94.  Numerous courts have held that both corporate insiders and outsiders must offer more than conclusory statements that false claims were submitted to the government; they must support such allegations with the specificity required by Rule 9(b).  Here, Relator has alleged that false claims were submitted, but has not identified a specific amount of charges that were submitted, provided the dates that false claims were submitted or provided a copy of a single bill or payment.  His allegations of fraudulent billing are primarily conclusory summations and

43

assumptions or allegations based solely on "information and belief."[12]  If Relator is unable to

identify a single false claim arising from the alleged scheme of fraud or at least set forth an

adequate basis on which his belief is based, he cannot meet even a "bare-bones Rule 9(b) test."

Walsh, 98 F.Supp.2d at 147 (holding that Rule 9(b) is not satisfied by allegations "setting out a

methodology by which the vendors might have produced false invoices, . . . without citing a

single false claim arising from an allegedly false invoice"); United States ex rel. Stewart v. The

Louisiana Clinic, 2002 U.S. Dist. LEXIS 10102, 2002 WL 1066745, at *4 (E.D. La. May 28,

2002) ("Without alleging a single false claim by any one of the[] defendants . . . [the] allegations

fail to meet even a bare-bones Rule 9(b) test") (internal quotations omitted); see also Clausen,

290 F.3d at 1305 (dismissing the complaint on the basis that the relator only used conclusory

summations to allege fraudulent billing, thus "set[ting] out the process by which Defendants

could have produced false claims, but provid[ing] no facts that this process did in fact result in

the submission of false claims").

　　　　　Relator does provide *some* factual basis for his claim—namely, that "Yale has a long-

standing practice of billing the Professional Component of Radiology Services for all reports that

---

[12] For example, in paragraph 56 of the Second Amended Complaint, Relator ends the description of the fraudulent scheme with the conclusory summation that the Chair and Vice-Chairs at YNHH "made numerous attempts to intimidate Yale's Radiology Department faculty members to review and interpret these old Radiology Studies and furnish finalized reports for which Yale *could and would bill* the Professional Component . . ." 2d Am. Compl. ¶ 56 (emphasis added).  Relator offers similarly conclusory assumptions at other points in the complaint, including the allegation that "[b]illing for panel studies not medically indicated violates Medicare and Medicaid billing requirements and also subject [sic] patients to needless, potential [sic] harmful radiation." Id. ¶ 89. Moreover, for other fraudulent activities, Relator alleges fraudulent billing based only on information and belief. See, e.g., id. ¶ 77 ("*On information and belief*, Defendants Yale and YNHH billed Medicare and Medicaid for the Professional Component of these Radiology Studies never reviewed by a Qualified Radiologist, in violation of 31 U.S.C. § 3729(a)(1-2).") (emphasis added); id. ¶ 78 ("*Upon information and belief*, Defendants utilized the 'Autosign' process and the other afore-described non-Qualified Radiologist Radiology Study report finalization methods to avoid and conceal the obligations of said Defendants to repay the United States monies paid to Yale and YNHH for both the Professional and Technical Components of these Radiology Services, in violation of 31 U.S.C. § 3729(a)(7) and 18 U.S.C. § 1001.") (emphasis added).

44

are signed (and thereby 'finalized') by Yale faculty and submitting claims under the name of the

faculty member that signs the report" and that "there is no question that if Plaintiff's allegations

are accepted as true, Yale University must have submitted claims for reimbursement from the

Medicare program (under the name of the faculty signing each report) for all such signed reports

for Medicare patients," Opp'n at 34 (citing Smith Aff., Exh. A ¶¶ 9-11, 16, 18) These statements,

however, are merely conclusory allegations lacking factual substantiation.  The policy of not

subjecting a defendant to the time and expense of defending an "improvident" claim requires

evidence of some, although not each and every, instance of actual billing to sufficiently allege

that fraud occurred.  See Rombach, 355 F.3d at 171.

Another FCA case, United States ex rel. Pogue v. Diabetes Treatment Ctrs. of America,

Inc., involved allegations of illegal kickbacks to physicians in return for patient referrals to

diabetes treatment centers in hospitals across the country.  238 F.Supp.2d 258, 261 (D.D.C.

2002).  The defendants were numerous hospitals around the United States and the conduct at

issue allegedly occurred over a twelve-year period.  Id. at 267.  In denying the defendants'

motion to dismiss, the court held that "where a complaint covers a multi-year period, Rule 9(b)

may not require a detailed allegation of all facts supporting each and every instance of

submission of a false claim."  Id. at 268;[13] see also Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir.

1998) (holding that even though it did not "describe in detail a single specific transaction," the

complaint met the particularity requirement of Rule 9(b) because the detailed description of the

allegedly fraudulent scheme "identifie[d] the circumstances of the alleged fraud" sufficiently for

---

[13] The court noted and relied in part on the fact that the relator had adequately alleged "the crucial element of a False Claims Act action"—"that false claims were submitted" to the federal government—in denying defendants' motion to dismiss.  Pogue, 238 F.Supp.2d at 268.

the defendants to prepare an adequate answer).  Pogue and Cooper state much more liberal constructions of the law than has been generally recognized in the Second Circuit.  Although the courts in In re Cardiac Devices and United States ex rel. Taylor v. Gabelli both upheld relators' complaints in the face of Rule 9(b) challenges, they both explicitly stated that the "complaints sufficiently identified the submission of specific false claims.  This is not a situation where only a general scheme of fraud was alleged that might have resulted in the submission of false claims.  Here, the fraudulent scheme was the submission of the claims themselves."  In re Cardiac Devices, 221 F.R.D. at 337; Taylor, 345 F.Supp.2d 313, 339 (S.D.N.Y. 2004) (quoting In re Cardiac Devices, 221 F.R.D. at 337).  Unlike those cases, this case involves allegations of a general scheme of fraud that *might* have resulted in the submission of false claims.  Like the complaints in Clausen, nowhere in the Second Amended Complaint "can one find any allegation, stated with particularity, of a false claim actually being submitted to the government." 290 F.3d at 1312.  Moreover, some of the evidence tends to show that fraudulent bills were *not* submitted. See Tencza emails, Opp'n Exh. C (saying, with regard to Autosign, that "[i]t is VERY important that we do not bill for the study," and emphasizing that "no bill will go out for Autosign").

Although the complaint may provide Defendant with adequate notice of the claims against it, Rule 9(b) has other purposes that must also be considered.  In addition to providing notice that enables defendants to prepare meaningful defenses to charges of fraud, the particularity requirement of Rule 9(b) serves the purposes of, *inter alia*, preventing conclusory allegations of fraud from serving as a basis for strike suits and fishing expeditions, and protecting defendants from groundless charges that may damage their reputations.  See Rombach, 355 F.3d at 171; see also Segal, 467 F.2d at 607-08  ("A complaint alleging fraud should be filed only after

46

a wrong is reasonably believed to have occurred; it should serve to seek redress for a wrong, not

to find one."). Without a description of any actual fraudulent billing, Defendant is forced to

search its records for evidence to prove it did not commit fraud, releasing Relator from the

burden of proving that fraud was actually committed. In light of these multiple purposes, in

conjunction with the fact that the complaint at issue does not identify any particular false or

fraudulent claim allegedly submitted nor does it provide the source of information or factual

basis for Relator's conclusory allegations that Defendant submitted false or fraudulent bills, this

Court finds that Relator has failed to satisfy the Rule 9(b) particularity requirements. The FCA

cause of action, therefore, should be dismissed on this basis as well as for lack of subject-matter

jurisdiction.

### c.    Leave to Amend

Failure to satisfy Rule 9(b) generally results in dismissal of the complaint without

prejudice. In re Time Warner Sec. Litig., 9 F.3d 259, 266 (2d Cir. 1993) (citing Luce v.

Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986)). Defendant argues that this Court should not allow

Relator leave to amend the Second Amended Complaint, citing the rule that courts may deny

leave to amend if such leave would be "futile." Mem. Supp. at 30 (citing Acito v. IMCERA

Group, 47 F.3d 47, 55 (2d Cir. 1995)). Courts generally hold, however, that leave to amend

should be freely granted, especially in cases where dismissal was based on Rule 9(b). Acito, 47

F.3d at 55; FED. R. CIV. P. 15(a). Trial courts have discretion over whether to allow plaintiffs to

amend their complaints, but in order to deny leave, there must be "good reason" to do so. Id.

(citing S.S. Silberblatt, Inc. v. East Harlem Pilot Block Bldg. 1 Hous. Dev. Fund Co., 608 F.2d

28, 42 (2d Cir. 1979). This Court finds that the balance of equities and the interests of justice in

this case weigh in favor of granting leave to amend and giving Relator an additional opportunity to satisfy Rule 9(b).

### 3.    Whether the FCA Claims Should be Dismissed for Failure to State a Claim Pursuant to Rule 12(b)(6)

Although Relator's claims were already dismissed for lack of subject matter jurisdiction and for failure to meet the Rule 9(b) particularity requirements, in the alternative, certain claims should also be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

### a.    Standard of Review of a Motion to Dismiss Under Rule 12(b)(6)

Defendant also moves to dismiss Relator's Second Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The function of a motion to dismiss for failure to state a claim is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 776 (2d Cir. 1984) (citation omitted).  Therefore, when considering such a motion, the court must accept the facts alleged in the complaint as true.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  Courts should not grant a Rule 12(b)(6) motion to dismiss merely because recovery seems unlikely or remote, as "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996); see also Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (following the "accepted rule" that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

When ruling on a motion to dismiss, a district court should decide the motion on the complaint alone, excluding additional evidence, affidavits, exhibits and factual allegations contained in legal briefs or memoranda.  Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000).  Although a district court should not consider outside evidence on a motion to dismiss, it is permissible to consider facts stated in the complaint or in documents that are attached to the complaint as exhibits or that have been incorporated in the complaint by reference.  Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991); see also Stuto v. Fleishman, 164 F.3d 820, 826 n.1 (2d Cir. 1999) (finding the district court's consideration of a document permissible on a motion to dismiss because the document was discussed in the complaint, and thus incorporated by reference).  Appellate courts may properly vacate a district court's ruling on a motion to dismiss "even where the court's ruling simply makes a connection not established by the complaint alone or contains an unexplained reference that raises the possibility that it improperly relied on matters outside the pleading in granting the defendant's Rule 12(b) motion."  Id. at 84 (internal citations omitted).

### b.  "Knowing Assistance" Standard

It is important to distinguish between billing for the Professional Component and the Technical Component of radiological studies.  Defendant asserts that "YNHH has no responsibility for, nor does it bill for, the Professional Component of Radiological Services."  YNHH's Reply in Supp. Mot. Dismiss, 3:02cv1205 (PCD) [Doc. No. 75], at 4.  The Supreme Court has said, however, that the provisions of the FCA, read together, "indicate a purpose to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the

government."  United States ex rel. Marcus v. Hess, 317 U.S. 537, 544-45 (1943).  Similarly, the

Court has noted the inclusiveness of the Act in other contexts, holding that "[t]his remedial

statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to

cause the Government to pay out sums of money."  United States v. Neifert-White Co., 390 U.S.

228, 233 (1968).  According to this reasoning, a defendant "need not be the one who actually

submitted the claim forms in order to be liable."  United States v. Mackby, 261 F.3d 821, 827-28

(9th Cir. 2001) (holding that the defendant physician "caused the claims to be submitted with

false information" by telling a billing service and his office manager to "substitute" his PIN for

another doctor's for billing purposes) (citing United States v. Krizek, 111 F.3d 934, 942 (D.C.

Cir. 1997) (holding a doctor liable for false claims that his wife prepared, since he "delegated to

his wife authority to submit claims on his behalf" and "utterly" failed to review the false

submissions)).  The Mackby Court held that to establish "knowing assistance," the causation

element must be proved by a preponderance of the evidence.  261 F.3d at 828.  Moreover, a

relator must properly allege that the defendants knowingly "assisted one another and cooperated

in a scheme or pattern of billing for and covering up [] allegedly false-claim items."  United

States ex rel. Riley v. St. Luke's Episcopal Hosp., 355 F.3d 370, 378 (5th Cir. 2004).  Therefore,

any claims which solely allege false or fraudulent billing of the Professional Component with no

allegations of YNHH's "knowing assistance" or "cooperation" should be dismissed since Yale is

no longer a party to the lawsuit.

> c.     The False Claims Act

As stated previously, "[t]he False Claims Act authorizes private citizens to sue on behalf

of the United States to recover treble damages from those who knowingly make false claims for

money or property upon the Government or who knowingly submit false statements in support of such claims or to avoid the payment of money or property to the Government." Lissack, 377 F.3d at 146. The test for liability under the FCA is: "(1) whether there was a false statement or a fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material[14], and (4) that caused the government to pay out money or forfeit moneys due (i.e., that involved a 'claim')." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 785 n.7 (4th Cir. 1999).[15]

There are multiple theories of liability under the FCA, two of which are referred to as "legally false" and "factually false" certification. "Legally false" certification applies when a defendant has "false[ly] or fraudulent[ly] certifi[ed] that they are in compliance with the applicable federal statute or regulation." Mikes v. Straus, 274 F.3d 687, 696 (2d Cir. 2001). Legally false certification is distinguished from "factually false" certification, which applies when a defendant has incorrectly described goods or services provided or has requested

---

[14] The Second Circuit has declined to explicitly decide whether the FCA contains a materiality requirement. See Mikes v. Straus, 274 F.3d 687, 697 (2d Cir. 2001). The Mikes court made clear that "[a] materiality requirement holds that only a subset of admittedly false claims is subject to False Claims Act liability" and held that "not all instances of regulatory noncompliance will cause a claim to become false." Id. The court declined, however, to "address whether the Act contains a separate materiality requirement." Id. Generally, however, courts tend to require that the false statement or claim at issue be material.

[15] Although the courts generally require that the false statement or claim at issue be material, they have generally rejected the additional requirement that the United States have suffered damages as a result of the false or fraudulent claim. See, e.g., Rex Trailer Co. v. United States, 350 U.S. 148, 152 (1956) (holding, in the context of a section of the Surplus Property Act "essentially the equivalent" of the FCA, that "there is no requirement, statutory or judicial, that specific damages [sustained by the Government] be shown"); Harrison, 176 F.3d at 785 n.7; United States ex rel. Joslin v. Cmty. Home Health of Md., Inc., 984 F.Supp. 374, 383 (D. Md. 1997) (citing United States ex rel. Pogue v. American Healthcorp., Inc., 914 F.Supp. 1507, 1508-09 (M.D. Tenn. 1996)); S. REP. NO. 345, 99th Cong., 2d Sess. 8, as reprinted in 1986 U.S.C.C.A.N. at 5273. But see Blusal Meats, Inc. v. United States, 638 F.Supp. 824, 827 (S.D.N.Y. 1986), aff'd on other grounds, 817 F.2d 1007 (2d Cir. 1987) (requiring, for purposes of the FCA, that the United States have suffered damages as a result of the alleged false or fraudulent claim). This court joins the majority of other courts that have considered the issue in rejecting the additional element that the United States must have suffered some damages as a result of the false or fraudulent claim.

reimbursement for goods or services that were never provided.  Id. at 697 (noting that the "most

common false claim" involves "a claim for goods or services not provided, or provided in

violation of contractual terms, specification, statute, or regulation").

It is clear that "a claim under the [FCA] is legally false only when a party certifies

compliance with a statute or regulation as a *condition* to governmental payment."  Id.  The

Medicare Regulations and the CMS (formerly HCFA)-1500 and HCFA-1450 forms expressly

provide that certification is a precondition to governmental reimbursement.  In order to obtain

reimbursement and as a condition to governmental payment, providers must certify that they are

in compliance with the terms on the form.  Form CMS-1500, which is required for Medicare Part

B benefits to be paid, requires physicians to "certify that the services shown on this form were

medically indicated and necessary for the health of the patient and were personally furnished by

me or were furnished incident to my professional service by my employee under my immediate

personal supervision."  Similarly, hospitals must submit the Form HCFA-1450 (UB-92) in order

to obtain reimbursement for items and services provided to a patient.  In submitting the Form

HCFA-1450, hospitals are required to certify—but only if seeking CHAMPUS

reimbursement—that "the information submitted as part of this claim is true, accurate and

complete, and, the services shown on this form were medically indicated and necessary for the

health of the patient."  In addition to this form, Medicare providers are required to annually

submit a Hospital Cost Report, Form HCFA-2552, which summarizes the amount of interim

payments received and the amount to which the hospital claims entitlement from Medicare.  This

Cost Report contains a mandatory certification that the report "is a true, correct and complete

statement prepared from the books and records of the provider in accordance with applicable

instructions."

                 d.    Discussion

As Relator notes, former defendant Yale would use the CMS-1500 form for submission

of claims for the Professional Component of radiology services whereas Defendant YNHH uses

the HCFA-1450 form for the submission of claims for the Technical Component of such

services.  The HCFA-1450 form does not contain the same express certification as does the

CMS-1500 form.  The HCFA-1450 form does not contain the certification that the services in

question "were personally furnished by me or were furnished incident to my professional service

by my employee under my immediate personal supervision," only requiring providers to certify

that the services "were medically indicated and necessary" in the event that the hospital is

seeking CHAMPUS reimbursement.  See Form HCFA-1450; Riley, 355 F.3d at 376.

Relator alleges that Defendant submitted false or fraudulent bills to Medicare and

Medicaid but does not mention CHAMPUS.  This fact alone does not exonerate YNHH—as

discussed above, the FCA applies to anyone "who knowingly assisted in causing the government

to pay claims which were grounded in fraud, without regard to whether that person had direct

contractual relations with the government."  United States ex rel. Marcus v. Hess, 317 U.S. 537,

544-45 (1943).  Therefore, Defendant "need not be the one who actually submitted the claim

forms in order to be liable."  United States v. Mackby, 261 F.3d 821, 827 (9th Cir. 2001).  In his

Complaint, Relator explains the tight-knit relationship between Yale and YNHH, describes the

GME Residency Program and the Affiliation Agreement, names specific persons who hold high-

ranking positions at both institutions, and makes other allegations regarding YNHH's

cooperation with and knowledge of the alleged fraudulent conduct.  See 2d Am. Compl. ¶¶ 8, 9,

40, 42-48, 53-55, 57-58, 77-78, 89, 92.  These allegations are sufficient to find that YNHH

knowingly assisted and cooperated with Yale in at least certain parts of the alleged fraudulent

scheme.  See Riley, 355 F.3d at 378 (holding that because Relator alleged that "the defendants

assisted one another and cooperated in a scheme or pattern of billing for and covering up these

allegedly false-claim items," the allegations were sufficient to implicate all defendants).  The

sufficiency of specific allegations in light of the cooperation and knowing assistance standard

will be discussed, as necessary, below.

i.    Allegations that Defendants Billed for Studies by

Radiologists Who Were Not Qualified Teaching Physicians

Defendant argues that Relator's allegation that "reports by residents and fellows were

finalized by . . . outside clinical attending physicians [i.e., Drs. Simmons and Haims] who are not

authorized to bill Medicare as Teaching Physicians" fails to state a claim under the FCA.  Mem.

Supp. at 32 (quoting 2d Am. Compl. ¶ 75).  Under the applicable Medicare regulations, a

teaching physician is defined as "a physician (other than another resident) who involves residents

in the care of his or her patients."  42 C.F.R. § 415.152.  This broad definition of teaching

physician seems to include, and thus permit billing by, outside clinical attending physicians.  Due

to this inclusive definition, Relator's allegation in paragraph 75 of the Second Amended

Complaint fails to state a claim.

Moreover, Relator does not provide support for or explain his claim that Medicare would

not provide reimbursement for services performed by "non-qualified" physicians.  2d. Am.

Compl. ¶ 78.  As the Regulations provide no basis for distinguishing between "qualified" and

"non-qualified" physicians, a claim that one or more are unqualified does not give rise to a viable

54

cause of action. Relator does not respond to Defendant's arguments that this claim should be dismissed and the Court can find no reason to uphold the claim. Therefore, the claims in paragraph 75 and the portion of paragraph 78 relating to "the other afore-described non-Qualified Radiologist Radiology Study report finalization methods" should also be **dismissed**, in addition to the afore-mentioned grounds, for failure to state a claim.

ii. Allegations that Defendants Billed for Studies for Which the Signing Radiologist did not Review the Associated Image and/or the Preliminary Report

In a situation similar to the one at hand, Mikes held that an allegation that signing, certifying physicians did not "personally furnish" the associated services as required by the CMS-1500 form is a permissible cause of action. 274 F.3d at 699. As the CMS-1500 form allows for reimbursement only when the services at issue were "furnished by [the signing physician] or . . . by [the signing physician's] employee under [his or her] immediate personal supervision," allegations that these conditions were not met may state a cause of action.

A. Allegations Regarding the Neuroradiology Fellows

Defendant argues that Relator's allegations regarding the neuroradiology fellows' and residents' review of reports are based on the "false assumption" that Yale and YNHH cannot properly bill Medicare and Medicaid for services rendered by fellows and residents without review by a supervising physician. Defendant is responding to Relator's contention that "[i]n the event that a Radiology Study is interpreted and/or dictated by a Resident, Fellow or anyone other than a Qualified Radiologist, a Qualified Radiologist must review and sign the Study in accordance with the applicable rules and regulations governing physicians at Teaching Hospitals.

55

Otherwise that study may not be billed." 2d Am. Compl. ¶ 14.  Relator argues that if an

interpretation is prepared by a Resident or Fellow, a Teaching Physician must indicate that he or

she has personally reviewed the image and the interpretation and either agrees with or edits the

findings.  2d. Am. Compl. ¶ 31; Opp'n at 36 (citing 42 C.F.R. §§ 172,[16] 180).  Relator claims that

"Medicare does not pay for the interpretation if the documentation shows simply a

countersignature of the Resident's interpretation by the Teaching Physician."  2d Am. Compl. ¶

31 (citing 42 C.F.R. § 415.172; 60 Fed. Reg. 63124).  Relator further alleges that "over a one-

year period . . . several thousands of Radiology Reports read by Residents and first year

Neuroradiology Fellows were fraudulently finalized by Yale Faculty who never reviewed the

images." Id. ¶ 83.  Relator alleges that the reports were fraudulently finalized "for billing

purposes," id. ¶ 84, in violation of the Medicare/Medicaid certification which requires signing

providers to certify that "the services . . . were medically indicated and necessary for the health of

the patient and were personally furnished by me or were incident to my professional service by

my employee under my immediate personal supervision."  See CMS Form 1500.  These claims

involve the Form CMS-1500, which is submitted by physicians as a condition of reimbursement

for the Professional Component of medical services.  As a technical matter, YNHH is not

required to and does not submit the Form CMS-1500 as a condition of reimbursement.

    Defendant asserts that Medicare carriers "must pay for the [Professional Component] of

radiology services furnished by a physician to an individual patient in all settings under the fee

schedule for physician services regardless of the specialty of the physician who performs the

---

[16] 42 C.F.R. § 415.172 reads: "If a resident participates in a service furnished in a teaching setting,
physician fee schedule payment is made only if a teaching physician is present during the key portion of any service
or procedure for which payment is sought."

service." Mem. Supp. at 33 (quoting Medicare Claims Processing Manual, Ch. 13, § 20.1). As residents and fellows are "licensed physicians," Defendant argues, Medicare is required to pay for services rendered by them under this provision. Moreover, Defendant contends that the services of "moonlighting" residents and fellows may properly be billed to Medicare even without the supervision or presence of teaching physicians. Id. (citing 42 C.F.R. § 415.208[17]). Defendant is correct in part—the services of "moonlighting" residents and fellows may be billed as physician services if certain criteria are met. 42 C.F.R. § 415.208(b)(2).[18] The regulation also provides, however, that the services of residents who are not "moonlighting" are *not* payable as physician services. 42 C.F.R. § 415.208(b)(1).[19] Since the questions of whether the residents and fellows qualify as "moonlighting" residents and whether the specified criteria are met require factual evidence outside of the amended complaint, they are not properly determined on a motion to dismiss.[20]

The allegations in paragraphs 83-88 of the Second Amended Complaint, however, deal with the Professional Component of Radiology Services, for which YNHH is not technically

---

[17] The regulation defines "services of moonlighting residents" as "services that licensed residents perform that are outside the scope of an approved GME program." 42 C.F.R. § 415.208(a).

[18] The regulation provides that services performed by "moonlighting" residents that "are performed in an outpatient department or emergency department of a hospital in which they have their training program are covered as physician services and payable under the physician fee schedule if all of the following criteria are met: (i) The services are identifiable physician services and meet the conditions for payment of physician services to beneficiaries in providers in § 415.102(a). (ii) The resident is fully licensed to practice medicine, osteopathy, dentistry, or podiatry by the State in which the services are performed. (iii) The services performed can be separately identified from those services that are required as part of the approved GME program."

[19] The regulation provides, in pertinent part, that "[t]he services of residents to inpatients of hospitals in which the residents have their approved GME program are not covered as physician services and are payable under §§ 413.75 through 413.83 regarding direct GME payments."

[20] Outside evidence, such as Defendant's assertion that Smith previously admitted under oath that he "do[es] not claim that Yale billed for these studies," is not properly considered on a motion to dismiss. See Reply at 9; Friedl, 210 F.3d at 83.

responsible and does not bill directly.  Relator does not specifically allege, with respect to these claims, that YNHH knowingly participated in these practices or knowingly cooperated with Yale.  See Riley, 355 F.3d at 378.  Although the Court is required to construe the allegations in the light most favorable to the plaintiff, the Court should not go beyond the allegations to make unwarranted assumptions and conclusions.  Therefore, Relator's claim against YNHH detailed in paragraphs 14, 31, 83 and 84 of the Second Amended Complaint fails to state a claim and should be **dismissed**.

B.    Allegations Regarding the "Clean Up Project"

Relator alleges that Defendant improperly engaged in a "clean up project," pursuant to which attending faculty radiologists were asked to sign off on or finalize reports with which they had not been involved and which had not previously been interpreted or finalized for use in connection with patients' diagnosis and treatment.  2d Am. Compl. ¶¶ 58-65, 80-82.  Defendant argues that these allegations are insufficient because Relator "does not claim that the voluntary faculty members failed to interpret the report and associated images contemporaneously with providing care for the patient."  Mem. Supp. at 35.  Relator does allege, however, that physicians were being "coerced" to sign off on reports on patients with whom they had never been involved or had any association and to finalize reports of Radiology Studies that were a couple of years old and that the physicians had never been involved with.  2d Am. Compl. ¶¶ 62-63, 65, 80-81.

Defendant also argues that Relator fails to allege (1) "that Medicare was asked to pay twice for the same service;" and (2) "that Medicare was asked to pay a cent more than if the voluntary faculty members had themselves finalized the reports."  Id. (citing 2d Am. Compl. ¶¶ 58-65, 80-82); Reply at 20-21.  This Court has already established that the FCA does not require

58

a showing that the United States have suffered damages as a result or fraudulent claim.  See Rex Trailer, 350 U.S. at 152.  The relevant issue here is not whether the government has paid twice or paid more than necessary, but whether there was a false or fraudulent certification.

_____CMS Form 1500 includes an express certification that the physician's services were "medically indicated and necessary for the health of the patient and were personally furnished by [the signing physician] or were furnished incident to [the signing physician's] professional service by [his or her] employee under [his or her] immediate personal supervision."  Defendant then tries to go on to argue, however, that "[a]s long as the provider does not bill twice for the same service, Medicare does not question whether the subsequent review and finalization by another physician was medically necessary."  Id. at 21.  This statement is not completely accurate, as Medicare may not question whether a service was timely provided in such a case, but all services provided and billed for still must be medically necessary.  Relator's allegation goes beyond a claim that services were not timely provided to a claim that the signing physician did not actually provide the services and/or that the services were not medically necessary.  The Regulations set the requisite standard for Teaching Physician involvement.  See 42 C.F.R. §§ 415.170 (providing that the services must be "personally furnished by a physician who is not a resident" or "furnished by a resident in the presence of a teaching physician"); 415.172 ("If a resident participates in a service furnished in a teaching setting, physician fee schedule payment is made only if a teaching physician is present during the key portion of any service or procedure for which payment is sought."); 415.180 ("Physician fee schedule payment is made for the interpretation of diagnostic radiology and other diagnostic tests if the interpretation is performed or reviewed by a physician other than a resident.").  If Relator's allegations are true and

59

Defendant billed for studies with which the signing physician was not involved (and therefore, for which the signing physician could not assess medical necessity), this would state a claim under the FCA and thus, these allegations should not be dismissed on that basis.

C.    Allegations Regarding the Use of "Autosign"

Defendant also argues that Relator's claims regarding the use of the "Autosign" function fail to state a claim.  Mem. Supp. at 35 (citing 2d Am. Compl. ¶¶ 20, 57-61, 66-74, 76-78).  Defendant asserts that Relator has "selectively omitted" certain quotes from the Tencza emails which tend to undermine his claims.[21]  Id.  For example, Defendant cites Ms. Tencza's explicit statement that "[i]t is VERY important that we do not bill for the study."  See id.; see also Opp'n Exh. C.  Similarly, Defendant quotes Ms. Tencza's statements in a subsequent email—also quoted by Relator—in which she reiterates that "no bill will go out for 'Auto Sign.' That is the purpose of creating Autosign."  See Mem. Supp. at 35; see also Opp'n Exh. C.  Based on these conflicting statements, Defendant asserts that Relator cannot state a claim based on the use of Autosign.[22]  Mem. Supp. at 36.  There is some evidence, however, suggesting that Defendant may have billed for studies finalized by Autosign, including Relator's allegation that Autosign was used to move studies from "C" status, indicating that they have not been interpreted, to "F" status, indicating that they have been interpreted and finalized, 2d Am. Compl. ¶ 20, the fact that

_____

[21] Normally, outside evidence cannot be considered on a motion to dismiss.  Friedl, 210 F.3d at 83.  It is permissible, however, to consider facts stated in documents that are attached to the complaint as exhibits or that have been incorporated into the complaint by reference.  See Stuto, 164 F.3d at 826 n.1.  Although the Tencza email was not attached to the Second Amended Complaint as an exhibit, Relator has incorporated it by reference by quoting and discussing the email in the Second Amended Complaint.  See 2d Am. Compl. ¶¶ 58, 60, 66; emails attached to Opp'n as Exh. C.

[22] In its Reply, Defendant also uses Relator's "prior judicial admission that he personally has no idea whether Yale submitted claims for such reports" to argue that the claims relating to Autosign should be dismissed.  As outside evidence should not be considered on a motion to dismiss, however, this argument will not be considered at this stage.  Friedl, 210 F.3d at 83.

Yale automatically submits claims for reimbursement for radiology tests and procedures once they are in "F" status, Opp'n Exh. A ¶¶ 11, and Ms. Tencza's admission that "[t]his procedure cannot prevent an attending from finalizing a report without viewing the images" and thus, the "procedure cannot correct an issue [the] billing [department] is now aware of." Tencza email, Opp'n Exh. C.

Relator's substantiation for these claims is based entirely on a series of inferences—i.e., evidence of certain studies' movement from C to F status, automatic billing for studies in F status and the fact that Tencza's procedure cannot prevent fraudulent billing—and should be regarded as extremely subject to question. The Tencza memos and statements cited by Defendant raise an inference to the contrary, i.e., that no fraudulent billing occurred, and thus the present record leaves Relator's justification for the claim extremely in doubt. Viewing the facts in the light most favorable to Relator, it is questionable whether a reasonable jury could legitimately find that Defendant violated the FCA. The matter need not be decided at this time, however, in view of the otherwise dispositive resolution of the matter.

      iii.    Allegations that Defendants Billed for Medically Unnecessary Studies

Relator claims that Defendants, either by performing reads of "old" studies or by routinely ordering panels of tests without regard to medical necessity, improperly billed Medicare for the Professional Component of radiology studies that were not medically necessary. 2d Am. Compl. ¶¶ 55-56, 89-92. It is important to note that term "medically necessary," as used on the CMS-1500 form, refers to the level rather than the quality of the services provided. See Mikes, 274 F.3d at 698 (holding that the term "does not impart a qualitative element mandating a particular

standard of medical care). Thus, "medically necessary" applies to "ex ante coverage decisions,"
not to "ex post critiques of how providers executed a procedure." Id. Contrary to Defendant's
arguments, Relator does not challenge the quality of the radiology studies provided but only the
decision to order certain procedures for patients, an allegation that the Second Circuit has found
to be a viable cause of action. Id. at 699.

    Although claims for medically unnecessary treatment are actionable under the FCA,
Relator's allegations regarding "old" studies (¶¶ 55-56) only allege improper billing of the
Professional Component and therefore do not directly implicate YNHH. See 2d Am. Compl. ¶
56 ("Yale could and would bill for the Professional Component") (emphasis added). Relator
does, however, allege that "YNHH has employed a full-time staff person to find lost Radiology
Studies" in order to bill for "old" studies and that "[i]t is a long-standing practice in the YNHH
Emergency Department that certain panels of diagnostic tests, including Radiology Studies, are
routinely ordered as a matter of practice, regardless of whether the tests are medically indicated,
and prior to patients being examined or evaluated by appropriate medical providers." Id. ¶¶ 55,
89. Moreover, Relator alleges that both Defendants "knowingly submitted claims for payment
from the Medicare and Medicaid Programs for both the Technical and Professional Components
of those Services." Id. ¶ 92. These statements, in conjunction with the earlier descriptions of
Yale and YNHH's closely interconnected relationship, sufficiently allege cooperation and
"knowing assistance" so as to implicate YNHH.

    The allegations in paragraphs 89-92 of the Second Amended Complaint assert that
Defendants improperly billed for both the Technical and Professional Components of radiology
services. Defendant asserts that the allegations are "so vague and conclusory that Defendants

cannot respond," arguing that they should be dismissed pursuant to Rule 9(b) as well as Rule

12(b)(6). Mem. Supp. at 36. Defendant also argues that Relator "cannot use the implied false

certification theory to second guess medical judgment." Reply at 21-22 (citing Mikes, 274 F.3d at

702). Mikes held that although "a provider's choice of procedures must be 'reasonable and

necessary,'" federal courts are not obligated to "step outside their primary area of competence

and apply a qualitative standard measuring the efficacy of those procedures," as "[t]he quality of

care standard . . . is best enforced by those professionals most versed in the nuances of providing

adequate health care." 274 F.3d at 702.

    Although Relator fails to respond to Defendant's assertions on this issue, the Medicare

regulations and statutes clearly require physicians to certify that the services they perform are

reasonable and medically necessary for diagnosis or treatment. See 42 U.S.C. § 1395y(a)(1)(A)

(excluding from coverage items and services that "are not reasonable and necessary for the

diagnosis or treatment of illness or injury or to improve the functioning of a malformed body

member"); 42 C.F.R. § 411.15(k); see also Mikes, 274 F.3d at 702 (holding that "in submitting a

Medicare reimbursement form, a defendant implicitly certifies compliance with §

1395y(a)(1)(A)"). As discussed above, the term "medically necessary," as used on the form,

refers to the level rather than the quality of the services provided; therefore, a challenge to the

decision to order certain procedures for patients—rather than to the quality of the studies

themselves—is a viable cause of action See Mikes, 274 F.3d at 698-99. Accordingly, Relator's

allegations that services not "medically indicated and necessary for the health of the patient"

were provided contrary to the certification would constitute an FCA violation if true and should

not be dismissed for failure to state a claim. See id. ¶¶ 55-56, 89-92.

B.      False Claims Act: Section 3730(h) Retaliation Claims

Relator alleges that "[b]ecause of his investigation and reporting of the frauds alleged [in the Second Amended Complaint], [he] was harassed and was discriminated against in the terms and conditions of his employment, by and through the acts of the Defendants' officers, agents, and employees, including Dean [David] Kessler[, M.D.,] Bruce McClennan, M.D., James Brink, M.D., [and] Howard Forman, M.D." 2d Am. Compl. ¶ 99.  His retaliation claim includes allegations of harassment, threats and intimidation, salary cuts, decreased responsibility, lost administrative positions and titles, forced resignation from Yale and YNHH and being forced to leave the state of Connecticut.  Id.  The FCA prohibits employers from retaliating against relators, providing that:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole. Such relief shall include reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees. An employee may bring an action in the appropriate district court of the United States for the relief provided in this subsection.

31 U.S.C. § 3730(h).  This provision was enacted in an effort to protect employees who assist in the discovery and prosecution of fraud and to encourage persons with knowledge of such fraud to come forward, because "few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or other form of retaliation."  S. REP. NO. 345, 99th Cong., 2d Sess. 35 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5300.

Defendant contends that Relator's Section 3730(h) claim for retaliation should be

dismissed as untimely, arguing that the claim is governed by the 90-day limitations period of Connecticut's whistle-blower statute and thus is time-barred. Mem. Supp. at 36-40. Defendant also argues that the retaliation claim should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Id. at 41-45.

1.     Whether Relator's Retaliation Claim is Time-Barred

To determine the appropriate statute of limitations for a cause of action created by a statute, courts first ask whether a limitations period is expressly supplied by the statute. If one is not supplied, then the most closely analogous state limitations period governs. See North Star Steel Co. v. Thomas, 515 U.S. 29, 33-34 (1995); Reed v. United Transp. Union, 488 U.S. 319, 323 (1989). The Supreme Court recently concluded that Section 3730(h) is not governed by a federal limitations period; instead, courts must apply the most closely analogous state limitations period. Graham Cty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson, ___ U.S. ___, 125 S. Ct. 2444, 2453 (2005) (resolving a disagreement among the Circuits with its holding that Section 3731(b)(1)'s six-year statute of limitations does not apply to Section 3730(h) retaliation actions). The Court is left to determine, therefore, which state limitations period applies.

In making this determination, we must ask (1) which state law cause of action is most closely analogous to Section 3730(h) and (2) whether the limitations period applicable to that cause of action comports with the policies underlying the federal law. See North Star Steel, 515 U.S. at 34 (recognizing a "narrow exception" to the general rule when the applicable state law limitations period would "frustrate or interfere with the implementation of national policies" or would "be at odds with the purpose or operation of federal substantive law") (internal citations omitted). In cases where the "narrow exception" applies, courts generally look to a limitations

period provided by an analogous federal law that is "more in harmony with the objectives of the immediate cause of action." Id. (internal citations omitted).

Defendant argues that the "most closely analogous" state statute is Section 31-31m of the Connecticut General Statutes, which provides:

> No employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports . . . a violation or a suspected violation of any state or federal law or regulation . . . to a public body . . . . No municipal employer shall discharge, discipline or otherwise penalize any employee because the employee . . . reports . . . to a public body concerning the unethical practices, mismanagement or abuse of authority by such employer. The provisions of this subsection shall not be applicable when the employee knows that such report is false.

Conn. Gen. Stat. § 31-51m(b). This statute, also known as Connecticut's "whistleblower" statute, provides for a ninety-day limitations period:

> Any employee who is discharged, disciplined or otherwise penalized by his employer in violation of the provisions of subsection (b) may, after exhausting all available administrative remedies, bring a civil action, . . . *within ninety days of such violation* . . . .

Conn. Gen. Stat. § 31-51m(c) (emphasis added). Since Smith resigned from Yale on June 30, 1999 and his Original Complaint in this action was not filed until July 19, 2000, it is clear that he failed to assert his claim for some, if not all, of the allegedly retaliatory acts within the ninety-day period.

Relator concedes that Section 31-51(b) provides for a cause of action similar to the retaliation claim under the FCA, however, Relator argues that it is not the "most closely analogous" cause of action available under Connecticut law. Opp'n at 48. Relator contends that Section 31-51m and Section 3730(h) are distinguishable, in that the scope of protected conduct for which Section 31-51m provides protection is much narrower, thus protecting employees from "far fewer activities" than does Section 3730(h). Opp'n at 48-49. Specifically, Relator points to

language in Section 31-51m which only protects employees who *report* violations or suspected

violations of law, whereas Section 3730(h) protects all employees who engage in lawful acts "in

furtherance of an action under this section, *including investigation for, initiation of, testimony*

*for, or assistance in* an action . . . ." See Conn. Gen. Stat. § 31-51m; 31 U.S.C. § 3730(h).

While the conduct protected under Section 31-51m would be protected under Section 3730(h), a

great deal of conduct protected under Section 3730(h) does not fall under the limited protection

of Section 31-51m.  In this case, for example, Relator claims not only that Defendant retaliated

on the basis of his reporting of alleged violations of the FCA but also for his investigation of

Defendant's allegedly fraudulent conduct.  See 2d Am. Compl. ¶ 99.  Although Defendant claims

that "[t]he analogy between § 3730(h) and § 31-51m could not be more straightforward," Reply

at 22, this Court does not find it to be the *most* closely analogous state cause of action.

Relator maintains that the three-year statute of limitations provided for under Connecticut

General Statutes Section 31-51q or under the common law wrongful discharge claim is the most

closely analogous limitations period under state law.  Opp'n at 50-52.  Connecticut General

Statutes Section 31-51q protects employees who exercise "rights guaranteed by the first

amendment to the United States Constitution or section 3, 4, or 14 of article first of the

Constitution of the State."  Conn. Gen. Stat. § 31-51q.  Section 31-51q is concerned with broadly

protecting constitutional rights, whereas Section 3730(h) is concerned with protecting employees

who, *inter alia*, report and investigate fraudulent activities.  S. REP. NO. 99-345, at 34 (1986), *as*

*reprinted in* 1986 U.S.C.C.A.N. 5266, 5299.  The speech protected under Section 31-51q need

only be on a matter of "public concern;" there is no requirement that it be connected to an

investigation of an employer's allegedly illegal activities.  See Cotto v. United Techs. Corp., 48

Conn. App. 618, 630, 711 A.2d 1180 (Conn. App. Ct. 1998).  Although it is clear that speech about unlawful conduct or fraudulent and corrupt practices is a matter of public concern, this Court also does not find this statute to be the "most closely analogous" state cause of action.

Several of the courts to consider the issue have held that the state law cause of action most closely analogous to that provided for under Section 3730(h) was the state's common law tort claim for wrongful discharge.  See, e.g., United States ex rel. Lujan v. Hughes Aircraft Co., 162 F.3d 1027, 1035 (9th Cir. 1998) (holding that "the most analogous statute of limitations under California law is the one-year statute applicable to wrongful termination in violation of California public policy"); United States ex rel. Ackley v. Int'l Business Machines Corp., 110 F. Supp. 2d 395, 404-05 (D. Md. 2000) (applying the general three-year limitations period applicable to torts in Maryland and noting that "[c]ourts that have applied state limitations statutes to Section 3730(h) claims have chosen wrongful discharge from employment as the proper analogue to retaliation"); United States ex rel. Truong v. Northrop Corp., No. CV 88-967, 1991 WL 496831, *3  (C.D. Cal. 1991) ("The state-law cause of action most closely analogous to an employee's private claim for retaliation against an employer is one for wrongful termination in violation of public policy."); Giuffre v. Delta Air Lines, Inc., 746 F. Supp. 238, 241 (D. Mass. 1990) (applying the three-years limitations period for torts in Massachusetts and noting that "[t]he plaintiff's claim for retaliatory discharge [under the ERISA statute] is most analogous to a tort action.").  Similarly, the Supreme Court noted, in remanding Wilson for determination of which state statute is most closely analogous to Section 3730(h) actions, that the dissenting judge in the appellate court had concluded that "the most closely analogous state statute of limitations is North Carolina's three-year statute of limitations governing wrongful discharge claims."

Wilson, ___ U.S. ___, 125 S. Ct. at 2453.  Although the Supreme Court did not decide which state limitations period applied, its opinion implied that North Carolina's limitations period for wrongful discharge claims would be the appropriate choice, and consequently, was the limitations period applied by the Fourth Circuit on remand.  See United States ex rel. Wilson v. Graham Cty. Soil & Water Conserv. Dist., 424 F.3d 437 (4th Cir. 2005).

Connecticut also recognizes a common law tort claim for wrongful discharge "where the discharge contravenes a clear mandate of public policy."  See Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 474-77, 427 A.2d 385, 386 (1980) (articulating the principle that "public policy imposes some limits on [an employer's] unbridled discretion to terminate the employment of someone hired at will").  Although it is not always clear what constitutes a "clear mandate of public policy," the Connecticut Supreme Court has concluded that employers should not ignore the public policy articulated by relevant state statutes.  Sheets, 179 Conn. at 480, 427 A.2d at 389.  Similarly, federal statutes prohibiting employers from discharging employees for the exercise of specific rights articulate a "clear mandate of public policy."  Jaskilka v. Carpenter Tech. Corp., 757 F. Supp. 175, 178 (D. Conn. 1991) (holding that "[a] complaint alleging discharge for the purpose of depriving an employee of retirement benefits under ERISA bears a close resemblance to a cause of action for wrongful discharge in violation of a clear mandate of public policy under Connecticut law" and applying Connecticut's three-year statute of limitations for common law wrongful discharge actions).  Similarly, the Connecticut courts have held that retaliating against an employee who complains about fraudulent business practices or who reports a scheme to defraud the federal government violates the State's public policy and thus gives rise to a common law wrongful discharge claim.  See Smith v. Yardney Elec. Corp., 4

Conn. App. 69, 74-75, 492 A.2d 512 (1985); Faulkner v. United Tech. Corp., 240 Conn. 576, 579-89, 693 A.2d 293 (1997).  In accordance with the above authorities, this Court holds that the most closely analogous state statute of limitations is Connecticut's three-year statute of limitations governing wrongful discharge tort claims.  See Jaskilka, 757 F. Supp. at 177 ("Because there is no explicit statutory exception for a limitation on claims for wrongful discharge, the relevant statute of limitations for wrongful discharge is the general [three-year] statute for actions founded upon a tort. ").

Turning to the second question in the analysis, the Court finds Connecticut's three-year limitations period to be consistent with Section 3730(h) and the general policies underlying it. See Ackley, 110 F. Supp. 2d at 405.  As the Ackley court noted, there is nothing in the text or legislative history of Section 3730(h) to indicate that a three-year statute of limitations would conflict with its underlying policies:

> The legislative history of Section 3730(h) establishes a two-fold policy: (1) protecting whistle-blowers against discrimination by their employers and (2) promoting anti-fraud enforcement efforts.  Nothing in the legislative history suggests that Congress intended these claims to proceed on an especially fast track, which it might have easily indicated in the statute had it cared to. Other federal legislation, protective of personal rights but nonspecific as to the limitations period and embracing various state laws, such as the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, contemplate actions being brought with various state limitations periods up to three years. When shorter periods have been intended, Congress has not hesitated to say so. Nor is the balance that three years strikes between the time for an employee to present a claim and the right of an employer to be free from stale claims in any way inappropriate. The search for truth if the three-year period is acknowledged will not "be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise."

Id.  Similarly, this Court finds that application of Connecticut's three-year limitations period to Relator's Section 3730(h) claims is in harmony with the federal statute and the policies

underlying it.

Relator alleges that he was retaliated against for investigating and reporting the alleged fraudulent activities to Yale University and Hospital Administrators during 1998 and 1999, until he was forced to resign from Yale.  Opp'n at 51; 2d Am. Compl. ¶¶ 4, 7, 99.  Relator filed his Original Complaint in this action on July 19, 2000 and thus all of the alleged retaliatory acts fall well within the three-year statute of limitations period.  Accordingly, Relator's Section 3730(h) retaliation claims are not barred by the applicable statute of limitations.

> 2.   Whether the Retaliation Claims Should be Dismissed for Failure to State a Claim Pursuant to Rule 12(b)(6)

In order to state a claim for retaliation under Section 3730(h) of the FCA, a relator must show that (1) the employee engaged in conduct protected under the FCA; (2) the employer knew that the employee was engaged in such conduct; and (3) the employer discharged, discriminated against or otherwise retaliated against the employee because of the protected conduct.  Karvelas, 360 F.3d at 235; Yesudian v. Howard Univ., 153 F.3d 731, 736 (D.C. Cir. 1998).  Defendant argues that Relator "has failed to allege facts sufficient to establish any of the required elements of a Section 3730(h) claim for retaliation, and his claim should be dismissed."  Mem. Supp. at 41.

> a.   Whether Relator Engaged in Protected Conduct

To satisfy the first prong in the analysis, Relator must demonstrate that he engaged in activity protected by the FCA.  31 U.S.C. § 3730(h).  He need not actually have filed a FCA lawsuit or have developed a winning claim to receive Section 3730(h)'s protection, but need only have engaged in conduct "in furtherance of" a FCA action.  Karvelas, 360 F.3d at 236; Mikes v.

71

Straus, 889 F. Supp. 746, 752 (S.D.N.Y. 1995); 31 U.S.C. § 3730(h). The determination of

whether conduct is "in furtherance" of a FCA action is guided by the legislative history, which

states that "[p]rotected activity should . . . be interpreted broadly." S. REP. NO. 99-345, at 34, *as*

*reprinted in* U.S.C.C.A.N. at 5299. As such, courts have generally concluded that "conduct in

furtherance of an action under [the FCA]" will be interpreted as conduct that was calculated to,

or reasonably could lead to a viable FCA action. See, e.g., Karvelas, 360 F.3d at 236; Yesudian,

153 F.3d at 740; Faldetta v. Lockheed Martin Corp., 2000 U.S. Dist. LEXIS 16216, *40

(S.D.N.Y. Nov. 9, 2000). Generally, when a potential plaintiff engages in an investigation in

which it would be reasonable to conclude that there is a "distinct possibility" that he or she would

find evidence of a FCA violation, courts are inclined to find that the first prong of the analysis

has been satisfied. See Yesudian, 153 F.3d at 740. The fact that, in the end, a potential plaintiff

may fail to find such evidence does not change the analysis of his or her retaliation claim, nor

does the fact that he or she may not "know" that the investigation could lead to a suit under the

FCA. Id. at 740-41 ("specific awareness" of the FCA is not required); Moor-Jankowski v. Bd. of

Trs. of New York Univ., 96-cv-5997, 1998 WL 474084, at *10 (S.D.N.Y. Aug. 10, 1998)

("[Section] 3730(h) protection is available not only where a false claims action is actually filed,

but also where the filing of such an action, by either the employee or the government, was 'a

distinct possibility' at the time the assistance was rendered.") (internal citations omitted). "The

protected conduct itself is simply 'acts done . . . in furtherance of an action under this section,'

and even an investigation conducted without contemplation of—or knowledge of the legal

possibility of—a False Claims Act suit can end up being 'in furtherance' of such an action."

Yesudian, 153 F.3d at 741. Although "protected conduct" should be interpreted broadly, a

plaintiff must at least demonstrate that his or her investigation, inquiries and complaints were conducted with the purpose of exposing a "fraud upon the government." Moor-Jankowski, 1998 WL 474084 at *10; see also Hopper, 91 F.3d at 1269 (plaintiff must do more than "merely attempt[] to get the [defendant] to comply with Federal and State regulations;" he or she must be "trying to recover money for the government" and "investigating fraud"). Whether acts are found to have been in furtherance of a FCA action are more appropriately assessed in terms of their function or effect and not on the intent of the actor, at the time, that he or she was doing so as a foundation or basis for an FCA action.

Courts have held that an investigation into fraudulent billing practices constitutes protected conduct under Section 3730(h). See Yesudian, 153 F.3d at 740 (holding that "investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government" constitute "protected conduct"). Similarly, internal reporting of false claims can also constitute protected activity. See Yesudian, 153 F.3d at 741 n.9 (citing McKenzie, 123 F.3d at 944 (6th Cir.); United States ex rel. Ramseyer v. Century Healthcare Corp., 90 F.3d at 1523 (10th Cir. 1996); Robertson v. Bell Helicopter Textron, Inc., 32 F.3d 948, 951 (5th Cir. 1994); Mikes, 889 F. Supp. at 752 (S.D.N.Y. 1995)). At several points in his Second Amended Complaint, Relator claims that he investigated and reported to Yale and YNHH problems regarding improper billing and "fraud":

> 67. Relator Smith reported and complained about the deficiencies in patient care, improper billing, falsification of records and deficiencies in the GME Residency Program to Defendants' representatives . . . along with numerous other representatives of Yale and YNHH . . . and the Defendants failed to take any corrective action in response to those reports and complaints.

> 68. Concerned about what he perceived to be substandard care which was harming patients and putting patients at risk, the illegal alteration of patient records,

misrepresentation of information on patient reports, and fraudulent billing practices, Relator Smith reviewed a series of radiology reports in the DecRad system. The review encompassed those reports which Dr. Burrell had complained about to Dr. Forman and Dr. McClennan, those reports finalized by "Autosign" for the period from January 1, 1998 to May 2000, and other reports finalized "after-the-fact" which had never been interpreted or finalized for use in connection with the patient's diagnosis and treatment.

73.  Relator Smith's investigation has revealed that at least 81 patient radiological reports initially interpreted by Residents and Fellows have been altered to reflect the names of Qualified Radiologists as the Responsible Radiologists even though those so named never supervised the Residents and Fellows when the preliminary interpretations were performed and they never reviewed or interpreted the Radiology Studies prior to finalizing the reports.

77.  On information and belief, Defendants Yale and YNHH billed Medicare and Medicaid for the Professional Component of these Radiological Studies never reviewed by a Qualified Radiologist, in violation of 31 U.S.C. § 3729(a)(1-2).

78.  Upon information and belief, Defendants utilized the "Autosign" process and the other afore-described non-Qualified Radiologist Radiology Study report finalization methods to avoid and conceal the obligations of said Defendants to repay the United States monies paid to Yale and YNHH for both the Professional and Technical Components of these Radiological Services, in violation of 31 U.S.C. § 3729(a)(7) and 18 U.S.C. § 1001.

79.  On July 15, 1999, Dr. Rosenfield met with President Levin, to discuss in detail the Medicare fraud committed by Dr. McClennan and colleagues . . . .

80.  On July 15, 1999, Dr. Burrell met with President Levin on the issues raised in Dr. Burrell's letter dated July 3, 1999 (as referenced above) e.g.: . . . d. Extensive issues related to fraud . . .

81.  On July 21, 1999, Drs. Burrell, Rosenfield, and [Relator] Smith met with Yale's General Counsel, Dorothy Robinson, Esq. in her office: . . . e. Dr. Burrell informed General Counsel Robinson of at least five serious improprieties regarding inappropriate signing of reports. . . .

Although these allegations are much too vague to meet Rule 9(b) pleading standards,

Relator does properly allege that he was investigating and reporting defendant's alleged

fraudulent billing practices rather than just its noncompliance with federal and state regulations.[23]

As Relator properly alleges that his investigations and reports concerned activities that allegedly

involved fraud on the government, he satisfies the first prong of the Section 3730(h) inquiry.

   b. Whether Defendant Knew that Relator was Engaged in Protected

    Conduct

   To satisfy the second element of a FCA retaliation claim, Relator must show that "the

employer had knowledge the employee engaged in protected activity." Karvelas, 360 F.3d at 237

(quoting S. REP. NO. 99-345, *as reprinted in* 1986 U.S.C.C.A.N. at 5300). Although the Second

Circuit has yet to interpret this aspect of Section 3730(h), precedent from other Circuits provides

guidance. Generally, to establish employer knowledge, "an employee must supply sufficient

facts from which a reasonable jury could conclude that the employee was discharged because of

activities which gave the employer reason to believe that the employee was contemplating a qui

tam action against it." Mikes, 889 F. Supp. at 753 (S.D.N.Y.).

   Since a plaintiff is not required to "know" that his or her investigation may lead to a FCA

action, similarly, there can be and is no requirement that the defendant know that the employee

has filed or is contemplating such an action. Yesudian, 153 F.3d at 742; Karvelas, 360 F.3d at

238 (holding that the defendant need not even "be aware of the existence of the FCA"). All that

Defendant must have known is that Relator was engaged in protected activity—that is,

investigation or other activity concerning potentially false or fraudulent claims that reasonably

could lead to a FCA case. Yesudian, 153 F.3d at 742-43 (noting that "requiring a plaintiff to

---

[23] As courts are required to make all reasonable inferences in favor of the plaintiff on a Rule 12(b)(6) motion to dismiss, we assume that Relator's references to investigation and reporting of "fraud" is referring to defendant's allegedly fraudulent billing practices and not just to potential violations of federal and state laws. See Karvelas, 360 F.3d at 238 n.24.

advise his employer that he has filed or is contemplating filing a qui tam complaint would

contravene the qui tam section of the Act itself" and "frustrate . . . congressional concern[s]").

To require an express or even an implied threat of a qui tam action would impose an unrealistic

requirement on employees—insisting that employees inform their employers of their intention to

sue them on behalf of a "defrauded government" would eviscerate the FCA's incentives to

investigate fraudulent activities. Mikes, 889 F. Supp. at 753.[24]

Internal reporting has been held to constitute protected activity, but if an employee wants

to impute knowledge to the employer for purposes of the second prong of the analysis, he must

specifically tell the employer that he is concerned about possible fraud. Yesudian, 153 F.3d at

743-44 ("Merely grumbling to the employer about job dissatisfaction or regulatory violations

does not satisfy the requirement—just as it does not constitute protected activity in the first

place."). In two similar cases, Hopper and Robertson, the courts found that the second prong was

not satisfied because even though the plaintiffs had done some investigations and made some

internal complaints, they made no allegations of actual fraud. See United States ex rel. Hopper v.

Anton, 91 F.3d 1261, 1269 (9th Cir. 1996) (holding that since plaintiff was "not trying to recover

money for the government" and "was not investigating fraud," her "investigatory activity did not

have any nexus to the FCA" and thus her claim failed); Robertson v. Bell Helicopter Textron,

Inc., 32 F.3d 948, 949-50 (5th Cir. 1994) (affirming the district court's grant of judgment as a

---

[24] At least one court within this Circuit has held, however, that a plaintiff must inform the employer that he or she believes that the suspected fraudulent activities are in violation of United States law. United States ex rel. Vallejo v. Investronica, Inc., 2 F. Supp. 2d 330, 339 (W.D.N.Y. 1998) (finding that the plaintiff had not stated a claim for retaliation, in part, because he did "not allege that he told the defendants that he was going to report such impropriety to officials of the Government or that he was contemplating his own qui tam action"). At some point such a requirement may be proper, but an FCA action would not necessarily be the intent of belief of Relator at the inception of his or her investigation or in its early stages.

matter of law and holding that "there was insufficient evidence to support the jury's findings that [the defendant] knew of [the plaintiff's] alleged investigations in furtherance of a qui tam action").

The <u>Robertson</u> plaintiff had an additional weakness as well—since the plaintiff's job in that case involved substantiating charges and because he never characterized his concerns as involving investigations into potentially fraudulent activity, his employer had no way of knowing that his concerns were any different than those typically raised as part of his job. 32 F.3d at 952. Generally, courts have held that if making complaints is part of an employee's job, he or she must do "something more" to "make clear [his or her] intentions of bringing or assisting in [a FCA] action in order to overcome the presumption that [he or she was] merely acting in accordance with [his or her] employment obligations." <u>Ramseyer</u>, 90 F.3d at 1523 n.7; <u>see also</u> <u>Faldetta v. Lockheed Martin Corp.</u>, 2000 U.S. Dist. LEXIS 16216, *41 (S.D.N.Y. Nov. 9, 2000) (finding that "[t]he evidence in the record does not support a finding that [plaintiff] actually did anything beyond what was required of his position").

Here, Relator suffers from neither of the above weaknesses. Relator properly alleges that he reported allegations of Medicare fraud and the submission of false claims to the governmetn to Hospital and University Administrators. <u>See</u> 2d Am. Compl. ¶¶ 79-81. Although the pleadings are vague, they do state that Drs. Rosenfield, Burrell and Relator reported "Medicare frauds committed by Dr. McClennan and colleagues," <u>id</u>. ¶ 79, "[e]xtensive issues related to fraud," <u>id</u>. ¶ 80, and informed Yale's General Counsel that certain doctors "are committing fraud

according to Medicare regulations."[25] Id. ¶ 81.  These pleadings, although vague, are sufficient

for a  "reasonable jury to conclude that defendant[] had reason to believe that [relator] was

investigating their alleged fraudulent billing practices in contemplation of a possible qui tam

action." See Mikes, 889 F. Supp. at 753-54.

c.     Whether Defendant Retaliated Because of the Protected Conduct

In order to state a claim for retaliation, Relator must also allege that he was retaliated

against because of his protected conduct.  Karvelas, 360 F.3d at 239 (citing S. REP. NO. 99-345,

at 35, as reprinted in 1986 U.S.C.C.A.N. at 5300).  To satisfy this third element, Relator must do

more than generally state the required elements of the claim—he must also allege facts sufficient

to support his allegations.  Id. at 240.  Although detailed pleading of the facts is not required, see

Fed. R. Civ. P. 8(a), a complaint must "allege a factual predicate concrete enough to warrant

further proceedings."  Id. ("Simply parroting the language of a statutory cause of action, without

providing some factual support, is not sufficient to state a claim.") (citations omitted); see also

Vallejo, 2 F. Supp. 2d at 339 (finding that plaintiff failed to state a claim for retaliation, in part,

because he did "not allege[] any facts to support his conclusion that his harassment and

termination was, in fact, retaliation for protected activity"); Faldetta, 2000 U.S. Dist. LEXIS

16216 at *47 (granting the defendant's motion for summary judgment in part, because there was

"insufficient evidence in the record from which a reasonable jury could establish a nexus

between [plaintiff's] purportedly protected activities and his discharge).

Relator alleges that "[b]ecause of his investigation and reporting of the frauds alleged

---

[25] Although Relator's allegations primarily concern information given to Yale's administrators, some of Defendant YNHH's administrators are named as well.  The court will assume, for purposes of the Rule 12(b)(6) motion to dismiss, that because of the close working relationship between the two and the fact that many of the persons named held positions and worked with both entities, YNHH was informed of Relator's reports and concerns.

herein, Relator Smith was harassed and was discriminated against in the terms and conditions of his employment, by and through the acts of the Defendant's officers, agents, and employees, including Dean Kessler, Bruce McClennan, M.D., James Brink, M.D., Howard Forman, M.D. . . ." 2d Am. Compl. ¶ 99. Relator then lists the specific ways in which he alleges Defendant retaliated against him, including allegations that "he was repeatedly harassed, threatened and subject to intimidation by Bruce McClennan, M.D. and others;" "his salary was cut;" "he was stripped of administrative positions and titles . . . ;" "he was forced to resign from Yale and YNHH;" "he was interfered with in his attempts to obtain employment elsewhere;" and "he was forced to leave the state of Connecticut which had been his home for 19 years." Id.

Relator's conclusory allegations fail to state a claim for retaliation. "Nowhere in his complaint does [Relator] allege a factual predicate concrete enough to support his conclusory statement that he was retaliated against because of conduct protected under the FCA."[26] Karvelas, 360 F.3d at 240. Although he makes strong accusations, Relator has not alleged facts sufficient to support a conclusion that the alleged harassment and "forced" resignation did, in fact, constitute retaliation for his protected activity and therefore, Relator has failed to state a claim for retaliation under Section 3730(h). Relator's allegations relate adverse employment consequences, however, there are no facts which can be reasonably found to raise an inference that his FCA conduct was a precipitating factor in bringing about the adverse consequences. Relator's retaliation claim is hereby **dismissed**. This Court will, however, grant Relator leave to

---

[26] Because Relator resigned and was not terminated by Defendant, this Court need not engage in the burden-shifting analysis employed by other courts. See, e.g., Mikes, 889 F. Supp. at 754 (holding that once plaintiff raises an issue of fact regarding the "actual reason" for his or her termination, the burden shifts to the defendant "to prove affirmatively by a preponderance of the evidence that the same decision would have been made even if plaintiff had not engaged in protected activity").

amend his complaint in this regard should he have a basis to do so, provided that he submit a proposed amended complaint to the Court within thirty days from the date of this Ruling.

> 3.     <u>Whether the Retaliation Claims on behalf of Non-Parties Burrell and</u>
>     <u>Rosenfield should be Dismissed</u>

Defendant argues that Relator's Section 3730(h) claims on behalf of Drs. Rosenfield and Burrell should be dismissed for lack of standing. Mem. Supp. at 44 (citing 2d Am. Compl. ¶¶ 100, 101). Defendant maintains that plaintiffs bringing retaliation claims "may not seek redress for the alleged injury of other persons." <u>Id</u>. at 44-45. Section 3730(h) provides, in relevant part:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). The language of the statute indicates that it is only the employee retaliated against who may seek relief for any harm suffered. The statute does not appear to contemplate employees bringing Section 3730(h) suits on behalf of other employees. In order to bring a suit, "the irreducible constitutional minimum of standing" requires a plaintiff to have suffered a "particularized" injury; that is, one that "affect[s] the plaintiff in a personal and individual way." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61, 561 n.1 (1992). Relator does not challenge Defendant's argument on this issue, and thus this Court will grant Defendant's motion and **dismiss** the retaliation claims asserted on behalf of Drs. Burrell and Rosenfield. 2d Am. Compl. ¶¶ 100-01.

    C.     <u>Defamation Claim</u>

Defendant argues that Relator's defamation claim should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Mem. Supp. at 45. In order to establish a claim for defamation under Connecticut law, a plaintiff must prove that: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." Iosa v. Gentiva Health Services, Inc., 299 F. Supp. 2d 29, 37-38 (D. Conn. 2004); RESTATEMENT (SECOND) OF TORTS § 558. Since Relator does not qualify as a "public figure," Defendant is liable if it (1) "knows that the statement is false and that it defames [Relator];" (2) "acts in reckless disregard of these matters;" or (3) "acts negligently in failing to ascertain them." Id. § 580B.

Relator argues that he properly pled each of the above elements. Specifically, Relator alleges that:

> 105. Various Yale and [YNHH] representatives made false and injurious statements to third parties, including but not limited to employees, agents, and/or representatives of Cornell University Medical College, New York Presbyterian Hospital, Northwestern University and Boston University, as well as colleagues and staff at Yale and YNHH.
> 106. The statements made about Relator Smith were reckless and wanton in that they were false and known to be false at the time they were made by Yale and YNHH's representatives.
> 107. The falsity of the allegations caused Relator Smith to suffer harm to his reputation and professional image with his professional colleagues and in the community, as well as severe mental and emotional distress.

2d Am. Compl. ¶¶ 105-07. Under Rule 8(e)(1), the standards for pleadings are liberal. Fed. R. Civ. P. 8(e)(1). The complaint need only "afford defendant sufficient notice of the communications complained of to enable him to defend himself." Kelly v. Schmidberger, 806 F.2d 44, 46 (2d Cir. 1986) (citations omitted). Defendants argues that Relator's allegations of

defamation fail to state a claim because he fails to plead the specific defamatory statements that were made. Although *in haec verba* or verbatim pleading is not required, see id. (citation omitted), Relator must plead, in order to provide sufficient notice, "what defamatory statements . . . were made concerning the plaintiff, when they were made, [and] to whom they might have been made." Anthony v. Young & Rubicam, 979 F. Supp. 122, 128 (D. Conn. 1997) (quoting Bramesco v. Drug Computer Consultants, 834 F. Supp. 120, 122 (S.D.N.Y. 1993); also citing Bobal v. Rensselaer Polytechnic Inst., 916 F.2d 759, 762 (2d Cir. 1992)).

Relator's vague allegations do not sufficiently plead any defamatory statements. He need not list the alleged defamatory statements verbatim, but Relator must at least plead the content of the alleged communications, when they were made, the context in which they were made, or by and to whom they were made, which he fails to do. Because of the vague and conclusory nature of Relator's defamation allegations, Defendant is unable to assert an informed defense.[27] See Kelly, 806 F.2d at 46. For the reasons stated above, Relator's defamation claim fails to state a cause of action and pursuant to Rule 12(b)(6), is hereby **dismissed**.

## III.  CONCLUSION

For the reasons stated above, Defendant's motion to dismiss [Doc. No. 169] is **granted**. Specifically, this Court finds that Relator's FCA claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, and in the alternative, for failure to meet the particularity requirements of Fed. R. Civ. P. 9(b). This Court also holds that the claims outlined in paragraphs 75, 78, 14, 31, 83 and 84 of the Second Amended Complaint and

---

[27] For example, Defendant argues that because of the lack of specificity in Relator's allegations, they are unable to assert a viable statute of limitations defense. Mem. Supp. at 47.

Relator's retaliation and defamation claims should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim.  Moreover, the Court finds that the retaliation claim asserted by Relator on behalf of non-parties Burrell and Rosenfield should be dismissed for lack of standing.

      SO ORDERED.

                            Dated at New Haven, Connecticut, February  10 , 2006.

                                        /s/
                              Peter C. Dorsey, U.S. District Judge
                              United States District Court